## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| VICKI PETERSON, and PAUL SADEGHI, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs.<br><br>  v.<br><br>3M COMPANY; EIDP, INC.; and THE CHEMOURS COMPANY,<br><br>      Defendants. | No. _____<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................1

II.  JURISDICTION ...............................................................11

III. VENUE .........................................................................12

IV.  PARTIES .......................................................................12

    A.   Plaintiffs ................................................................12

    B.   Defendants...........................................................14

V.   FACTUAL ALLEGATIONS ............................................15

    A.   PFAS products, including those used for stain- and soil-
protection in carpets, are extremely harmful to health and
the environment.....................................................15

    B.   Carpets infused with PFAS are a significant source of
harmful PFAS in indoor environments. ...............18

    C.   PFAS in carpeting is dangerous throughout the life of the
carpet. ..................................................................37

    D.   For decades, Defendants have known that PFAS products
cause severe health and environmental damages...............41

        1.   3M has known for decades of health and
environmental risks from PFAS. ...............41

        2.   Old DuPont has known for decades of PFAS's
health and environmental risks, as has Chemours
after it was spun off...................................51

        3.   Daikin has known for decades about PFAS's
health and environmental risks. ...............60

4.      For decades, Defendants and Daikin have collaborated to suppress information about PFAS risks, deceived consumers and regulators, and failed to act on their knowledge of grave dangers of PFAS products such as PFAS-infused products ............... 62

E.    After stopping sales of C8 PFAS products, the Concealment Enterprise, 3M, Old DuPont, and Daikin started selling C6 PFAS (and Chemours sold C6 PFAS after it was spun off), including to carpet manufacturers, even though they knew C6 PFAS is as dangerous a C8 PFAS or knew they lacked data to sell C6 PFAS products as safer. ............................................................ 71

F.    After selling Stainmaster carpets for almost two decades, Old DuPont sold its Stainmaster business to Invista in 2004, but Old DuPont, Chemours, and Daikin thereafter sold PFAS products to Invista. ......................................... 77

G.    Defendants stopped using PFAS in or around 2020 but continued to lie about the harms caused by those products. ......................................................... 83

H.    New DuPont and Corteva agreed with Chemours to share costs for PFAS liabilities arising out of conduct before July 1, 2015. ............................................. 87

VI.    TOLLING OF THE STATUTE OF LIMITATIONS ................... 89

A.    Discovery Rule Tolling ....................................... 89

B.    Estoppel ...................................................... 90

VII.    CLASS ALLEGATIONS ...................................... 91

VIII.    CLAIMS ................................................... 94

A.    Claim on behalf of each Plaintiff and all Class members. ............... 94

COUNT 1 (against all Defendants)  Violations of Racketeer Influenced and  Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), (d) ........................................... 94

1. The members of the PFAS Concealment Enterprise. ........................................................95

2. The Predicate Acts .................................................98

B. State Law Claims................................................103

1. Claim brought on behalf of all Class members relating to their State-law claims. ...........................103

COUNT 2 Conspiracy.............................................103

2. Claims brought on behalf of Class members who installed their carpeting in Alabama (the "Alabama Class members"). .................................................104

COUNT 3 (against all Defendants)  Alabama Extended Manufacturer's Liability Doctrine (design defect)....................................104

COUNT 4 (against all Defendants)  Alabama Extended Manufacturer's Liability Doctrine (failure to warn) ...................................106

3. Claims brought on behalf of Class members who installed their carpeting in Alaska (the "Alaska Class members"). .................................................108

COUNT 5 (against all Defendants)  Strict Products Liability (design defect) .................................................108

COUNT 6 (against all Defendants)  Strict Products Liability (failure to warn)................................................110

COUNT 7 (against all Defendants)  Nuisance ALASKA STAT. ANN. § 09.45.230 *et seq.* ..................................................112

COUNT 8 (against all Defendants)  Violation of the Alaska Unfair Trade Practices and Consumer Protection Act (ALASKA STAT. ANN. § 45.50.471 *et seq.)* ...........................................113

4. Claims brought on behalf of Class members who installed their carpeting in Arizona (the "Arizona Class members"). .................................................116

COUNT 9 (against all Defendants)  Strict Products Liability (design defect) ........................................................................................116

COUNT 10 (against all Defendants)  Strict Products Liability (failure to warn) ........................................................................................118

COUNT 11 (against all Defendants)  Nuisance......................................................120

COUNT 12 (against all Defendants)  Violation of the Arizona Consumer Fraud Act (ARIZ. REV. STAT. § 44-1521 *et seq.*) .......................121

    5.    Claims brought on behalf of Class members who installed their carpeting in Arkansas ("Arkansas Class members"). ...................................................124

COUNT 13 (against all Defendants)  Strict Products Liability (design defect) ........................................................................................124

COUNT 14 (against all Defendants)  Strict Products Liability (failure to warn) ........................................................................................126

    6.    Claims brought on behalf of Class members who installed their carpeting in California ("California Class members"). ...................................................128

COUNT 15 (against all Defendants)  Strict Products Liability (design defect) ........................................................................................128

COUNT 16 (against all Defendants)  Strict Products Liability (failure to warn) ........................................................................................131

COUNT 17 (against all defendants)  Nuisance CAL. CIV. CODE § 3479 *et seq.* ........................................................................................133

COUNT 18 (against all defendants)  Violation of the California Unfair Competition Law (CAL. BUS. & PROF. CODE § 17200 *et seq.*)...................134

    7.    Claims brought on behalf of Class members who installed their carpeting in Colorado ("Colorado Class members"). ...................................................136

COUNT 19 (against all Defendants)  Strict Products Liability (design defect) ........................................................................................136

COUNT 20 (against all Defendants)  Strict Products Liability (failure to warn).............................................................................................138

COUNT 21 (against all Defendants)  Nuisance......................................................140

COUNT 22 (against all Defendants)  Violation of the Colorado Consumer Protection Act (COLO. REV. STAT. § 6-1-101 *et seq.*) ..............141

      8.    Claims brought on behalf of Class members who installed their carpeting in Connecticut (collectively, "Connecticut Class members")........................143

COUNT 23 (against all Defendants)  Strict Products Liability (design defect) ...................................................................................143

COUNT 24 (against all Defendants)  Strict Products Liability (failure to warn).............................................................................................146

COUNT 25 (against all Defendants)  Nuisance......................................................148

      9.    Claims brought on behalf of Class members who installed their carpeting in Delaware ("Delaware Class members"). ...................................................................149

COUNT 26 (against all Defendants)  Negligence (design defect) .......................149

COUNT 27 (against all Defendants)  Negligence (failure to warn).....................151

COUNT 28 (against all Defendants)  Nuisance......................................................153

COUNT 29 (against all Defendants)  Violation of the Delaware Consumer Fraud Act (DEL. CODE TIT. 6, § 2513 *et seq.*) ...........................154

      10.    Claims brought on behalf of Class members who installed their carpeting in Florida ("Florida Class members"). ................................................................157

COUNT 30 (against all Defendants)  Strict Products Liability (design defect) ...................................................................................157

COUNT 31 (against all Defendants)  Strict Products Liability (failure to warn).............................................................................................159

11.    Claims brought on behalf of Class members who installed their carpeting in Georgia ("Georgia Class members"). ...................................................................161

COUNT 32 (against all Defendants)  Violation of the Georgia Fair Business Practices Act (GA. CODE ANN. § 10-1-390 *et seq.*) .....................161

COUNT 33 (against all Defendants)  Violation of the Georgia Uniform Deceptive Trade Practices Act (GA. CODE ANN. § 10-1-370 *et seq.*) ...............................................................................163

12.    Claims brought on behalf of Class members who installed their carpeting in Hawaii ("Hawaii Class members"). ...................................................................164

COUNT 34 (against all Defendants)  Strict Products Liability (design defect) ...............................................................................164

COUNT 35 (against all Defendants)  Strict Products Liability (failure to warn) ...............................................................................166

COUNT 36 (against all Defendants)  Nuisance. ...............................................168

13.    Claims brought on behalf of Class members who installed their carpeting in Illinois ("Illinois Class members"). ...................................................................169

COUNT 37 (against all Defendants)  Strict Products Liability (design defect) ...............................................................................169

COUNT 38 (against all Defendants)  Strict Products Liability (failure to warn) ...............................................................................171

COUNT 39 (against all Defendants)  Nuisance. ...............................................173

COUNT 40 (against all Defendants)  Violation of Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILL. COMP. STAT. ANN. 505/1 *et seq.*) ...............................................................174

14.    Claims brought on behalf of Class members who installed their carpeting in Indiana ("Indiana Class members"). ...................................................................177

COUNT 41 (against all Defendants)  Violation of Indiana Products Liability Act IND. CODE ANN. § 34-20-1-1 et seq. (design defect) ...................................................................................177

COUNT 42 (against all Defendants)  Violation of Indiana Products Liability Act IND. CODE ANN. § 34-20-1-1 et seq. (failure to warn)........................................................................................179

COUNT 43 (against all Defendants)  Nuisance IND. CODE ANN. § 32-30-6-1 *et seq.* ...................................................................181

    15.    Claims brought on behalf of Class members who installed their carpeting in Iowa ("Iowa Class members"). ..............................................................182

COUNT 44 (against all Defendants)  Design Defect Claim.................................182

COUNT 45 (against all Defendants)  Failure to Warn Claim ..............................185

COUNT 46 (against all Defendants)  Nuisance IOWA CODE ANN. § 657.1 ...............................................................................187

COUNT 47 (against all Defendants)  Violation of Iowa Private Right Of Action For Consumer Frauds Act (IOWA CODE § 714H.1 *et seq.*)........................................................................................188

    16.    Claims brought on behalf of Class members who installed their carpeting in Maryland ("Maryland Class members"). ...................................................................190

COUNT 48 (against all Defendants)  Strict Products Liability (design defect) ...................................................................................190

COUNT 49 (against all Defendants)  Strict Products Liability (failure to warn)........................................................................................192

COUNT 50 (against all Defendants)  Nuisance.....................................................194

COUNT 51 (against all Defendants)  Violation of Maryland Consumer Protection Act (MD. CODE ANN., COM. LAW § 13-101 *et seq.*)........................................................................................195

17.    Claims brought on behalf of Class members who installed their carpeting in Massachusetts ("Massachusetts Class members")..........................197

COUNT 52 (against all Defendants)  Breach of the implied warranty of merchantability (design defect)................................197

COUNT 53 (against all Defendants)  Breach of the implied warranty of merchantability (failure to warn)...........................200

COUNT 54 (against all Defendants)  Nuisance MASS. GEN. LAWS ANN. CH. 243, § 1 *et seq.* ................................202

COUNT 55 (against all Defendants)  Violation of the Massachusetts General Law Chapter 93A (MASS. GEN. LAWS CH. 93A, § 1 *et seq.*)................................................203

18.    Claims brought on behalf of Class members who installed their carpeting in Minnesota ("Minnesota Class members"). ....................................205

COUNT 56 (against all Defendants)  Strict Products Liability (design defect) ................................................205

COUNT 57 (against all Defendants)  Strict Products Liability (failure to warn)................................................207

COUNT 58 (against all Defendants)  Nuisance MINN. STAT. ANN. § 561.01 *et seq.* ..............................209

19.    Claims brought on behalf of Class members who installed their carpeting in Missouri ("Missouri Class members"). ....................................210

COUNT 59 (against all Defendants)  Strict Products Liability (design defect) ................................................210

COUNT 60 (against all Defendants)  Strict Products Liability (failure to warn)................................................213

COUNT 61 (against all Defendants)  Nuisance..................................215

COUNT 62 (against all Defendants)  Violation of the Missouri Merchandising Practices Act (MO. REV. STAT. § 407.005 *et seq.*)..................................................................................216

    20.   Claims brought on behalf of Class members who installed their carpeting in Nevada ("Nevada Class members")..................................................................218

COUNT 63 (against all Defendants)  Strict Products Liability (design defect) ...............................................................................218

COUNT 64 (against all Defendants)  Strict Products Liability (failure to warn)..............................................................................220

COUNT 65 (against all Defendants)  Nuisance NEV. REV. STAT. 40.140 ..................................................................................222

COUNT 66 (against all Defendants)  Violation of the Nevada Deceptive Trade Practices Act (NEV. REV. STAT. § 598.0903 *et seq.*)..................................................................................223

    21.   Claims brought on behalf of Class members who installed their carpeting in New Hampshire ("New Hampshire Class members")....................................225

COUNT 67 (against all Defendants)  Strict Products Liability (design defect) ...............................................................................225

COUNT 68 (against all Defendants)  Strict Products Liability (failure to warn)..............................................................................227

COUNT 69 (against all Defendants)  Nuisance...........................................229

COUNT 70 (against all Defendants)  Violation of the New Hampshire Consumer Protection Act (N.H. REV. STAT. ANN. § 358-A:1 *et seq.*)..................................................................................230

    22.   Claims brought on behalf of Class members who installed their carpeting in New Jersey ("New Jersey Class members")........................................................233

COUNT 71 (against all Defendants)  Strict Products Liability (design defect) ...............................................................................233

COUNT 72 (against all Defendants)  Strict Products Liability (failure to warn) ...................................................................................235

COUNT 73 (against all Defendants)  Nuisance....................................................237

COUNT 74 (against all Defendants)  Violation of the New Jersey Consumer Fraud Act (N.J. STAT. ANN. § 56:8-1 *et seq.*) ...........................238

    23.    Claims brought on behalf of Class members who installed their carpeting in New Mexico ("New Mexico Class members")..........................................240

COUNT 75 (against all Defendants)  Strict Products Liability (design defect) .......................................................................................240

COUNT 76 (against all Defendants)  Strict Products Liability (failure to warn) ...................................................................................243

COUNT 77 (against all Defendants)  Nuisance....................................................245

COUNT 78 (against all Defendants)  Violation of the New Mexico Unfair Trade Practices Act (N.M. STAT. ANN. § 57-12-1 *et seq.*) ..............246

    24.    Claims brought on behalf of Class members who installed their carpeting in New York ("New York Class members"). ...................................................248

COUNT 79 (against all Defendants)  Strict Products Liability (design defect) .......................................................................................248

COUNT 80 (against all Defendants)  Strict Products Liability (failure to warn) ...................................................................................250

COUNT 81 (against all Defendants)  Nuisance....................................................252

    25.    Claims brought on behalf of Class members who installed their carpeting in North Carolina ("North Carolina Class members"). ........................................253

COUNT 82 (against all Defendants)  Products Liability (design defect) .......................................................................................253

COUNT 83 (against all Defendants)  Products Liability (failure to warn) ...................................................................................256

COUNT 84 (against all Defendants)  Nuisance....................................258

COUNT 85 (against all Defendants)  Violation of North Carolina Unfair And Deceptive Trade Practices Act (N.C. GEN. STAT. § 75-1.1 *et seq.*) ....................................................................259

    26.   Claims brought on behalf of Class members who installed their carpeting in Ohio ("Ohio Class members"). .................................................................261

COUNT 86 (against all Defendants)  Products Liability Ohio Rev. Code Ann. § 2307.71 et seq. (design defect)...............................261

COUNT 87 (against all Defendants)  Products Liability Ohio Rev. Code Ann. § 2307.71 et seq. (failure to warn) ...........................263

COUNT 88 (against all Defendants)  Nuisance....................................265

    27.   Claims brought on behalf of Class members who installed their carpeting in Oklahoma (collectively, "Oklahoma Class members")..................................266

COUNT 89 (against all Defendants)  Strict Products Liability (design defect) ...................................................................................266

COUNT 90 (against all Defendants)  Strict Products Liability (failure to warn)...................................................................................268

COUNT 91 (against all Defendants)  Nuisance OKLA. STAT. ANN. TIT. 50, § 1 *et seq.* ....................................................................270

COUNT 92 (against all Defendants)  Violation of the Oklahoma Consumer Protection Act (OKLA. STAT. TIT. 15, § 751 *et seq.*) ................271

    28.   Claims brought on behalf of Class members who installed their carpeting in Oregon (collectively, "Oregon Class members"). .....................................274

COUNT 93 (against all Defendants)  Strict Products Liability (design defect) ...................................................................................274

COUNT 94 (against all Defendants)  Strict Products Liability (failure to warn)..................................................................................276

COUNT 95 (against all Defendants)  Nuisance......................................................278

COUNT 96 (against all Defendants)  Violation of the Oregon Unlawful Trade Practices Act (OR. REV. STAT. § 646.605 *et seq.*).....................................................................................279

  29. Claims brought on behalf of Class members who installed their carpeting in Pennsylvania ("Pennsylvania Class members").............................281

COUNT 97 (against all Defendants)  Strict Products Liability (design defect) ...........................................................................281

COUNT 98 (against all Defendants)  Strict Products Liability (failure to warn)..................................................................................284

COUNT 99 (against all Defendants)  Nuisance......................................................286

COUNT 100 (against all Defendants)  Violation of the Pennsylvania Unfair Trade Practices  And Consumer Protection Law (73 PA. CONS. STAT. § 201-1 *et seq.*).......................................................287

  30. Claims brought on behalf of Class members who installed their carpeting in South Carolina (collectively, "South Carolina Class members"). ..................288

COUNT 101 (against all Defendants)  Strict Products Liability (design defect) ...........................................................................288

COUNT 102 (against all Defendants)  Strict Products Liability (failure to warn) ...........................................................................290

COUNT 103 (against all Defendants)  Nuisance......................................................292

COUNT 104 (against all Defendants)  Violation Of The South Carolina Unfair Trade Practices Act (S.C. CODE ANN. § 39-5-10 *et seq.*).....................................................................................293

31. Claims brought on behalf of Class members who installed their carpeting in South Dakota ("South Dakota Class members")..........................................294

COUNT 105 (against all Defendants)  Strict Products Liability (design defect) ...................................................294

COUNT 106 (against all Defendants)  Strict Products Liability (failure to warn) ................................................296

COUNT 107 (against all Defendants)  Nuisance S.D. CODIFIED LAWS § 21-10-1 *et seq.* ......................................298

COUNT 108 (against all Defendants)  Violation of the South Dakota Deceptive Trade Practices  And Consumer Protection Law (S.D. CODIFIED LAWS § 37-24-6 *et seq.*)..........................299

32. Claims brought on behalf of Class members who installed their carpeting in Tennessee ("Tennessee Class members"). ...................................................302

COUNT 109 (against all Defendants)  Strict Products Liability (design defect) ...................................................302

COUNT 110 (against all Defendants)  Strict Products Liability (failure to warn) ................................................304

COUNT 111 (against all Defendants)  Nuisance...................................306

33. Claims brought on behalf of Class members who installed their carpeting in Texas ("Texas Class members").................................................307

COUNT 112 (against all Defendants)  Strict Products Liability (design defect) ...................................................307

COUNT 113 (against all Defendants)  Strict Products Liability (failure to warn) ................................................309

COUNT 114 (against all Defendants)  Nuisance...................................311

COUNT 115 (against all Defendants)  Violation of the Texas
Deceptive Trade  Practices And Consumer Protection Act (TEX.
BUS. & COM. CODE § 17.4 *et seq.*)...............................................................312

    34.   Claims brought on behalf of Class members who
installed their carpeting in Utah ("Utah Class
members")...............................................................315

COUNT 116 (against all Defendants)  Strict Products Liability
(design defect) ...............................................................315

COUNT 117 (against all Defendants)  Strict Products Liability
(failure to warn)...............................................................318

COUNT 118 (against all Defendants)  Nuisance UTAH CODE ANN. §
78B-6-1101 *et seq.*...............................................................320

COUNT 119 (against all Defendants)  Nuisance WASH. REV. CODE
ANN. § 7.48.120 *et seq.*...............................................................321

COUNT 120 (against all Defendants)  Violation of Washington
Consumer Protection Act (WASH. REV. CODE ANN. § 19.86.010
*et seq.*)...............................................................322

    35.   Claims brought on behalf of Class members who
installed their carpeting in West Virginia ("West
Virginia Class members")...............................................................324

COUNT 121 (against all Defendants)  Strict Products Liability
(design defect) ...............................................................324

COUNT 122 (against all Defendants)  Strict Products Liability
(failure to warn)...............................................................326

COUNT 123 (against all Defendants)  Nuisance...............................................................328

COUNT 124 (against all Defendants)  Violation of the West Virginia
Consumer Credit  And Protection Act (W. VA. CODE § 46A-1-
101 *et seq.*)...............................................................329

    36.   Claims brought on behalf of Class members who
installed their carpeting in Wisconsin ("Wisconsin
Class members"). ...............................................................332

COUNT 125 (against all Defendants)  Strict Products Liability
    (design defect) .............................................................................332

COUNT 126 (against all Defendants)  Strict Products Liability
    (failure to warn) ..........................................................................335

COUNT 127 Nuisance WIS. STAT. ANN. § 844.01 *et seq.*......................................337

REQUEST FOR RELIEF ...................................................................................338

DEMAND FOR JURY TRIAL ...........................................................................338

Plaintiff, individually and on behalf of all others similarly situated (the "Class"), allege:

## I.    INTRODUCTION

1.    This case arises out of the sale and installation of carpets that release toxic carpet dust containing per- and polyfluoroalkyl substances (PFAS), which adults and children unknowingly inhale. Carpets and rugs are major sources of human and ecological PFAS exposures. Carpets and rugs constitute nearly half of all floor coverings in U.S. homes and workplaces. A large percentage of the PFAS produced worldwide are used to treat carpets, rugs, and other home textiles to confer stain-, soil-, oil- or water-resistance. The PFAS-laden dust in carpets has permanently damaged the buildings where carpet treated with PFAS has been installed, and the harm will continue unless those carpets are removed and replaced with non-PFAS carpet.

2.    PFAS are a diverse group of chemicals often referred to as "forever chemicals" because their strong carbon-fluorine bonds make them extremely resistant to degradation in the environment and difficult for the body to effectively metabolize and/or excrete.

3.    Once released to the environment during product manufacture, use, or disposal, PFAS become part of a virtually closed cycle leading to chronic human and ecological exposures. Carpets and rugs contribute substantially to the amount of

the ubiquitous environmental contamination and exposures. Because persistent PFAS lack a natural degradation route, their levels in the environment, humans, or biota will continue to rise for as long as PFAS are produced and used in consumer products, and even after production of these compounds has ceased.

4. Human exposure to PFAS begins early in a person's life, since mothers transfer these chemicals to their babies via the placenta and breastfeeding. Through normal use, treated carpets, rugs, and other consumer products release PFAS into indoor air and dust, which people inhale or ingest.

5. Carpets and rugs are a major source of exposure for infants and children via direct contact and incidental indoor dust ingestion. Young children have been shown to ingest more soil and dust than adults, due to greater hand-to-mouth transfer; this can result in higher exposure to PFAS found in these contaminated environmental media.

6. Exposure to PFAS can lead to adverse health outcomes in humans. If humans are exposed to PFAS through diet, drinking water or inhalation, these chemicals remain in the body for a long time. As people continue to be exposed to PFAS, the levels in their bodies may increase to the point where they suffer from adverse health effects. Studies indicate that some PFAS can cause reproductive and developmental, liver and kidney, and immunological effects that are harmful, as well as tumors in laboratory animals. The most consistent findings from human

epidemiology studies show a small increase in serum cholesterol levels among exposed populations, with more limited findings related to infant birth weights, effects on the immune system, cancer, and thyroid hormone disruption. Some PFAS have also been linked to phytotoxicity, aquatic toxicity, and terrestrial ecotoxicity.

7.      Defendants 3M Company ("3M"), EIDP, Inc., formerly known as E.I. du Pont de Nemours and Company ("Old DuPont"), and The Chemours Company ("Chemours"), along with non-defendant Daikin America, Inc. ("Daikin"), intentionally manufactured, distributed, marketed, and/or sold stain- and soil-repellents with PFAS to carpet manufacturers and others without disclosing the dangers of PFAS that were known to each of those entities. PFAS products sold by Defendants and Daikin were applied by carpet manufacturers and others to all or virtually all carpets manufactured in the United States before carpet manufacturers stopped incorporating PFAS into their carpet products in 2020.

8.      For decades, while fully aware of the health risks posed by PFAS products, Defendants and Daikin through a common enterprise (the "PFAS Concealment Enterprise"), sold PFAS products to carpet manufacturers and others without disclosing the toxicity of their stain repellents. As those entities knew and intended, and as a foreseeable and common purpose of the PFAS Concealment Enterprise, carpet manufacturers infused their carpets with PFAS products before they were sold to the public. Other than when Old DuPont owned Stainmaster

carpets, as discussed below, those entities did not themselves apply the PFAS products to carpeting. Instead, carpet manufacturers or other non-parties applied the PFAS products to carpet fibers before the carpets were manufactured or applied the PFAS products after the carpet had already been manufactured.

9.      Defendants and Daikin and the PFAS Concealment Enterprise never disclosed to the carpet manufacturers and retailers—let alone to consumers or anyone else—that PFAS in carpets is extremely dangerous to health, property, and the environment. Instead, those entities collaborated to conceal the truth and such concealment was a common purpose of the PFAS Concealment Enterprise.

10.     Rather than tell the truth members of the PFAS Concealment Enterprise promoted the repellant qualities of their products. For example, in 2018, Thomas McAndrews (a former Worldwide Director of Old DuPont's Flooring Systems Division) was interviewed as part of the "Oral history interviews with former employees of DuPont Company's Textile Fibers Department."[1] Each of his five interviews was accompanied by a picture of him with a smiling child wearing a shirt with the Stainmaster carpet logo, without disclosing that PFAS in Stainmaster carpets seriously harmed children as they played on the carpeting and otherwise absorbed PFAS from it:

---

[1] https://digital.hagley.org/2010215?page=7&display=list (last visited Aug. 22, 2024).



11.    McAndrews said in his interview that "I still get emotional when I remember the STAINMASTER story. Sometimes I have to stop talking." But he did not mention PFAS, let alone "get emotional" about the harm inflicted by PFAS in Stainmaster carpets, even though in 2016 the United States Environmental Protection Agency ("EPA") had stated that "[c]hildren are particularly susceptible to exposure from inhalation of PFC off-gassing from carpet and carpet protectants during their earliest years when they are lying, crawling and spending large amounts of time playing on the carpet. The significantly high levels of PFC found by ORD

[EPA's Office of Research and Development] in carpet and carpet protectants pose an exposure concern for children through this pathway."[2]

12.    The common purpose and actions of Defendants and Daikin to hide the truth about PFAS and PFAS-infused products is exemplified by a 3M Material Safety Data Sheet that 3M had sent to Old DuPont in 1997. To protect workers who are exposed to hazardous chemicals in their work environment, OSHA adopted the Hazard Communication Standard (HCS) in November 1983. The standard requires chemical manufacturers and importers to evaluate the hazards of chemicals that they produce and distribute. The HCS requires information about hazards and protective measures to be disseminated on container labels and Material Safety Data Sheets (MSDSs). All employers with employees exposed to regulated chemicals must provide access to the labels and the MSDSs. Employers using the manufactured chemicals must also train employees to understand the information provided by the MSDS and the labels and how to use the information to protect themselves. The HCS covers all chemicals in American workplaces.[3]

13.    The 1997 Material Safety Data Sheet that 3M sent *only* to Old DuPont stated:

---

[2]    https://www.epa.gov/sites/default/files/2016-01/documents/pfcs_action_plan 1230_09.pdf (last visited July 16, 2024).

[3]    https://www.osha.gov/news/testimonies/03252004 (last visited Aug. 29, 2024).

> CANCER:
> WARNING: Contains a chemical which can cause
> cancer. (3825-24-1) (1983 and 1993 studies conducted
> jointly by 3M and Dupont).

The "chemical" referred to in that document was PFOA,[4] which is a particularly harmful PFAS and which 3M and DuPont knew—*based on their own joint studies* as show in detail in this Complaint—could cause cancer.

14.    Instead of informing the public of those dangers, 3M and DuPont suppressed the 1997 MSDS as part of the wrongful conduct of the PFAS Concealment Enterprise. A former Minnesota Attorney General testified before a Unites States House Committee about a lawsuit by Minnesota against 3M for PFAS pollution. In part, she testified about the 1997 Material Safety Data Sheet that 3M gave to DuPont.[5] After quoting from the document, she testified that "3M removed the label that same year and for decades sold PFAS products without warning the public of its dangers."[6] Her testimony only concerned 3M, but the same is true of

---

[4] *See* Bilott, Robert, *Exposure*, at 351.

[5] Lori Swanson, Former Attorney General of Minnesota, Testimony Before the Committee on Oversight and Reform, Subcommittee on Environment, United States House of Representatives (Sept. 10, 2019), https://www.congress.gov/116/meeting/house/109902/witnesses/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf, at page 3 (last visited Aug. 29, 2024). The MSDS cited by Swanson is attached to that testimony as Exhibit A.

[6] *Id.*

DuPont, which associated with 3M to suppress the truth and to sell PFAS products for decades without warning the public of the dangers of those products.

15.    Carpet manufacturers and retailers learned only recently that the PFAS-infused products used to treat carpets are extremely dangerous. But they did not learn that from Defendants or Daikin.

16.    It fell to third parties to inform carpet manufacturers and retailers about those dangers. For example, the Green Science Policy Institute held a workshop in 2018 "for the carpet industry to educate them about the PFAS problem and brainstorm solutions."[7] As the Institute explained, "More than a dozen high-level representatives from major carpet manufacturers (Interface, Mohawk, Milliken & Co., Tarkett, Shaw, etc.) attended the workshop, along with large purchasers, academic and government scientists, NGOs and companies who had successfully phased out PFAS. Participants' carpet companies produced about 90% of the carpets and rugs sold in the US."[8]

17.    As the Institute further explained, the "carpet industry had recently shifted from the older long-chain C8 to short-chain C6 PFAS treatments and came into the workshop believing the chemical industry claim that C6 was not

---

[7]    https://greensciencepolicy.org/our-work/communications-strategy/pfas-in-carpets/ (last visited July 17, 2024).

[8] *Id.*

problematic. After learning that C6 and likely the whole class of PFAS were also harmful during our workshop, the companies all agreed at the end of the day to phase out all PFAS including C6 and other short chains substitutes."[9]

18.    The Institute reported that "[m]anufacturers that have completely phased out PFAS include Engineered Floors, Interface, Shaw, and Tarkett. As of January 2020, retailers The Home Depot and Lowe's have stopped selling any carpets and rugs treated with PFAS."[10]

19.    But even then, Defendants and Daikin continued to falsely claim that PFAS is *not* harmful. And none of the Defendants or Daikin has offered to replace the millions of carpets impregnated with PFAS and installed throughout the United States.

20.    Defendants and Daikin have been forced to pay for some environmental harms caused by their PFAS products but have not paid a penny for harms caused by carpeting that was treated with Defendants' PFAS products. For example, 3M has agreed to pay $10.3 billion to settle claims that it contaminated public water systems with PFAS, while Old DuPont, Chemours, and Corteva, Inc., agreed to pay

---

[9] *Id.* The transition from C8 to C6 PFAS—and their harms to health and the environment—are discussed in detail below.

[10] *Id.*

$1.19 billion to settle similar claims.[11] Objections to the settlement were filed by "22 governments and agencies in New York, Texas, Colorado, California and elsewhere. They said the settlements will not fully cover cleanup and legal costs facing water providers after the companies allegedly polluted drinking water with per- and polyfluoroalkyl substances, or PFAS."[12]

21.    Other examples are the $12 million class action settlement by 3M and Daikin in 2022 to resolve claims they contaminated residential water sources in Alabama. And 3M and another company agreed to a $54 million settlement with property owners in Michigan whose homes are atop toxic PFAS contamination.

22.    In contrast, Defendants in this action and Daikin have not paid a dime for the grievous harms caused by carpets in homes and day-care centers infused with PFAS, and none of them has offered to replace any carpets treated with PFAS-infused products. Plaintiffs file this action to remedy that injustice.

23.    Plaintiffs on behalf of a class of persons who bought carpets treated with PFAS, bring claims under the Racketeering Influenced and Corrupt Organization Act and various state laws seeking damages in the form of money to replace all PFAS carpet.

---

[11]    https://www.reuters.com/legal/litigation/3m-dupont-pfas-settlements-called-inadequate-by-cities-other-objectors-2023-11-13/ (last visited July 17, 2024).

[12] *Id.*

## II.    JURISDICTION

24.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the RICO Act, 18 U.S.C. § 1962. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

25.    This Court also has original jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1), as modified by the Class Action Fairness Act of 2005, because Plaintiffs and Defendants are citizens of different states; there are more than 100 members of the Class (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and Class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

26.    This Court has personal jurisdiction over each Defendant because they have minimum contacts with the United States, this District, and this State, and they intentionally availed themselves of the laws of the United States and this State by conducting a substantial amount of business throughout the State, including the design, manufacture, distribution, testing, and sale of the PFAS-infused products used in carpets sold in this State and District. Defendants' misconduct as alleged in this lawsuit had the foreseeable and intended effect of causing injury to the business

or property of persons residing and located in the United States, including in this District.

### III.    VENUE

27.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because: (i) Defendants conduct substantial business in this District and have intentionally availed themselves of the laws and markets of the United States and this District; and/or (ii) many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia*, the manufacture of PFAS-infused carpet treatment products, the use of such products by carpet manufacturers and the exposure of customers in this District to these products. Defendants sold PFAS-infused chemicals to carpet manufacturers for the purpose of using those chemicals to treat the carpets, which foreseeably were sold to, at minimum, tens of thousands of consumers in this District. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants are subject to personal jurisdiction in this District.

### IV.    PARTIES

**A.    Plaintiffs**

28.    Plaintiff Vicki Peterson is a resident and citizen of Minnesota. She purchased carpet for her residence in fall of 2012 from Home Depot. The carpet is still installed in her home's basement. At the time Mrs. Peterson purchased her carpet she was unaware that it was manufactured with PFAS that would be emitted by the carpet, causing property damage to her house immediately and continuing over the

years until this day. Defendants have yet to disclose to her that her carpet was treated with PFAS. She did not know that PFAS was in her carpet until this year. Mrs. Peterson would not have purchased the carpet if Defendants had disclosed the presence of PFAS in the carpet. As a result of Defendants' conduct, she was injured due to the property damage caused by the carpet emitting PFAS in her household and by buying a product she never would have if she had known about the PFAS. She seeks removal and replacement of her carpet as a result of Defendants' wrongdoing.

29.    Paul Sadeghi is a resident and citizen of Minnesota. He purchased carpet for his residence in approximately 2017 from Home Depot. The carpet is still installed in his home. At the time Mr. Sadeghi purchased his carpet he was unaware that it was manufactured with PFAS that would be emitted by the carpet, causing property damage to his house immediately and continuing over the years until this day. Defendants have yet to disclose to him that his carpet was treated with PFAS. He did not know that PFAS was in his carpet until this year. Mr. Sadeghi would not have purchased the carpet if Defendants had disclosed the presence of PFAS in the carpet. As a result of Defendants' conduct, he was injured due to the property damage caused by the carpet emitting PFAS in his household and by buying a product he never would have if he had known about the PFAS. Mr. Sadeghi seeks removal and replacement of his carpet as a result of Defendants' wrongdoing.

**B.     Defendants**

30.     Defendant 3M Company (formerly known as Minnesota Mining and Manufacturing Company) is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144. 3M manufactured, distributed, and sold PFAS Products. 3M was the sole producer of PFOS, which it made using an Electro-Chemical Fluorination method (ECF), for which it sought intellectual property rights. 3M researched, developed, manufactured, designed, marketed, distributed, released, promoted, and/or otherwise sold PFAS and/or PFAS Products in markets around the United States.

31.     Defendant EIDP, Inc., formerly known as E.I. du Pont de Nemours and Company ("Old DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Old DuPont has done business throughout the United States. Old DuPont has been involved in the production and sale of PFAS Products since the 1950s. Old DuPont researched, developed, manufactured, designed, marketed, distributed, released, promoted, and/or otherwise sold PFAS and/or PFAS Products in markets around the United States. On June 1, 2019, Old DuPont (now known as EIDP) became a direct subsidiary of Corteva, Inc., which currently conducts substantially all of its operations through EIDP.

- 14 -

32.    Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19801. In 2015, Old DuPont spun off Chemours as an independent company to operate Old DuPont's performance chemicals business and take on vast environmental liabilities, including those related to PFAS.

## V.    FACTUAL ALLEGATIONS

**A.    PFAS products, including those used for stain- and soil-protection in carpets, are extremely harmful to health and the environment.**

33.    PFAS are a group of thousands of human-made chemical compounds containing bonds of fluorine and carbon atoms. The fluorine-carbon bond is one of the strongest bonds in chemistry. Due to their unique chemical structure, PFAS are extremely stable and repel oil, grease, water, and heat. They do not naturally occur in the environment.

34.    PFAS are extremely toxic and have significant detrimental impacts on human health. PFAS contribute to the following: (a) cancers (liver, kidney, testicular, breast, pancreas, and prostate); (b) liver diseases; (c) adverse pregnancy outcomes; (d) developmental effects (including delayed puberty); (e) reduced immune system responses; (f) infertility; (g) reduced bone density in children; (h) diabetes; (i) non-alcoholic fatty liver disease; and (j) colitis, Chrones Disease, and other inflammatory bowel diseases.

35.    The chemical structure of PFAS make them (1) persistent, (2) mobile, (3) bioaccumulative and biomagnifying, and (4) toxic.

36.    PFAS do not significantly break down or biodegrade either in the environment or in living organisms. This extreme persistence has given them the nickname "Forever Chemicals." The same is true for PFAS products used to treat carpets.

37.    As humans are exposed to PFAS, the concentration of PFAS in their blood and organs increases.

38.    According to the CDC, the elimination half-lives of PFOA and PFOS, or the length of time for the concentration of those substances in the human body to decrease by one-half, are estimated to be 3.5 years and 4.8 years, respectively. For comparison, the half-lives of arsenic, lead (in human blood), and radioactive polonium are ten hours, thirty-two days, and forty days.

39.    PFAS are toxic and cause significant adverse effects to human and animal health. Toxicology and human epidemiology studies by independent researchers, as well as decades of studies and lab animal testing by the Defendants, have demonstrated the risks posed to human and animal health from PFAS.

40.    Federal government agencies, including the Center for Disease Control's Agency for Toxic Substances and Disease Registry, have concluded there are adverse human health effects associated with PFAS exposure, including kidney

and testicular cancer; liver damage or changes in liver function; delayed growth and development (including decreased infant birth weight); decreased vaccine response; and increased cholesterol.

41.    As EPA has explained,[13] "peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:

    i.    Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.

    ii.    Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.

    iii.    Increased risk of some cancers, including prostate, kidney, and testicular cancers.

    iv.    Reduced ability of the body's immune system to fight infections, including reduced vaccine response.

    v.    Interference with the body's natural hormones.

    vi.    Increased cholesterol levels and/or risk of obesity."

42.    In the same publication, EPA explained that "[b]ecause children are still developing, they may be more sensitive to the harmful effects of chemicals such as

---

[13] *See* https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited July 16, 2024).

PFAS. They can also be exposed more than adults," in part because "[y]oung children crawl on floors and put things in their mouths which leads to a higher risk of exposure to PFAS in carpets, household dust, toys, and cleaning products."[14]

43.    EPA has also explained that "[h]armful per- and poly-fluoroalkyl substances (PFAS) are an urgent public health and environmental issue facing communities across the United States."[15] Moreover, a "growing body of scientific evidence shows that exposure at certain levels to specific PFAS can adversely impact human health and other living things. Despite these concerns, PFAS are still used in a wide range of consumer products and industrial applications."

**B.    Carpets infused with PFAS are a significant source of harmful PFAS in indoor environments.**

44.    In carpets and rugs, PFASs have been used since the early 1980s to impart stain-, soil-, and grease resistance. According to the Carpet and Rug Institute, the industry trade group representing 90 percent of U.S. carpet manufacturers, "most residential and commercial carpets are treated" with PFAS-based stain and soil repellents (Yarbrough 2017). PFAS-containing treatments can be applied to carpets at four different stages: (1) during the manufacturing of the carpet fibers; (2) during

---

[14] *Id.*

[15] "PFAS Strategic Roadmap: EPA's Commitments to Action 2021-2024," *See* https://www.epa.gov/system/files/documents/2021-10/pfas-roadmap_final-508.pdf (last visited July 3, 2024).

the carpet and rug manufacturing process, at the carpet and rug mill; (3) after the carpet and rug manufacturing process, at a separate finishing facility or in stores at the time of sale; or (4) postsale of the carpet or rug by consumers or professional cleaners (U.S. EPA 2012).

45.    In the mid-1950s, 3M developed Scotchgard Fabric Protector, the first PFAS-based stain and soil repellent for use on textiles. This was followed in 1963 by the development of Zepel by DuPont, for use on clothing. Later, in 1972, 3M produced Scotchgard Carpet Protector, the first product specifically marketed for use on carpets (Maitland 1982). The floor covering sector has been receptive to using surface treatments because carpet fibers are commonly made of synthetic materials such as nylon, polypropylene, acrylic, and polyester, which can readily absorb water- or oil-based compounds. Thus, most commercial and residential carpets and rugs sold in the U.S. are treated with PFASs to provide resistance to soil and to oil- or water-based stains, by preventing adhesion of solid and liquid contaminants to fibers. However, according to a major carpet manufacturer (Davis 2016), PFAS-based treatments increase product performance only for lower-quality carpet fibers, and only for a limited amount of time because, when the coating begins to wear off, it traps soil underneath, creating permanent stains.

46.    Researchers at the O'Neill School of Public and Environmental Affairs of Indiana University published a peer-review study in 2020 (the "Indiana Study"),

titled "Per- and polyfluoroalkyl substances in paired dust and carpets from childcare centers."[16] The study analyzed 42 types of PFAS in childcare carpet samples. The Indiana Study found that:

- "Carpets can be a significant source of per- and polyfluoroalkyl substances (PFASs) in the indoor environment and may be an especially important source of exposure for children and toddlers."

- "In this study, we measured PFAS concentrations in paired carpet and dust samples from 18 California childcare centers in 2018 to investigate carpet as a contributor to PFASs in dust. Median total PFAS concentrations (PPFASs) in carpets and dust were 471 ng/g and 523 ng/g, respectively. 6:2 FTOH and 6:2 FTSA were the two dominant PFASs, collectively accounting for over 50% of the PPFASs in both media. Other frequently detected PFASs included C4eC14 perfluoroalkylcarboxylic acids, C4eC8 perfluoroalkylsulfonic acids, PFDS, 4:2 FTSA, 8:2 FTSA, FOSA, MeFOSE, EtFOSE, 8:2 FTOH, and 10:2 FTOH."

---

[16] Chemosphere, Volume 251, July 2020, 126771. The study can be found at https://www.fosan.org/wp-content/uploads/2023/04/PFAS-nella-polvere-e-nei-tappeti-degli-asili-nido.pdf.

- "We found strong associations between PFAS levels in carpet and dust pairs, suggesting that carpets can be a source and a sink for PFASs. The estimated total perfluoroalkyl acids (PFAA) intake via dust ingestion for children was 0.023, 0.096, and 1.9 ng/kg body weight/day in the low-, intermediate-, and high-exposure scenarios, respectively."

- "Our data suggest that PFASs of emerging concern are playing an increasingly important role in indoor exposure to PFASs."

47.     These chemicals pose a wide range of severe health risks. For example, among other findings, California state scientists recently evaluated the toxicity of 6:2 FTOH3 and identified several concerns: "6:2 FTOH causes breast cancer cells to grow. 6:2 FTOH fits the definition of a "developmental toxicant"; this means that offspring were harmed when their mothers were exposed during pregnancy. Specifically, in laboratory studies, 6:2 FTOH increased the number of offspring that died and reduced the offsprings' weight. 6:2 FTOH also damages the liver, the pancreas, and teeth. Exposure to 6:2 FTOH may be particularly harmful to children because of its ability to disrupt hormones and development."[17] And "6:2 FTOH is significantly more toxic than PFHxA. Use of toxicological studies conducted with

---

[17] *See* California Office of Environmental Health Hazard Assessment. 6:2 Fluorotelomer Alcohol (FTOH) Toxicity Review. August 2016.

PFHxA to assess 6:2 FTOH exposure may significantly underestimate human health risk."[18]

48.    As another example, "Due to their structural similarities, 6:2 fluorotelomer sulfonic acid (6:2 FTSA) [is] often used as alternatives to perfluorooctane sulfonate (PFOS) and perfluorooctanoic acid (PFOA), respectively.... [A]dult male mice were exposed with 5 mg/kg/day of 6:2 FTCA or 6:2 FTSA for 28 days to investigate their hepatotoxicological effects. . .6:2 FTSA was detected at high and very high levels in serum and liver, respectively, demonstrating bioaccumulation potential and slow elimination. Furthermore, 6:2 FTSA induced liver weight increase, inflammation, and necrosis…. Although PFOA and PFOS commonly activate peroxisome proliferator-activated receptor α (PPARα), 6:2 FTSA induced an increase in PPARγ and related proteins, but not in lipid metabolism-related genes such as PPARα."[19] Adult male mice administered 6:2 FTSA at 5 mg/kg-d over 28 days exhibited increases in liver weight, hepatocellular

---

[18] *See* "Comparative analysis of the toxicological databases for 6:2 fluorotelomer alcohol (6:2 FTOH) and perfluorohexanoic acid (PFHxA)" [Food Chem. Toxicol. 138 (2020) 1-16], at https://pubmed.ncbi.nlm.nih.gov/32087313/ (last visited July 18, 2024).

[19] *See* "Comparative hepatotoxicity of 6:2 fluorotelomer carboxylic acid and 6:2 fluorotelomer sulfonic acid, two fluorinated alternatives to long-chain perfluoroalkyl acids, on adult male mice." [Sheng *et al*. 2017 Aug], at https://pubmed.ncbi.nlm.nih.gov/28032147/#:~:text=Our%20results%20showed% 20that%206,for%20legacies%20PFOA%20and%20PFOS (last visited July 18, 2024).

hypertrophy, hepatocellular necrosis, and biochemical markers associated with liver inflammation. Serum levels of the liver enzyme AST, an indicator of liver damage, and albumin were also elevated, and histological evidence of liver necrosis was observed.[20]

49.     Findings on PFOS and PFSA led EPA to review similar chemicals to determine whether they might present similar concerns. The agency began investigating PFOA in 1990s and found that it, too: (1) is very persistent in the environment; (2) is found at very low levels both in the environment and in the blood of the general U.S. population; (3) remains in people for a very long time; and (4) causes developmental and other adverse effects in laboratory animals.[21]

50.     EPA further explained that studies have found other related perfluorinated compounds, including perfluoroalkane sulfonates (PFSAs), in very small amounts in the blood of the general human population as well as wildlife.[22] Although most of the health and environmental studies have focused primarily on PFOS, analysis of the structure of the compounds indicates that the results of those studies may be applied to a larger category of PFSA chemicals. EPA believes that

---

[20] *Id.*

[21] *See* "Risk Management for Per- and Polyfluoroalkyl Substances (PFAS) under TSCA." https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-and-polyfluoroalkyl-substances-pfas

[22] *Id.*

the chemical similarity between PFOS and PFSA raises the likelihood that health and environmental concerns are similarly present for PFSA compounds. Following the voluntary phaseout of PFOS by the principal worldwide manufacturer, EPA took prompt regulatory actions in 2002 and 2007 under the TSCA to limit any future manufacture or importation of 271 PFSA chemicals, essentially encompassing all PFSA chemicals on the U.S. market.[23]

51.    Moreover, literature findings have shown the relationship of specific PFCAs and some adverse effects, including cancer, alteration in immunological and thyroid function, liver disease, lipid and insulin dysregulation, kidney disease, and its unfavorable towards reproduction.[24]

52.    Another article has explained that "[c]hildren can be exposed to a toxic medley of per- and polyfluorinated chemicals (PFAS) from carpets, according to a peer-reviewed study published today in Chemosphere. But the good news is that daycares, schools, and families can eliminate this exposure source by replacing older carpets. Most carpet manufacturers recently stopped using PFAS, which were

_____

[23] *Id.*

[24] *See* "Per- and Polyfluoroalkyl Substance Toxicity and Human Health Review: Current State of Knowledge and Strategies for Informing Future Research," Fenton et al. 2021, *Environ Toxicol Chem* 2021;40:606–630, found at https://pubmed.ncbi.nlm.nih.gov/33017053/ (last visited July 18, 2024).

formerly applied to carpets to make them stain- and soil-resistant. Retailers like The Home Depot and Lowe's now only sell PFAS-free carpets."[25]

53.    In September 2021, EPA issued a report titled "Multi-Industry Per- and Polyfluoroalkyl Substances (PFAS) Study – 2021 Preliminary Report."[26] In section 3.4, EPA addressed "PFAS Exposure and Health Effects." EPA stated that "[t]here are a variety of ways that individuals may be exposed to PFAS. Known exposure routes for PFAS include … Direct contact with products treated with PFAS, such as food papers/packaging and treated carpets." Section 8.1 explained that "[a]t least one state, California, is in the process of regulating PFAS in carpets, rugs, and after-market treatments."

54.    In 2019, the California's Department of Toxic Substances Control (DTSC) issued an article entitled "Product – Chemical Profile for Carpets and Rugs Containing Perfluoroalkyl or Polyfluoroalkyl Substances."[27] According to the Department, "(1) there is potential for human and other organism exposure to

---

[25]  *See*  https://greensciencepolicy.org/news-events/press-releases/study-pfas-in-carpets-a-major-exposure-source-for-children (April 29, 2020) (last visited July 16, 2024).

[26]  *See*  https://www.epa.gov/system/files/documents/2021-09/multi-industry-pfas-study_preliminary-2021-report_508_2021.09.08.pdf  (last  visited  July  16, 2024).

[27]  See  https://dtsc.ca.gov/wp-content/uploads/sites/31/2020/02/Final_Product-Chemical_Profile_Carpets_Rugs_PFASs_a.pdf  (last  visited  July  3,  2024).  The article was prepared by the Agency's Department of Toxic Substances Control.

perfluoroalkyl and polyfluoroalkyl substances (PFASs) from carpets and rugs; and (2) the exposure has the potential to contribute to or cause significant and widespread adverse impacts." Moreover, "DTSC has identified carpets and rugs as major sources of human and ecological PFAS exposures. Carpets and rugs constitute nearly half of all floor coverings in U.S. homes and workplaces. A large percentage of the PFAS produced worldwide are used to treat carpets, rugs, and other home textiles to confer stain-, soil-, oil- or water-resistance." The DTSC explained that "[t]hrough normal use, treated carpets, rugs, and other consumer products release PFASs into indoor air and dust, which people inhale or ingest."

55.    Based in part on the foregoing "Chemical Profile for Carpets," the DTSC announced that effective July 1, 2023, it had "adopted carpets and rugs containing perfluoroalkyl or polyfluoroalkyl substances (PFASs) as a Priority Product," requiring "[d]omestic and foreign carpet and rug manufacturers whose products contain any member of the class of PFASs in their carpets or rugs" to comply with regulations concerning potential product removal or chemical removal.[28] The DTSC explained that it "adopted these regulations due to concerns about the hazard traits of PFASs and their widespread presence in the environment, humans, and other living organisms. Carpets and rugs treated with PFASs for stain-

---

[28]    *See*    https://dtsc.ca.gov/scp/carpets-and-rugs-with-perfluoroalkyl-and-polyfluoroalkyl-substances-pfass/ (last visited July 3, 2024).

or soil-resistance are potential long-term sources of widespread human and ecological exposures to this class of chemicals."[29]

56.     The DTSC proposed to list carpets and rugs containing perfluoroalkyl or polyfluoroalkyl substances as a Priority Product, finding that this product-chemical combination meets the identification and prioritization factors outlined in the Safer Consumer Products regulations: (1) there is potential for human and other organism exposure to PFAS from carpets and rugs; and (2) the exposure has the potential to contribute to or cause significant and widespread adverse impacts.[30]

57.     The DTSC identified carpets and rugs as major sources of human and ecological PFAS exposures. Carpets and rugs constitute nearly half of all floor coverings in U.S. homes and workplaces. A large percentage of the PFAS produced worldwide are used to treat carpets, rugs, and other home textiles to confer stain-, soil-, oil- or water-resistance.[31]

58.     The DTSC found that, once released to the environment during product manufacture, use, or disposal, PFAS become part of a virtually closed cycle leading to chronic human and ecological exposures. Carpets and rugs contribute to the ubiquitous environmental contamination and exposures, as do other consumer

---

[29] *Id.*

[30] *Id.* at 6.

[31] *Id.* at 7.

products such as food packaging, cosmetics, and waterproof clothing. Because persistent PFAS lack a natural degradation route, their levels in the environment, humans, or biota will continue to rise for as long as PFAS are produced and used in consumer products, and even after production of these compounds has ceased.[32]

59.    Human exposure to PFAS begins early in life, since mothers transfer these chemicals to their babies via the placenta and breastfeeding. In the general population, PFAS exposure occurs mainly by ingesting contaminated food and drinking water, but other sources of exposure may contribute. This contamination is partly due to releases of PFAS from treated consumer products at various points in their lifecycle, including manufacturing, use, and disposal. Through normal use, treated carpets, rugs, and other consumer products release PFAS into indoor air and dust, which people inhale or ingest.[33]

60.    Further, carpets and rugs are a major source of exposure for infants and children via direct contact and incidental indoor dust ingestion. Young children have been shown to ingest more soil and dust than adults, due to greater hand-to-mouth transfer; this can result in higher exposure to PFAS found in these contaminated environmental media. Industrial workers, carpet installers, carpet recyclers, carpet

---

[32] *Id.*

[33] *Id.*

cleaners, and workers in upholstered furniture, furnishings, outdoor clothing, and carpet stores may also experience above-average PFAS exposure levels.[34]

61.    Due to the strength of the carbon-fluorine bond, PFAS are characterized by high environmental persistence, which leads to continuous and poorly reversible accumulation in the environment, and hence to likely increasing exposures. Many PFAS display significant mobility in environmental media, which makes them widespread in the environment and in living organisms. Some members of the PFAS class bioaccumulate significantly in animals or plants, including in foods consumed by humans, and undergo lactational or transplacental transfer from mothers to offspring. Certain PFAS also contribute to global warming.[35]

62.    Moreover, there is evidence that exposure to PFAS can lead to adverse health outcomes in humans. If humans are exposed to PFAS through diet, drinking water or inhalation, these chemicals remain in the body for a long time. As people continue to be exposed to PFAS the levels in their bodies may increase to the point where they suffer from adverse health effects. Studies indicate that some PFAS can cause reproductive and developmental, liver and kidney, and immunological effects, as well as tumors in laboratory animals. The most consistent findings from human epidemiology studies are a small increase in serum cholesterol levels among exposed

---

[34] *Id*. at 8.

[35] *Id.*

populations, with more limited findings related to infant birth weights, effects on the immune system, cancer, and thyroid hormone disruption. Some PFAS have also been linked to phytotoxicity, aquatic toxicity, and terrestrial ecotoxicity.[36]

63.    Based on the criteria in the Safer Consumer Products regulations, PFAS have the potential to cause significant and widespread adverse impacts to sensitive subpopulations, including fetuses, infants, young children, pregnant women, carpet installers, carpet recyclers, carpet cleaners, and carpet retail sector workers; to environmentally sensitive habitats; and to threatened and endangered species. Given the known hazard traits, replacing currently used PFAS in carpets and rugs with other members of the PFAS class could constitute a regrettable substitution. Hence, this proposal covers carpets and rugs containing any member of the class of PFAS.[37]

64.    Moreover, most PFAS exhibit low vapor pressures, but compared to homologous hydrocarbons they tend to be similarly or somewhat more volatile, despite higher molecular weights.[38] Most PFAAs are semi-volatile and can adsorb onto indoor dust.[39]

---

[36] *Id.*

[37] *Id.* at 9.

[38] *Id.* at 19 (citing Krafft and Riess 2015a).

[39] *Id.* (citing Bohlin-Nizzetto et al. 2015; Dreyer et al. 2015; Haug et al. 2011; Jogsten et al. 2012; Knobeloch et al. 2012; Liu et al. 2015a; Liu et al. 2014; Strynar and Lindstrom 2008).

65.    Infants, toddlers, and small children are a sensitive subpopulation because of their increased ingestion and inhalation rates per unit of body weight, rapid development, immature physiological ability to detoxify environmental contaminants, and behavioral characteristics that predispose them to increased exposures to environmental contaminants.[40] This results in a higher body burden of PFAS as compared to adults.[41] Pregnant women and fetuses are also sensitive subpopulations because of transplacental migration and the vulnerability of the rapidly developing fetus.[42] Breastfed infants are susceptible to increased exposures to PFAS in breast milk, because breastfeeding is a route of PFAS excretion for lactating women.[43] Infants, toddlers, and small children often have increased exposures due to hand-mouth behaviors that can lead to increased incidental ingestion of dust and soil with environmental contaminants, and higher doses relative to body weight compared to adults.[44] Infants who crawl over carpets are at increased risk of inhaling carpet dust,[45] which may contain PFAS.

---

[40] *Id*. at 43 (citing EPA 2011).

[41] *Id.* (citing Rappazzo et al. 2017).

[42] *Id.* (citing Slotkin et al. 2008).

[43] *Id.* (citing Kang et al. 2016; Karrman et al. 2007; Mogensen et al. 2015; Mondal et al. 2014).

[44] *Id.* (citing EPA 2011).

[45] *Id.* (citing Wu et al. 2018).

66.    PFAS are widely found in house dust, with higher concentrations in homes with treated carpets.[46] Exposure via dust is higher in toddlers and small children than adults and can be significant due to children's lower body weights, increased inhalation rate, higher incidental dust ingestion rates, increased floor contact and hand-to-mouth behavior.[47] PFAS are readily absorbed following inhalation and ingestion.[48]

67.    In 2016, carpets and rugs accounted for 58.8 percent of flooring industry in volume in the United States.[49] An estimated 94.1 million square yards of carpet were sold in California in 2016.[50] According to the Carpet and Rug Institute, which is an industry trade group representing 90 percent of U.S. carpet manufacturers, "most residential and commercial carpets are treated" with PFAS-based stain and soil repellents.[51] Census data from 2012 identified more than 850 stores in California selling carpets and rugs.[52]

---

[46] *Id*. at 44 (citing Haug et al. 2011).

[47] *Id.* (citing Mercier et al. 2011; Tian et al. 2016).

[48] *Id.* (citing ATSDR 2018a).

[49] *Id*. at 46.

[50] *Id.* (citing CCSP 2016).

[51] *Id.* (citing Yarbrough 2017).

[52] *Id*. at 47.

68.    PFAS from carpets and rugs are found in home and office air samples, as well as in the blood of residents and office workers.[53] Compared to outdoor air, indoor air can have more than 1,000 times higher levels of FTOHs.[54] Carpets and rugs often contain FTOHs as manufacturing impurities or intermediate degradation products.[55] Carpet installation can result in significantly higher concentrations of PFAAs in indoor air than outdoor air.[56]

69.    During normal product use, surface abrasion can release PFAAs from treated carpet and rug fibers via tiny particles, which can become resuspended.[57] Human exposure to PFAS occurs via inhalation of volatile PFAS and PFAS-containing fine particles, as well as via incidental ingestion of household and office dust, which concentrates PFAS.[58]

70.    Researchers have measured PFAS in vacuum dust samples from 39 homes, finding correlations between the amount of PFNA and PFUnA in dust and

---

[53] *Id*. at 48 (citing Fraser et al. 2012; Fraser et al. 2013).

[54] *Id.* (citing Fraser et al. 2012; Müller et al. 2012).

[55] *Id.* (citing Herzke et al. 2012; Kotthoff et al. 2015; Liu et al. 2015c; Vestergren et al. 2015).

[56] *Id.* (citing Gewurtz et al. 2009).

[57] *Id.* (citing Rosati et al. 2008).

[58] *Id.* (citing Fraser et al. 2012; Harrad et al. 2010; Haug et al. 2011; Tian et al. 2016).

the presence of carpeting.[59] Later, other researchers measured 20 PFAS in dust from homes and found that exposure doses via incidental dust ingestion were significantly higher in toddlers than adults.[60] This indicates an increased potential for adverse impacts in this vulnerable subgroup.

71.    Regarding inhalation exposures, other researchers have found that FTOH concentrations in office air predicted PFOA concentrations in the blood of workers.[61] Carpet used in institutional settings may contain higher amounts of PFAS, presumably due to its use in high-traffic areas.[62]

72.    Human exposure to PFAAs, FASAs, FOSEs, and other PFAS can also occur through house dust,[63] which can have significantly higher PFAS levels than background concentrations in urban soils.[64] PFAA precursors in air and dust were observed to correlate with PFAA levels in human serum (Makey et al. 2017). Household dust can contain hundreds of chemicals (Moschet et al. 2018), including some with hazard traits similar to those of PFAS, such as flame retardants, phthalates, and environmental phenols (Mitro et al. 2016). Because Americans

---

[59] *Id.* (citing Knobeloch et al. 2012).

[60] *Id.* (citing Karásková et al. 2016).

[61] *Id.* (citing Fraser et al. 2012).

[62] *Id.* (citing Gewurtz et al. 2009).

[63] *Id.* at 51-52 citing (Jian et al. 2017).

[64] *Id.* at 52 (citing Tian et al. 2016; Xu et al. 2013).

spend, on average, more than 90 percent of their time indoors (Klepeis et al. 2001), incidental ingestion and inhalation of indoor dust represent potentially significant exposure pathways to multiple contaminants along with PFAS.

73.    Moreover, the air in homes, offices, and retail businesses can become contaminated with volatilized FTOHs, which are impurities or intermediate degradation products of the stain and soil repellents used on carpets and rugs.[65] PFAAs from carpet and rug treatments can also adsorb to house dust or be released as tiny particles from surface abrasion during normal use.[66] Household and office dust concentrates PFAS, leading to exposure via inhalation of PFAA-containing fine particles and incidental ingestion of dust.[67]

74.    A study of young adults in North Carolina found a statistically significant 57 percent increase in PFHxS levels in participants who reported vacuuming less frequently.[68] Another study of Canadian pregnant women found that levels of PFAA precursors in indoor air and dust correlated with participants' PFOA, PFNA, and PFOS serum levels.[69] Although incidental dust ingestion is generally

---

[65] *Id*. at 68 (citing Bohlin-Nizzetto et al. 2015; Schlummer et al. 2015).

[66] *Id.* (citing Rosati et al. 2008; Tian et al. 2016).

[67] *Id*. at 68-69 (citing Haug et al. 2011; Rosati et al. 2008; Shoeib et al. 2005).

[68] *Id*. at 69 (citing Siebenaler et al. 2017).

[69] *Id.* (citing Makey et al. 2017).

considered a minor pathway of exposure to PFAS in adults, it can be significantly higher in toddlers and young children.[70]

75.    Children between the ages of 1 and 3 spend a lot of time in contact with the floor, where dust settles, and engage in indoor hand-mouth behaviors an average of 16 times per day.[71] Thus, incidental dust ingestion can be a significant route of exposure for young children.[72] While adults are estimated to ingest an average of 50 mg/day of soil and dust, children under 6 may ingest 100 mg/day.[73] PFAS doses via incidental dust ingestion could be approximately an order of magnitude higher for toddlers than for adults.[74] A study of toddlers' cumulative exposure to PFOA and PFOS estimated a daily intake of 53.6 ng/day of PFOA and 14.8 ng/day of PFOS.[75]

76.    Office workers are another large group of Californians possibly experiencing chronic exposures to PFAS while on the job.[76] Office air can be contaminated with FTOHs from carpet treatments, leading to involuntary, chronic inhalation exposures in workers, which has not been well-characterized. PFAS can

---

[70] *Id.* (citing Tian et al. 2016; Wu et al. 2015).

[71] *Id*. at 72 (citing EPA 2011).

[72] *Id.* (citing Mercier et al. 2011; Tian et al. 2016).

[73] *Id.* (citing EPA 2011).

[74] *Id.* (citing Karásková et al. 2016).

[75] *Id.* (citing Tian et al. 2016).

[76] *Id.* (citing Bohlin- Nizzetto et al. 2015; Schlummer et al. 2015).

also adsorb to office dust or be released from surface abrasion as tiny particles, which office workers may ingest.[77] Due to their long usage life, commercial carpets could be a near-daily source of exposure to PFOA, PFOS, and other phased-out longer-chain PFAS for office workers.

## C.    PFAS in carpeting is dangerous throughout the life of the carpet.

77.    Carpets continue to emit PFAS throughout their lives. "[PFAS] are released by our consumer products, including carpets, bit by bit, through ordinary wear and tear. They make their way into our bodies and household dust. They are washed down the drain, contaminating wastewater and related biosolids used as compost. They are released to surface water and groundwater from the industrial facilities that manufacture and use them."[78]

78.    "Despite the voluntary removal of PFAS from new carpets, PFAS will remain a legacy chemical issue because of the ten to twenty year lifetime of carpets. Furthermore, current aftermarket treatments for stain, soil, and grease repellency still contain PFAS (HBN, 2017). As a result, it is precautionary to assume that all carpets in the waste or recycling pipeline are contaminated with PFAS."[79]

---

[77] *Id.* (citing Fraser et al. 2013).

[78] *See* https://informed.habitablefuture.org/resources/news/133-which-carpet-is-the-healthiest-busting-the-myth-on-carpet-claims (last visited July 16, 2024).

[79] https://bcgc.berkeley.edu/sites/default/files/final_report-_carpet_recycling-2020.pdf. (last visited July 16, 2024).

79.    According to the U.S. Centers for Disease Control (CDC), "Major types of human exposure sources from PFAS include… Hand-to-mouth transfer from surfaces treated with PFAS-containing stain protectants, such as carpets, which is thought to be most significant for infants and toddlers."[80] Adults can be exposed from inhalation or ingestion of dust, or dermal contact.[81]

80.    In 2017, the nonprofit Healthy Building Network reported that routine wear and tear, as well as any type of cleaning, dislodges PFAS chemicals from carpet fibers into air and dust.[82] It also reported that people inhale or ingest PFAS chemicals throughout the lifecycle of production, use, and disposal of carpet.[83]

81.    The Network further reported that the carpet industry eliminated treatments based on long-chain PFAS from U.S. production by 2008.[84] Under pressure from consumers and regulators, companies voluntarily replaced them with treatments based on shorter-chain compounds, including fluorotelomer-based PFAS

---

[80] https://stacks.cdc.gov/view/cdc/77114 (last visited July 16, 2024).

[81] *See*  https://www.ewg.org/news-insights/news/first-california-moves-protect-people-toxic-pfas-chemicals-carpets#1 (last visited July 16, 2024).

[82] *See*  https://habitablefuture.org/wp-content/uploads/2024/03/81-eliminating-toxics-in-carpet-lessons-for-the-future-of-recycling.pdf. (last visited July 16, 2024).

[83] *Id.*

[84] *Id.*

with six perfluorinated carbons (C-6) and perfluoroalkyl sulfonyl fluoride-based chemistries with four perfluorinated carbons (C-4, PFBS).[85]

82.    3M's Cottage Grove, Minnesota, plant stopped making the longer-chain PFAS over a decade ago, but continues to produce short-chain PFAS.[86] "'The environmental concentration of short-chain [PFAS] now often exceeds those of the longer-chain substances in water and other media, yet there is very limited toxicological data for them, and currently no tolerable daily intake has been established,' note Minnesota officials and other scientists who documented the distribution of PFAS from the Cottage Grove plant."[87]

83.    EPA, in its action plan for long-chain perfluorinated chemicals (PFCs), stated that "[c]hildren are particularly susceptible to exposure from inhalation of PFC off-gassing from carpet and carpet protectants during their earliest years when they are lying, crawling and spending large amounts of time playing on the carpet. The significantly high levels of PFC found by ORD [EPA's Office of Research and Development] in carpet and carpet protectants pose an exposure concern for children

---

[85] *Id.*

[86] *Id.*

[87] *Id.*

through this pathway. Adults can also be exposed to PFCs in carpets through inhalation and dermal contact."[88] (Citations omitted.)

84.    "[C]arpets are a surface that is touched often with bare skin and regular wear and tear of the carpet by walking may also release coated fibers into the air. Hand-to-mouth behavior of small children also introduces an oral exposure route. These many routes of repeated exposure to the carpet protectant materials necessitate alternatives that significantly reduce the health hazards posed by PFAS products."[89]

85.    Indeed, one study has shown that "replacing PFAS-containing carpet and furniture reduced dust concentrations by 78%, indicating the significance of home textile products as a PFAS source to dust and indoor air."[90]

---

[88]    https://www.epa.gov/sites/default/files/2016-01/documents/pfcs_action_plan1230_09.pdf (last visited July 16, 2024).

[89]    https://bcgc.berkeley.edu/sites/default/files/publications/aftermarket_treatment_case_study_-_final_-_web.pdf (last visited July 16, 2024).

[90] https://www.pca.state.mn.us/sites/default/files/gp3-06.pdf (last visited July 16, 2024) (citing Young, A. S., et al. (2021). Impact of "healthier" materials interventions on dust concentrations of per and polyfluoroalkyl substances, polybrominated diphenyl ethers, and organophosphate esters. Environment International, 150, 106151 (https://doi.org/10.1016/j.envint.2020.106151).

**D.     For decades, Defendants have known that PFAS products cause severe health and environmental damages.**

    **1.     3M has known for decades of health and environmental risks from PFAS.**

86.     3M was the largest manufacturer of PFAS chemicals in the United States from the 1940s through the early 2000s.

87.     3M manufactured PFAS by means of electrochemical fluorination beginning in the 1940s.

88.     3M knew for decades that its PFAS Products were toxic and would adversely affect the environment and human health. The allegations in the following paragraphs are based on a 719-page report by the Environmental Working Group ("EWG Report") that details 3M "internal memos, studies and other company documents detailing the two companies' history of deception."[91] The report includes a timeline with links to the supporting documents, which were obtained by the State of Minnesota in *State of Minnesota v. 3M Co*., Court File No. 27-CV-10-28862 (Hennepin County District Court).

89.     Lori Swanson, former Attorney General of Minnesota, testified in the House of Representatives that the State's lawsuit "alleged that 3M contaminated the aquifers that supplied drinking water to over 100,000 Minnesota residents through

_____

[91] https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPont-Timeline_sm.pdf (last visited Aug. 29, 2024).

its manufacture and disposal of these chemicals. The lawsuit was settled in February 2018—on the morning our trial was to begin. The settlement required 3M to pay $850 million to the State of Minnesota to bring long-term clean drinking water to our residents and up to another $40 million for short-term drinking water solutions."[92]

90.     Documents obtained in that trial demonstrate that 3M began testing the physiological and toxicological properties of PFAS compounds as early as 1950. Based on these internal studies, 3M knew that PFOA and PFOS were harmful to humans and the environment as early as the 1950s.

91.     By 1956, 3M knew that studies showed that PFAS bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.[93]

92.     By 1960, 3M knew that its waste PFAS could leach into groundwater and otherwise harm the environment. An internal 3M memorandum from 1960 described 3M's understanding that such wastes would "reach the water table and pollute domestic wells."[94]

---

[92]     https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf ("Swanson Testimony") (last visited Aug. 29, 2024).

[93] *Id*. at p. 38.

[94] *Id*. at p. 47.

93.    "By the early 1960s, 3M understood that PFCs [another name for PFAS] are stable and persist in the environment and that they do not degrade. *See*, *e.g.*, 3M Brand Fluorochemical Surfactants, June 15, 1963 (3MAO 1201629, at -1635) (Ex. 10) (listing chemical, thermal, and biological stability as '[t]he main features which distinguish these materials'); U.S. Patent No. 2,519,983, August 22,1950, at 4:33-39 (Ex. 11) (noting the '[h]igh degree of thermal stability and chemical inertness' of PFCs)."[95]

94.    In 1963, a 3M technical manual deemed PFAS to be toxic,[96] yet 3M chose to withhold its knowledge from its customers and the public, even as its knowledge of the dangers of PFAS continued to grow.

95.    Also in 1970, "3M warn[ed] Fire Journal, the magazine of the National Fire Protection Association, that PFAS is toxic to fish."[97]

96.    As the State of Minnesota explained in its lawsuit, "In 1975 two independent scientists—Dr. Warren Guy and Dr. Donald Taves—found PFAS in human blood in blood banks around the country. They called 3M to say they thought its chemicals may be to blame. But 3M 'plead ignorance' and misled the scientists, claiming that Scotchgard did not contain the chemicals found in blood, and refused

---

[95] *Id.* at p. 37.

[96] EWG Report at p. 2 (linking to 3M techical manual).

[97] *Id.* (linking to document).

to identify the chemicals in its products to the scientists. *See* Exhibit D. In doing so, the company thwarted the broader scientific community's understanding of the health impacts of these chemicals for a generation."[98]

97.    In 1976, 3M began monitoring the blood of its employees for the presence of PFAS because the company was concerned about potential health effects. For example, workers at 3M's Chemolite plant in Cottage Grove, Minnesota, were found to have blood PFAS levels at "1,000 times normal."[99]

98.    During the late 1970s, 3M's internal studies continued to demonstrate the environmental persistence and severe toxicity of the company's chemicals. 130. As the State of Minnesota explained in its lawsuit, a "1978 study by 3M on PFOS and PFOA confirmed that 'these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism.' See July 19, 1978 3M Technical Report Summary (3MA10054929, at - 4930) (Ex.13)."[100]

99.    In 1978, 3M conducted multiple PFOS and PFOA studies in monkeys and rats. The studies showed that PFOS and PFOA affected the liver and

---

[98] Swanson Testimony, at p. 4.

[99] *Id*. at p. 39.

[100] *Id.* at pp. 37-38.

gastrointestinal tract of the species tested. Results of a ninety-day animal study conducted by 3M in 1978 indicated that PFAS "should be regarded as toxic."[101]

100.   In 1978, 3M had to abort a study when all of the test monkeys died within the first few days or weeks after being given food contaminated with PFOS. The deaths were attributed to the "compound effect" of the chemical.[102]

101.   In 1979, an internal 3M report discussing the studies on PFOS and PFOA toxicity to animals stated that the compounds were "more toxic than anticipated" and recommended that "lifetime rodent studies should be undertaken as soon as possible." That year, 3M executives flew to San Francisco to consult Harold Hodge, a respected toxicologist. They told Hodge only part of what they knew: that PFOS had sickened and even killed laboratory animals and had caused liver abnormalities in factory workers. According to a 3M document that was marked "confidential," Hodge urged 3M executives to study whether 3M's fluorochemicals caused reproductive issues or cancer. After reviewing more data, he told one of them to find out whether the chemicals were present "in man," and he added, "If the levels are high and widespread and the half-life is long, we could have a serious problem."

---

[101] EWG Report at p. 2 (linking to 3M document).

[102] *Id*. at p. 26.

Yet Hodge's warning was omitted from official meeting notes, and the company's fluorochemical production increased over time.[103]

102.  With mounting evidence that its PFAS were toxic, persistent, and mobile in the environment, concerns were growing internally at 3M about the possible risks to its employees.

103.  A 1979 memo from an employee in 3M's medical department stated that "I believe it is paramount to begin now an assessment of the potential (if any) of long-term (carcinogenic) effects for these compounds [i.e., fluorochemicals]."[104]

104.  By 1979, Old DuPont and 3M were sharing research on the effects of PFAS to determine the risk to their employees.

105.  In 1981, 3M moved twenty-five female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure."[105] This was based on internal research showing that PFAS compounds were causing birth defects in rats.

---

[103]    https://www.newyorker.com/magazine/2024/05/27/3m-forever-chemicals-pfas-pfos-toxic (last visited Aug. 29, 2024).

[104] Swanson Testimony at p. 40.

[105] EWG Report at p. 332 (exhibit from State of Minnesota lawsuit).

106.   In 1989, a review of mortality data among 3M's chemical division workers found, compared to Minnesota death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."[106]

107.   In 1996, 3M employees visited Washington Works in Parkersburg, West Virginia for discussions with Old DuPont about finding replacements for their fluorochemicals. At a prior meeting in May 1995, the companies had set a goal of finding a replacement by 2000.

108.   By the late 1990s, 3M's own toxicologist had calculated a "safe" level for PFOS in human blood to be 1.05 ppb, at a time when 3M was well aware that the average level of PFOS found in the blood of the general population of the United States was approximately thirty times higher than this "safe" blood level.[107] 3M did not disclose this information for more than two decades.

109.   In 1998, a 3M employee (Kris Hansen) discovered that "PFOS, a man-made chemical produced by her employer 3M, really was in human blood, practically everywhere. Hansen's team found it in Swedish blood samples from 1957 and 1971. After that, her lab analyzed blood that had been collected before 3M

---

[106] *Id*. at p. 345 (exhibit from State of Minnesota lawsuit).

[107] https://www.consumerreports.org/toxic-chemicals-substances/case-suggests-forever-chemical-manufacturers-hid-health-risk-a8896667936/?srsltid=AfmBOop57sKZOIz7yzcw23QeWsXkVYumI4ccxcBVAVNHNxnadaNY75Dc (last visisted Aug. 29, 2024).

created PFOS. It tested negative. Apparently, fluorochemicals had entered human blood after the company started selling products that contained them. They had leached out of 3M's sprays, coatings, and factories—and into all of us."[108]

110.   That summer, an in-house librarian at 3M delivered a surprising article to Hansen's office mailbox. It had been written in 1981, by 3M scientists, and it described a method for measuring fluorine in blood, indicating that even back then the company was testing for fluorochemicals. One scientist mentioned in the article, Richard Newmark, still worked for 3M, in a low-lying structure nicknamed the "nerdy building." Hansen arranged to meet with him there.

111.   Newmark told Hansen that, more than twenty years before, two academic scientists, Donald Taves and Warren Guy, had discovered a fluorochemical in human blood. They had wondered whether Scotchgard might be its source, so they approached 3M. Newmark told her that his subsequent experiments had confirmed their suspicions—the chemical was PFOS—but 3M lawyers had urged his lab not to admit it.[109]

112.   "As Hansen wrote all this down in a notebook, she felt anger rising inside her. Why had so many colleagues doubted the soundness of her results if

---

[108]    https://www.propublica.org/article/3m-forever-chemicals-pfas-pfos-inside-story (last visited Aug. 29, 2024).

[109] *Id.*

earlier 3M experiments had already proved the same thing? After the meeting, she hurried back to the lab to find Bacon. 'He knew!' she told him."[110]

113.   Despite decades of knowledge about the ubiquity and toxicity of its PFAS, 3M only shared its concerns with EPA beginning in May 1998, with the submission of a TSCA 8(e) letter for PFOS.[111]

114.   3M's submission to EPA downplayed concerns about environmental impacts of PFAS. It did not mention its animal research from the seventies, and it said that the chemical caused "no adverse effects" at the levels the company had measured in its workers. A 3M employee explained the deficiencies in the submission:[112]

> 3M submitted a TSCA 8e last May, There is tremendous concern within EPA, the country, and the world about persistent bioaccumulative chemicals such as PFOS. Just before that submission we found PFOS in the blood of eaglets – eaglets still young enough that their only food consisted of fish caught in remote lakes by their parents. This finding indicates a widespread environmental contamination and food chain transfer and probably bioaccumulation and bio-magnification. This is a very significant finding that the 8e reporting rule was created to collect. 3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information.

---

[110] *Id.*

[111] Swanson Testimony, at p. 9 (exhibit from State of Minnesota trial).

[112] *Id.* at pp. 9-10.

115.   The same 3M employee, environmental specialist Dr. Rich Purdy, stated in his resignation letter in 1999 that PFOS is "the most insidious pollutant since PCB [polychlorinated biphenyl]. It is probably more damaging than PCB because it does not degrade, whereas PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB."[113] Dr. Purdy sent his resignation letter to EPA, effectively blowing the whistle on 3M's harmful and illegal activities.

116.   In 2000, a year after Hansen's meeting with 3M's CEO, 3M made a very costly decision under pressure from EPA: it was going to discontinue its entire portfolio of PFOS-related chemicals. In May 2000, for the first time, 3M officials revealed to the press that it had detected the chemical in blood banks. One executive claimed that the discovery was a "complete surprise." 3M's medical director told the New York Times, "This isn't a health issue now, and it won't be a health issue." But the newspaper also quoted a professor of toxicology. The press release falsely stated that "our products are safe" and cited 3M's purported "principles of responsible environmental management" as the reason to cease production.[114]

---

[113] *Id.* at p. 9.

[114]   https://www.nytimes.com/2000/05/19/business/epa-says-it-pressed-3m-for-action-on-scotchgard-chemical.html (last visisted Aug. 29, 2024).

117.  In 2006, EPA cited 3M for 244 violations of the Toxic Substances Control Act, accusing 3M of failing to notify the agency about new chemicals and of late reporting of "substantial risk information." 3M agreed to pay $1.52 million for these violations.[115]

118.  Between 1951 and 2000, 3M produced at least a hundred million pounds of PFOS and chemicals that degrade into PFOS. This is roughly the weight of the Titanic. After the late seventies, when 3M scientists established that the chemical was toxic in animals and was accumulating in humans, it produced millions of pounds per year.[116]

## 2.    Old DuPont has known for decades of PFAS's health and environmental risks, as has Chemours after it was spun off.

119.  In the 1950s, Old DuPont began using PFOA and other PFAS in its specialty chemical applications, including household products like Teflon, and supplied PFAS Products to third parties for use in manufacturing.

120.  Old DuPont quickly thereafter developed an understanding of the dangers of using these chemicals. Rather than warn the public or its consumers about

---

[115]          https://www.epa.gov/enforcement/3m-company-settlement#:~:text=3M%20agreed%20to%20pay%20a,information%2C%20and%20other%20reporting%20violations. (last visited Aug. 29, 2024).

[116]    https://www.propublica.org/article/3m-forever-chemicals-pfas-pfos-inside-story#:~:text=Between%201951%20and%202000%2C%203M,millions%20of%20pounds%20per%20year. (last visited Aug. 29, 2024).

these risks, Old DuPont covered up this information and promoted its PFAS-related products as safe.

121.   During this time, Old DuPont was aware that PFOA was toxic to animals and humans and that it bioaccumulates and persists in the environment. Old DuPont also knew that the PFAS present in Teflon and its other specialty chemical products would proliferate and contaminate the environment. Old DuPont was further aware that industrial facilities related to products like Teflon emitted and discharged PFOA and other PFAS into the environment in large quantities and that scores of people had been exposed to its PFAS, including via public and private drinking water supplies.

122.   In approximately 1951, Old DuPont started using PFOA in making Teflon for industrial uses at its Washington Works manufacturing plant in Parkersburg, West Virginia. As early as 1954, employees at Old DuPont's Washington Works plant reported that PFOA might be toxic. In 1961, seven years later, Teflon-coated consumer products hit the marketplace.[117]

123.   By 1961, Old DuPont scientists were issuing internal warnings about the toxicity associated with PFOA, after testing with PFOA led to enlarged livers –

---

[117]    https://pfasproject.com/parkersburg-west-virginia/#:~:text=DuPont%20began%20using%20PFOA%20to,female%20employees%20from%20Teflon%20work (last visited Aug. 29, 2024).

"the most sensitive sign of toxicity" – in rats, rabbits, and dogs. Old DuPont's Toxicology Section Chief cautioned that such products should be "handled with extreme care" and that contact with the skin should be "strictly avoided."[118]

124.   In 1964, a group of Old DuPont employees working in Teflon manufacturing became sick after their department was moved to a more enclosed workspace. They experienced chills, fever, difficulty breathing, and a tightness in the chest – symptoms referred to variously as "polymer-fume fever," "Teflon flu," or simply, "the shakes." Polymer-fume fever was first reported in the medical literature in 1951.

125.   In 1965, Old DuPont sponsored a study in which rats were fed a PFAS compound over a ninety-day period. Necropsies revealed discoloration of the liver, increased liver and kidney weight, and increased spleen size.[119]

126.   As early as 1966, Old DuPont was aware that PFOA could leach into groundwater.

127.   In 1970, an internal memo stated that Old DuPont's internal laboratory had found PFOA to be "highly toxic when inhaled and moderately toxic when injected."[120]

---

[118] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10237242/#B89 (last visited Aug. 29, 2024).

[119] EWG Report, at p. 2 (linking to document).

[120] Id. at p. 2 (linking to document).

128.   In 1973, Old DuPont scientists issued results from a study showing that PFOA caused adverse liver reactions in rats and dogs.[121]

129.   In 1975, Old DuPont toxicologists met with 3M employees to discuss the "possible toxic effects" of PFAS in Teflon. 3M provided Old DuPont with the results of its toxicity testing on rats and the companies discussed continued sharing of research.[122]

130.   By 1977, Old DuPont knew about research showing detections of organic fluorine in blood bank samples in the United States, which the researchers believed could be a potential result of human exposure to PFAS.[123]

131.   By 1979, Old DuPont's survey of employees in its Parkersburg, W.Va., Teflon plant found possible evidence of liver damage.[124]

132.   In 1981, both Old DuPont and 3M reassigned female workers after animal studies revealed PFAS damages the eyes of the developing fetus.[125]

133.   By 1981, Old DuPont obtained a 3M internal study that documented birth defects in the eyes of unborn rats exposed to PFAS in utero and urged female workers who came into contact with PFAS to consult their doctors "prior to

---

[121] EWG Report at pp. 177 *et seq*. (Old DuPont report).

[122] *Id*. at p. 2 (linking to report).

[123] *Id*. at p. 2 (linking to report).

[124] *Id*. at p. 2 (linking to report).

[125] *Id*. at p. 2 (linking to report).

contemplating pregnancy." Contemporaneously with 3M, Old DuPont reassigned "female employees of childbearing capability" from jobs where they would be in direct contact with PFAS.[126]

134.    In 1981, Old DuPont began secretly monitoring female employees who had been exposed to PFOA and conducted blood sampling of those who were pregnant or recently pregnant. Of the eight women who gave birth during this time period, two of the eight gave birth to children with birth defects in their eyes or face, and a third child had PFOA in the umbilical cord. As Old DuPont's medical director Bruce Karrh explained in a memo, this monitoring was undertaken to "answer a single question – does [PFOA] cause abnormal children?" The results of the research were described as "statistically significant."[127] Old DuPont abandoned the study without informing regulators or employees.

135.    In 1982, Old DuPont's medical director warned in a confidential memo about employees being exposed to potentially dangerous levels of PFOA. He recommended that "available practical steps be taken to reduce this exposure."[128]

---

[126] *Id*. at p. 334 (exhibit from State of Minnesota lawsuit).

[127]     https://www.ewg.org/news-insights/official-correspondence/update-ewg-petition-epa-concerning-duponts-response-epas (last visited Aug. 29, 2024).

[128] https://theintercept.com/2015/08/11/dupont-chemistry-deception/ (last visited Aug. 29, 2024).

136.   In addition to its knowledge of PFOA's toxicity dating back to the 1960s, Old DuPont was also aware that PFAS were capable of contaminating the surrounding environment, leading to human exposure. In 1984, Old DuPont secretly sent employees to obtain drinking water samples from surrounding communities. The results showed that PFOA released from its manufacturing operations was contaminating local drinking water supplies in Lubeck, West Virginia and Little Hocking, Ohio, but Old DuPont said nothing to regulators or the affected communities.[129]

137.   In 1992, a study by Old DuPont found elevated cancer rates among workers.[130]

138.   In 1995, an Old DuPont scientist wrote that "[w]e are concerned about the potential long-term human health effects of these [PFAS] materials considering they all appear to have long biological half-lives."[131]

139.   In 1997, a study by Old DuPont found heightened cancer rates among workers at the Parkersburg plant.[132]

---

[129] EWG Report at p. 2 (linking to document).

[130] *Id.* at p. 3 (linking to document).

[131] *Id.* at p. 655 (letter from Old DuPont's William J. Brock, Ph.D.).

[132] *Id.* at p. 3 (linking to document).

140.    In 1999, Old DuPont received preliminary results from a study showing that PFOA caused monkeys to lose weight and increased their liver size. Even monkeys given the lowest doses suffered liver enlargement, and one became so ill it had to be euthanized.

141.    After Old DuPont was sued by a West Virginia farmer in 1999, an internal memorandum regarding its litigation strategy shows that Old DuPont sought to "not create [the] impression that DuPont did harm to the environment" and wanted to "keep [the] issue out of the press as much as possible."[133]

142.    In 2000, John R. Bowman, an in-house counsel for PFOA issues, wrote an email to several colleagues: "I think we need to make more of an effort to get [Old DuPont] to look into what we can do to get the Lubeck community a clean source of water or filter the [PFOA] out of the water." He continued:

> I think we are more vulnerable than the MTBE defendants [manufacturers of another notorious groundwater contaminant, MTBE] because many states have adopted a drinking water guideline for MTBE and it is not biopersistent. My gut tells me the biopersistence issue will kill us because of an overwhelming public attitude that anything biopersistent is harmful.
>
> We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for

---

[133]    https://www.taipeitimes.com/News/bizfocus/archives/2004/08/08/2003197953 (citing document produced in class action suit against DuPont) (last visited Aug. 29, 2024).

punitives. [Bernard Reilly, another DuPont attorney] and I have been unsuccessful in even engaging the clients in any meaningful discussion of the subject. Our story is not a good one, we continued to increase our emissions into the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the bio-persistence of this chemical.

143. In a 2001 email, in-house lawyer Bernard Reilly described Old DuPont's response to the [PFOA] issue as "a debacle at best." Reflecting on a late 2001 meeting with EPA concerning PFAS contamination in Parkersburg, West Virginia, Mr. Reilly wrote that the "business did not want to deal with this issue in the 1990s, and now it is in their face, and some still are clueless. Very poor leadership, the worst I have seen in the face of a serious issue since I have been with DuPont."[134]

144. Notwithstanding its internal knowledge of PFOA's health and environmental risks from as early as the 1950s, Old DuPont publicly stated in 2003 that "[w]e are confident that there are no health effects associated with [PFOA] exposure," and that "[PFOA] is not a human health issue."

145. "Documents obtained from litigation against DuPont for PFOA contamination of water supplies in West Virginia and Ohio show that DuPont's own ethicists and medical experts found the company's spin on PFOA science to be

---

[134]      https://highline.huffingtonpost.com/articles/en/welcome-to-beautiful-parkersburg/ (last visited Aug. 29, 2024).

'misleading', 'disingenuous', 'unacceptable', and 'not supported by the available facts' (DuPont's Epidemiology Review Board 2005-2006)."[135]

146.  Old DuPont's own Epidemiology Review Board ("ERB") "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."[136]

147.  In 2004, EPA filed an administrative enforcement action against Old DuPont for its failure to disclose toxicity and exposure information for PFOA, in violation of TSCA and the Resource Conservation and Recovery Act ("RCRA"). Old DuPont eventually settled the lawsuit by agreeing to pay over $16 million in civil administrative penalties and undertake supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."[137]

---

[135]      https://www.ewg.org/research/credibility-gap-toxic-chemicals-food-packaging (last visited Aug. 29, 2024).

[136]
https://static.ewg.org/files/ERB_February2006.pdf?_gl=1*zjlmh4*_gcl_au*MTkz
ODY1MjU5MS4xNzIzNjQyMDMz*_ga*MTI0NTE5ODM4LjE3MTQ0ODc2Nz
U.*_ga_CS21GC49KT*MTcyNDk1MDY5NS4yMi4xLjE3MjQ5NTI0NzkuOC4w
LjE3NzQ2OTQxMzQ.&_ga=2.116395203.494412991.1724944528-
124519838.1714487675 (last visited Aug. 29, 2024).

[137]      https://www.epa.gov/enforcement/ei-dupont-de-nemours-and-company-and-
chemours-company-pfoa-settlements#:~:text=TSCA%2FRCRA%20settlement,-

148.    At about the time this penalty was issued, Old DuPont was making approximately $1 billion a year in revenue from products containing PFOA.

149.    As a spin off from Old DuPont, Chemours has known since its inception of the dangers of PFAS.

### 3.    Daikin has known for decades about PFAS's health and environmental risks.

150.    Daikin also has known of the dangers of PFAS since before 2000. A Daikin document states that Daikin "succeeds in fluorocarbon synthesis; begins mass production in 1942."[138] Fluorocarbons are PFAS. Then in 1953, Daikin developed "'Daiflon' fluorocarbon polymer (polychlorotrifluoro-ethylene)."[139] In 1955, Daikin developed "'Polyflon' fluorocarbon polymer (polytetrafluoro-ethylene)."[140] An entry in that same Daikin document states that "Development of Neoflon fluorocarbon polymer (copolymer of tetrafluoroethylene and hexafluoropropylene) begins; product successfully marketed in 1974."[141] After it

---

On%20December%2014&text=The%20settlement%20package%20 requires%20DuPont,Environmental%20Projects%20worth%20%246.25%20millio n (last visited Aug. 29, 2024).

[138]    https://www.daikin.com/-/media/Project/Daikin/daikin_com/corporate/ overview/summary/history/company_history/pdf/Chronology-pdf.pdf?rev=- 1&hash=C378F8B5C484B8F6AF671E54EFC4F764 (last visited Aug. 21, 2024). The document does not state which Daikin entity did this.

[139] *Id.*

[140] *Id.*

[141] *Id.*

developed more fluorocarbons in the next decades, Daikin established a factory in Kashima, Japan, "to produce fluorocarbons and fluorocarbon polymers."[142]

151.  Moreover, "Daikin America, Inc., and MDA Manufacturing, Inc., [were] established in U.S. as fluorocarbon polymer production and sales companies; factory begins operation in 1994."[143]

152.  Records from hearings with Daikin's parent company by the Osaka Prefectural Government obtained through a freedom of information request, as well as additional reporting, demonstrate that it was aware of PFOA's toxic nature since at least 2002.[144]

153.  Daikin did not stop manufacturing PFOA until in 2015, thirteen years after 3M had done the same.

154.  And in recent years, after studies found high levels of PFOA and illnesses around a Daikin plant in Japan, Daikin's parent company denied PFOA was a problem and stonewalled the release of information about the pollution. "We don't want the PFOA concentration at the Yodogawa Plant site disclosed," a Daikin representative told city officials.[145]

---

[142] *Id.*

[143] *Id.*

[144] https://en.tansajp.org/investigativejournal/7896/ (last visited Aug. 21, 2024).

[145] https://en.tansajp.org/investigativejournal/7892/ (last visited Aug. 21, 2024).

155.   Daikin's parent company refused to pay for cleanup of the PFOA pollution. Daikin said it was "not aware of PFOA causing health problems [in the area around its Yodogawa Plant], so we do not intend to implement any particular response at this time."[146]

156.   Daikin has never disclosed the dangers of PFAS to any carpet manufacturer or consumer, including Plaintiffs and the Class members.

**4.    For decades, Defendants and Daikin have collaborated to suppress information about PFAS risks, deceived consumers and regulators, and failed to act on their knowledge of grave dangers of PFAS products such as PFAS-infused products.**

157.   Despite their knowledge of the harms of their products, including PFAS-infused products, Defendants and Daikin have collaborated to suppress scientific research on the hazards associated with PFAS and mounted a campaign to control the scientific dialogue on the risks of PFAS.

158.   Through their roles as the designers, manufacturers, marketers, distributors, and sellers of PFAS Products, Defendants and Daikin controlled the information available to their customers, environmental regulators, and the general public. Defendants and Daikin had a vested and common financial interest in exercising this influence to conceal the true harmful nature of PFAS, in spite of their obligations to provide this information and to be truthful in advertising.

---

[146] https://en.tansajp.org/investigativejournal/7929/ (last visited Aug. 21, 2024).

159.   Internal documents and testimony made public demonstrate a strategy to "shape the debate at all levels." One consultant retained by Old DuPont to work on PFAS issues outlined the company's goal in a 2003 proposal:[147]

> DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. . . .The outcome of this process will result in the preparation of a multifaceted plan to take control of the ongoing risk assessment by the EPA, looming regulatory challenges, likely litigation, and almost certain medical monitoring hurdles. The primary focus of this endeavor is to strive to create the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. ***This would include facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm***. We would also lay the foundation for creating *Daubert* precedent to discourage additional lawsuits.... This battle must be won in the minds of the regulators, judges, potential jurors, and the plaintiff's bar.... Manufacturers must be the aggressors.

160.   3M's and Old DuPont's efforts to suppress knowledge of the harms of PFAS began as soon as evidence of its toxicity began to emerge, when they marked scientific studies and related documents as "confidential," withholding their

---

[147] Letter from P. Terrence Gaffney, Esq of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

disclosure in spite of the obvious public interest and evidencing an awareness of legal liability. As 3M's Dr. Rich Purdy wrote in a resignation letter:[148]

> 3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process. This has stymied intellectual development on the issue, and stifled discussion on the serious ethical implications of decisions.

161.    As part of the PFAS Concealment Enterprise, 3M used a variety of tactics to deceive others and to hide the negative effects of PFAS. In Dr. Rich Purdy's letter of resignation from 3M, he detailed among other things: 3M's tactics to prevent research into the adverse effects of its PFOS; 3M's submission of misinformation about its PFOS to EPA; 3M's failure to disclose substantial risks associated with its PFOS to EPA; 3M's failure to inform the public of the widespread dispersal of its PFOS in the environment and population; 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain; and 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.[149]

---

[148]    https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf (exhibit from State of Minnesota lawsuit) (last visisted Aug. 29. 2024).

[149] *Id.*

162.    3M intentionally withheld scientific information about the material risks of its PFAS Products. When researchers Guy and Taves contacted 3M in 1975 about the "universal presence" of organic fluorine in compounds in blood among the general population, 3M "plead ignorance," misled them by "advis[ing] him that 'Scotchgard' was a polymeric material not a [fluorochemical]," and took a position of "scientific curiosity and desire to assist in any way possible."[150] 3M directed its Central Analytical Laboratory (CAL) to conduct similar sampling from blood banks, from which an internal report concluded that the organic fluorine compounds "resembled most closely" PFOS, confirming the suspicions held by the 3M researchers. Subsequent 3M research in 1976 confirmed that the compounds found in human blood by Guy and Taves were PFOS manufactured by 3M.

163.    3M withheld material scientific information from government agencies as well. From the 1970s, 3M conducted over a thousand studies related to the properties of PFAS and its effects on human health and the environment. These studies should have been disclosed to EPA, pursuant to TSCA Section 8(e), but from 1980 to 1993, 3M submitted only eighty-four studies or reports to EPA. From 1998 to 2000, 3M submitted over 1,218 studies or reports, many of which had been prepared decades earlier.

---

[150] Swanson Testimony, at p. 4; Exh. D to Swanson Testimony, at pp. 13-15.

164.    Even after 3M's phaseout, the company worked to control and to distort the science on PFAS. When 3M revealed in 1998 that PFOS was in the blood of the general population, it developed a "Science Publication Strategy" to simultaneously publish select studies in academic journals to create a "context which demonstrates that there is no medical or scientific basis to attribute any adverse health effects to 3M products." Meanwhile, Dr. John Butenhoff, 3M's Manager of Corporate Toxicology, had already calculated a "safe" level of PFOS in human blood of 1.05 ppb and he reported internally that 3M needed to replace "PFOS-based chemistry as these compounds [are] VERY persistent and thus insidiously toxic."[151]

165.    3M's PFAS strategy included providing "[s]elective funding of outside research through 3M 'grant' money," including millions of dollars to a professor, John Giesy, who publicly presented himself as an independent expert but behind the scenes worked for 3M by reviewing articles submitted to academic journals for publishing. Dr. Giesy's goal, as expressed in a March 25, 2008, email, was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations they can be a large obstacle to refute." The deceptive intentions of 3M and Dr. Giesy

---

[151] https://www.consumerreports.org/toxic-chemicals-substances/case-suggests-forever-chemical-manufacturers-hid-health-risk-a8896667936/?srsltid=Afm BOop57sKZOIz7yzcw23QeWsXkVYumI4ccxcBVAVNHNxnadaNY75Dc    (last visisted Aug. 29, 2024).

were further evidenced by his assurances to his benefactor that he acted to ensure "there was no paper trail to 3M."

166.   Similarly, Old DuPont conducted its own studies of the toxicity of PFOA but did not communicate the results to the public or to regulators. Old DuPont understood the nature of PFAS, the significance of its concentrations, and the hazards it presented to the company's employees, the public, and the environment.

167.   Despite its knowledge, Old DuPont continued to manufacture PFAS while it actively suppressed scientific awareness of the hazards of its products.

168.   By the late 1990s, Old DuPont understood its substantial liability exposure from its decades of releasing toxic PFAS into the environment. Internally, its employees expressed concerns that "toxicity issues associated with [PFOA] exposure could turn it into the #1 DuPont torte [sic] issue."

169.   These liability concerns extended to their interactions with regulators and their misleading disclosures. In a 2001 email, Old DuPont lawyer Bernard Reilly wrote:[152]

> Got a call about 2130 when in bed last night from one of our engineers worrying about our technique for measuring surfactant at Parkersburg. We learned recently that our analytical technique has very poor recovery, often 25%, so any results we get should be multiplied by a factor of 4 or even 5. However, that has not been the practice, so we

---

[152] *In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Inj. Litig.*, No. 2:13-CV-170, 2016 WL 659112, at *58 (S.D. Ohio Feb. 17, 2016) (quoting email).

have been telling the agencies results that surely are low. Not a pretty situation, especially since we have been telling the drinking water folks not to worry, results have been under the level we deem "safe" of 1 ppb. We now fear we will get data from a better technique that will exceed the number we have touted as safe. Ugh

170.    In an October 2001 email, Reilly also stated:[153]

[W]e are exceeding the levels we say we set as our own guideline, mostly because no one bothered to do the air modeling until now, and our water test has [been] completely inadequate . . . . I have been telling the business to get out all the bad news . . . . Too bad the business wants to hunker down as though everything will not come out in the litigation, god knows how they could be so clueless.

171.    After EPA learned of the hazards of PFAS, the agency filed administrative actions against 3M and Old DuPont for concealing their knowledge in violation of federal law.

172.    In December 2005, Old DuPont settled with EPA to pay about $16.5 million to resolve TSCA and RCRA claims alleged in two complaints filed by the agency in July 2004 and December 2004. Those claims included "multiple failures to report information to EPA about substantial risk of injury to human health or the environment from a chemical during a period beginning in June of 1981 through March of 2001."

---

[153]    https://www.desmog.com/2019/12/13/film-dark-waters-chemical-pollution-history-dupont-shell-ohio-river-valley/ (showing picture of email) (last visited Aug. 29, 2024).

173.   In April 2006, 3M settled with EPA to pay approximately $1.5 million to resolve 244 separate counts under TSCA related to PFOS and PFOA, following a company-wide audit.

174.   Once EPA was alerted to the health hazards of PFAS in 1998 and received a late disclosure of over 1,200 reports and studies, EPA and the scientific community commenced significant scientific inquiries into the nature of these chemicals. Since then, the scientific community has produced a substantial body of research, with some years exceeding 1,000 published studies on PFAS. The extraordinary number of studies which have been conducted in the last two decades reflect the profound lack of knowledge held by the government and the general scientific community about the properties and risks of PFAS, as a consequence of Defendants concealing and suppressing knowledge and research for decades. Defendants sought to exploit that lack of knowledge to preserve their PFAS and related business lines.

175.   After it was spun off, Chemours continued to conceal the truth about the dangers of PFAS.

176.   For decades, Daikin collaborated with Old DuPont and 3M. By 1951, Daikin had exchanges with Old DuPont about a Freon manufacturing method. In 1982, Daikin and Old DuPont agreed to exchange eight patents, each, for tetrafluoroethylene granulation. In 1991, Daikin established a joint venture with 3M

to manufacture raw materials for fluoropolymers. A Daikin document states that in 1997 "[l]icensing agreements for new refrigerants (R410A, 407C, 404A) concluded with DuPont in U.S."[154]

177.    Daikin has joined the OFAS Concealment Enterprise of 3M and Old DuPont (and Chemours when it was spun off) to hide the dangers of PFAS. For example, the FDA licensed the Daikin-developed 6:2 FTOH PFAS compound for use in food packaging in 2009, based in part on the company's research indicating that the chemical was non-toxic.[155] But ten years later, researchers found that Daikin had hidden from the FDA two reports that indicated experimental animal toxicity out of which one was performed before FDA approved the chemical. They discovered the deficiency by comparing research for the chemical on Daikin's website to those sent to the FDA and discovered that the data on health effects was never sent.[156]

178.    Specifically, Daikin did not inform the U.S. FDA about a 2007 "month-long feeding study in rats showing that the liver and kidney of the animals treated

---

[154]    https://www.daikin.com/-/media/Project/Daikin/daikin_com/corporate/overview/summary/history/company_history/pdf/Chronology-pdf.pdf?rev=-1&hash=C378F8B5C484B8F6AF671E54EFC4F764 (last visited Aug. 21, 2024).

[155]    https://affidiajournal.com/en/the-dangers-of-forever-chemicals-were-hidden-in-food-packaging-by-chemical-giants (last visited Aug. 22, 2024).

[156]    Environmental Defense Fund, https://blogs.edf.org/health/2018/11/04/fda-approved-pfas-breakdown-assessing-food-additive-safety/ (last visited Aug. 21, 2024).

with C6SFA were heavier and showed pathological changes. Also, the rats' incisor teeth showed signs of decreased mineralization (mottled teeth) associated with ingestion of excessive fluoride. The study concluded that 'it was considered that [C6SFA] had mainly effects on the incisor, liver and kidney' and the no observed adverse effect level (NOAEL) was considered to be 5 mg/kg bw/day based on increased relative kidney weight in males at the next largest dose, 25 mg/kg bw/day…. This is consistent with the type of harm seen with longer chain PFAS."[157] Secondly, Daikin "did not include an animal study that measured the dose necessary to kill half of the tested animals as well as one additional *in vitro* study."[158]

179. Acting for commercial gain at the expense of consumers and others, the PFAS Concealment Enterprise manipulated, obfuscated, and failed to disclose scientific studies demonstrating the persistence, bioaccumulation, and toxicity of their PFAS products. Defendants and Daikin deceptively sought to mislead their customers and consumers in general about the safety of their PFAS products for environmental and human health and thereby delay the adoption of safe or safer alternatives to PFAS products.

**E.    After stopping sales of C8 PFAS products, the Concealment Enterprise, 3M, Old DuPont, and Daikin started selling C6 PFAS (and Chemours sold C6 PFAS after it was spun off), including to carpet manufacturers,**

---

[157] *Id.*

[158] *Id.*

**even though they knew C6 PFAS is as dangerous as C8 PFAS or knew they lacked data to sell C6 PFAS products as safer.**

180.   Before its phase-out in the early 2000s, PFOS was an active ingredient in 3M's Scotchgard. After 2003, 3M largely switched to PFBS-based formulas. PFBS is a C6 PFAS.

181.   Similarly, before its phase-out in the early 2000s, PFOA was an active ingredient in Stainmaster and other products sold by Old DuPont. As part of an agreement with EPA, Old DuPont ceased production and use of PFOA in 2013. Old DuPont introduced GenX in 2009 to replace PFOA in the manufacture of Teflon and coatings for stain-resistant carpeting, waterproof clothing, and many other consumer products. GenX is a C6 PFAS and is now a Chemours trademark name.

182.   Old DuPont promoted GenX as a safer alternative but soon realized it might be harmful. In reports later submitted to the EPA, the company acknowledged that rodents exposed to GenX suffered birth defects and showed signs of liver disease and cell changes indicative of early-stage cancer.[159]

183.   EPA has explained that "GenX chemicals are considered a replacement for perfluorooctanoic acid (PFOA), and PFBS is considered a replacement for

---

[159]   https://www.nytimes.com/2021/10/20/business/chemours-dupont-pfas-genx-chemicals.html (last visited August 14, 2024).

perfluorooctane sulfonic acid (PFOS)."[160] It also explained in 2018 that "the available oral toxicity studies show that the liver is sensitive to GenX chemicals, and the kidney and thyroid are sensitive to PFBS."[161] As it further stated in that same report: "**GenX Chemicals**: Animal studies have shown health effects in the kidney, blood, immune system, developing fetus, and especially in the liver following oral exposure. The data are suggestive of cancer."[162] And it stated: "**PFBS**: Animal studies have shown health effects on the thyroid, reproductive organs and tissues, developing fetus, and kidney following oral exposure. Overall, the thyroid and kidney are particularly sensitive to PFBS. The data are inadequate to evaluate cancer."[163]

184. Daikin and Chemours are members of the American Chemistry Council's FluoroCouncil, which has also hidden the dangers of C6 PFAS. Two reviews about C6 PFAS funded by the FluoroCouncil ignored a study by FDA scientists showing the dangers of C6 PFAS, even though the FDA study was published ten months before the FluoroCouncil submitted their analysis for peer-

---

[160] https://www.epa.gov/sdwa/drinking-water-health-advisories-genx-chemicals-and-pfbs) (last visited July 17, 2024).

[161] https://www.epa.gov/sites/default/files/2018-11/documents/factsheet_pfbs-genx-toxicity_values_11.14.2018.pdf (last visited August 14, 2024).

[162] *Id.*

[163] *Id.*

review.[164] "As a result, the industry evaluations continue to perpetuate the flawed assumptions, concluding that perfluorohexanoic acid (PFHxA) and related short-chain PFAS 'present negligible human health risk' and that this substance alone is a suitable marker for the 'safety of fluorotelomer replacement chemistry.'"[165]

185.    Defendants and Daikin have never provided any evidence that C6 PFAS products are safer than C8 PFAS products. For example, when asked about the safety of the C6 PFAS chemicals used to replace C8 PFAS chemicals, Chemours told the New York Times that a "significant body of data demonstrates that these alternative chemistries can be used safely."[166] In fact, no such "significant body of data" exists or ever has ever existed.

186.    To the contrary, EPA explained in 2009 that "[a]lthough there is an extensive database for PFOA, few studies have examined the toxicity of the shorter or longer chained PFAC. However, the data suggest that the toxicity profile is quite similar to that of PFOA, albeit at different dose levels presumably due to the differences in elimination half-life."[167]

---

[164]    https://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/ (last visited Aug. 21, 2024).

[165]    *Id.*

[166]    https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html (last visited July 16, 2024).

[167]    *See*    https://www.epa.gov/sites/default/files/2016-01/documents/pfcs_action_plan1230_09.pdf (last visited July 16, 2024).

187.   Moreover, more recent studies have shown that C6 PFAS is *not* safer than C8 PFAS. In October 2019, the California Environmental Protection Agency explained that "[s]horter-chain PFASs are marketed as less toxic compared to the longer chains, mainly because they appear to bioaccumulate less and to be more readily eliminated from some organisms. Nevertheless, they are equally persistent and more mobile in the environment than the chemicals they are replacing, and also show potential for toxicity."[168] The Agency explained that "[t]oxicological and epidemiological data clearly indicating the safety of aggregate, chronic, and low-dose exposures to PFASs found in stain and soil repellents are lacking."[169]

188.   Likewise in 2019, the California Department of Toxic Substances Control (DTSC) published a study *"Product – Chemical Profile for Carpets and Rugs Containing Perfluoroalkyl or Polyfluoroalkyl Substances,"*, listed the numerous routes of exposure and toxic impacts from ingesting carpet dust.

189.   Similarly, the Environmental Working Group reported in 2021 that "[n]umerous studies indicate that short-chain PFAS exhibit toxicity impacts similar to those of long-chain PFAS, causing effects such as immunosuppression,

---

[168]  *See* https://dtsc.ca.gov/wp-content/uploads/sites/31/2020/02/Final_Product-Chemical_Profile_Carpets_Rugs_PFASs_a.pdf (last visited July 3, 2024). The article was prepared by the California Environmental Protection Agency's Department of Toxic Substances Control.

[169]  *Id.*

reproductive and developmental toxicity, and harm to the thyroid."[170] It also concluded that "[s]hort-chain PFAS are as persistent in the environment as long-chain PFAS and contaminate our food and drinking water."[171]

190.   And an FDA study shows that C6 PFAS is more toxic than previously thought.[172] The FDA study – published in the peer-reviewed scientific journals Toxicology and Applied Pharmacology and Food and Chemical Toxicology – looked at a fluorotelomer alcohol, one of the 'forever chemicals' called PFAS. This compound, known as 6:2 FTOH, is one of the most important so-called short-chain PFAS compounds in our case, which the industry maintains are safer than the long-chain chemicals they were designed to replace."[173] "The findings indicate that the human health risks of this important short-chain PFAS have been significantly underestimated. And the studies show, once again, that the more we learn about short-chain PFAS, the more concerns emerge."[174]

---

[170] https://www.ewg.org/news-insights/news/new-generation-forever-chemicals-toxicity-exposure-contamination-and-regulation (last visited July 16, 2024).

[171] *Id.*

[172] "FDA Studies: 'Short-chain' PFAS Chemicals More Toxic Than Previously Thought," https://www.ewg.org/news-insights/news/fda-studies-short-chain-pfas-chemicals-more-toxic-previously-thought (last visited July 17, 2024).

[173] *Id.*

[174] *Id.*

191.  In a letter to the U.S. FDA, dated January 17, 2020, Daikin falsely claimed that "consumer exposure to C6 compounds is very low."[175]

192.  Daikin also falsely stated in that letter that "data shows no imminent public health risk that would necessitate a precipitous market withdrawal" of C6 products.[176]

193.  Daikin's letter responded to a letter from the FDA on October 1, 2019, which stated that "the 6:2 FTOH is biopersistent and possibly carcinogenic in rodents and likely to be so in humans. The re-assessment also identifies concerns for immunotoxicity and postnatal toxicity for the 6:2 FTOH…."[177]

**F.    After selling Stainmaster carpets for almost two decades, Old DuPont sold its Stainmaster business to Invista in 2004, but Old DuPont, Chemours, and Daikin thereafter sold PFAS products to Invista.**

194.  Old DuPont launched the Stainmaster product line in 1986 in a successful attempt to sell carpeting with a PFAS-infused Teflon coating that made nylon carpeting more resistant to stains.

---

[175]    https://blogs.edf.org/health/wp-content/blogs.dir/11/files/2021/04/Daikin-PNC-2422-PFAS_Daikin-Final-10-1-2019-and-response-combined.pdf, at p. 6.

[176] *Id.*

[177] *Id.* at p. 5.

195.   Old DuPont launched the largest advertising and promotion campaign in the history of the carpeting industry to sell Stainmaster carpets, without ever disclosing the use of PFAS or the dangers of which Old DuPont was fully aware.[178]

196.   One of the most memorable commercials from the Stainmaster advertising campaign aired in 1987, portraying a toddler in his highchair launching his blue airplane shaped dish into the air, spilling its contents onto Stainmaster carpet,[179] without disclosing that Stainmaster was endangering the child because of its used of PFAS.

197.   In his 2018 interview, Old DuPont's McAndrews stated that in the 1980s, Old DuPont developed an advertising campaign for Stainmaster carpets "aimed at our customers, the mills, or at our trade, the carpet industry. This would be comprehensive. This would be aimed at the entire consumer market in America." He further stated that the goal for the Stainmaster advertising "was to have this message go into every household in America, to have it go into every business office in America, to be heard by all those who were part of our distribution chain but mostly, to impact the end buyer, who in our market research, we determined was a woman between the ages of 25 and 59. They were the decision-makers. It was the

---

[178] https://findingaids.hagley.org/repositories/3/resources/1145 (last visited Aug. 22, 2024).

[179] *Id.*

- 78 -

wife in a family, or a single woman, whoever it would be, they were the primary drivers of our carpet business." He stated that Old DuPont "needed an ad campaign where the consumer would remember DuPont certified STAINMASTER Carpet after they turned the TV off."

198.   Old DuPont was in full control of Stainmaster production and sale. McAndrews explained that Stainmaster "would be certified by DuPont which meant our mill customers would construct carpeting according to the strictest quality standards imposed by DuPont. DuPont Technical Service would monitor these standards. They would have 24 hour a day, seven days a week access to all production facilities of the mills."

199.   The advertising campaign was an instant success. "Consumers were flooding into retail stores all over America. It was breathtaking what was happening. The Executive Committee, Kearns and everybody else was seeing what was going on. The plants were being pressed for every pound of production. We were completely oversold almost in an instant."

200.   According to McAndrews, "Even today, I marvel at the energy, the willingness of all these people, to contribute incredible hours. They were working round the clock. There was no Saturday and Sunday off for many of these people. They were in the labs on the weekends. They were the in labs all night. If they were

in marketing, they were on airplanes flying to California and coming back on red-eye specials. These people were weary with fatigue. But they didn't let up."

201.  McAndrews then said, "I still get emotional when I remember the STAINMASTER story. Sometimes I have to stop talking."

202.  But McAndrews failed to acknowledge, let alone express any emotion for, the harmful effects on children and adults for *three decades* by the PFAS in Stainmaster. Indeed, he never even mentioned PFAS in his interview but instead posed for a picture with a smiling child wearing a Stainmaster T-shirt.

203.  DuPont Textiles and Interiors was formed from Old DuPont's textile fibers division in February 2003. The company was given the name Invista and was then sold to privately owned Koch Industries on April 30, 2004, for $4.2 billion. The sale included Stainmaster and other brands.

204.  Invista continued to sell Stainmaster after the sale. In a lawsuit concerning PFAS water pollution allegedly caused by carpet manufacturers, Invista explained that "[s]ince its origin in 2004, INVISTA's role in the carpet industry has primarily been as a manufacturer of carpet fibers, which it sold to carpet mills to be manufactured into carpets, including carpets sold under the STAINMASTER® and Antron® brands. INVISTA's carpet fiber has never contained fluorochemicals of

any kind. INVISTA has also never manufactured carpets nor conducted any manufacturing operations in the Dalton area."[180]

205.   Invista stated that it "historically packaged its fiber sales with certain topical formulations to be applied during the carpet manufacturing process," and that the "fluorochemicals used in these formulations were manufactured by and sourced from third-party manufacturers DuPont, Chemours, and/or Daikin."[181]

206.   As Invista further explained, "Beginning in 2004 and continuing through approximately 2008, INVISTA bundled with its carpet fiber sales certain DuPont-brand, fluorochemical-containing soil resist products, which were supplied directly to INVISTA's carpet-mill customers by DuPont. These chemistries were labeled as DuPont products, without any INVISTA branding, and were accompanied by DuPont Material Safety Data Sheets/Safety Data Sheets."[182]

207.   Then, in "approximately 2008, INVISTA began directly shipping blended topical formulations with its fiber sales, which included, among other components, a C6 fluorochemical-containing additive that INVISTA purchased from DuPont, Chemours, and/or Daikin and mixed with various non-fluorochemical components to make an INVISTA-branded topical formulation in which the DuPont,

---

[180] *See Johnson v. 3M Co., et al.*, Case No. 4:20-cv-00008-AT (N.D. Ga.), Dkt. No. 1199-3 (filed May 31, 2023), at ¶ 9.

[181] *Id.*, ¶ 10.

[182] *Id.*, ¶ 11 (footnotes omitted).

Chemours, and/or Daikin additives were diluted. These fluorochemical additives constituted only one component of the overall topical formulation. Further, the fluorochemical component of these additives constituted only a small percentage of the total additive formulation."[183]

208.  "INVISTA transitioned to exclusively fluorine-free formulations in the United States by (a) May 2017 for its Antron®-branded carpets, and (b) by January 2019 for its STAINMASTER®-branded carpets."[184]

209.  Invista submitted a report with "numerous examples of direct communications between the fluorochemical manufacturers (including 3M, DuPont, and Daikin) and the carpet manufacturers (including Shaw and Mohawk) regarding fluorochemical-related environmental and health information. These communications occurred well in advance of INVISTA's origin in 2004 and continued well beyond."[185]

210.  Moreover, "[a]t all times, INVISTA relied on the fluorochemical manufacturers for fluorochemical-related environmental and health information, passing on all information it received to its customers."[186]

---

[183] *Id.*, ¶ 12 (footnotes omitted).

[184] *Id.*, ¶ 13 (footnotes omitted).

[185] *Id.*, ¶ 23 (footnote omitted).

[186] *Id.*, ¶ 24 (footnotes omitted).

211. For example, INVISTA relied on information provided to it by the "fluorochemical manufacturers in the manufacturers' Material Safety Data Sheets, Safety Data Sheets, and/or Technical Data Sheets. INVISTA then passed on that information to its customers as appropriate through Material Safety Data Sheets, Safety Data Sheets, Technical Data Sheets, and/or product labels."[187]

212. Finally, "if INVISTA's customers raised environmental or health questions about fluorochemicals, INVISTA's practice was to connect the customers with the manufacturers of those chemicals to obtain the information they sought."[188]

## G.    Defendants stopped using PFAS in or around 2020 but continued to lie about the harms caused by those products.

213. Even when it discontinued PFAS-infused Scotchgard in 2000, 3M continued to falsely claim that it is safe. On May 17, 2000, 3M announced that it would "stop making many of its well-known Scotchgard products."[189] But 3M falsely said that "Scotchgard, a spray that protects clothing, fabrics, upholstery and carpets from stains and other damage, *was safe and that the chemical compounds pose no health risk to humans*."[190]

---

[187] *Id.*, ¶ 25 (footnote omitted).

[188] *Id.*, ¶ 26 (footnote omitted).

[189]    https://www.nytimes.com/2000/05/17/us/3m-says-it-will-stop-making-scotchgard.html (last visited July 2, 2024).

[190] *Id.*

214.   William E. Coyne, the head of research and development at 3M said at that time that "[t]hese products have been safely used for 40 years and they continue to be safe. But the best decision we can make now is to stop adding to the environment. This is a corporate responsibility issue. This product does not decompose, it's inert—it's persistent; it's like a rock."[191]

215.   In May 2000, 3M also announced that it was stopping production of PFOS altogether. In a press release, 3M made no mention of health concerns but instead stated, "We are reallocating sources to accelerate innovation in more sustainable opportunities."[192] 3M's implication that the toxicity of PFOS had no bearing on its decision to stop production was false. EPA explained in a statement that 3M's own tests had show that PFOS could "pose a risk to human health and the environment, "and that if 3M hadn't withdrawn it, the agency would have forced it to do so.[193]

216.   In a press release dated December 20, 2022, 3M stated that it "today announced it will exit per- and polyfluoroalkyl substance (PFAS) manufacturing and work to discontinue the use of PFAS across its product portfolio by the end of 2025. 3M's decision is based on careful consideration and a thorough evaluation of the

---

[191] *Id.*

[192] Bilott, *Exposure*, at 52.

[193] *Id*. at 53.

evolving external landscape, including multiple factors such as accelerating regulatory trends focused on reducing or eliminating the presence of PFAS in the environment and changing stakeholder expectations."[194]

217.    In the press release, 3M further stated: "'This is a moment that demands the kind of innovation 3M is known for,' said 3M chairman and chief executive officer Mike Roman. '***While PFAS can be safely made and used***, we also see an opportunity to lead in a rapidly evolving external regulatory and business landscape to make the greatest impact for those we serve. This action is another example of how we are positioning 3M for continued sustainable growth by optimizing our portfolio, innovating for our customers, and delivering long-term value for our shareholders.'"[195]

218.    That press release further falsely stated that "3M's products are safe for their intended uses."[196]

219.    And in another document announcing that 3M would exit all PFAS manufacturing by the end of 2025, 3M falsely stated that "3M's products, including

---

[194]    https://news.3m.com/2022-12-20-3M-to-Exit-PFAS-Manufacturing-by-the-End-of-2025 (last visited July 16, 2024).

[195]    *Id.* (emphasis added).

[196]    *Id.*

those containing PFAS, are safe and effective for their intended uses in everyday life."[197]

220.  DuPont entities have also failed to inform consumers and others that its PFAS products are dangerous. In a "Statement on Poly and Per-Fluorinated Alkyl Substances (PFAS),"[198] DuPont de Nemours, Inc. ("New DuPont") stated that "[i]n June 2019, DuPont de Nemours, Inc. (DuPont) was established as a new multi-industrial specialty products company. DuPont de Nemours has never manufactured PFOA, PFOS or firefighting foam."[199] New DuPont ignored that, as UN experts have stated, Old DuPont "and Chemours have produced, marketed and profited from PFAS for decades, contributing to a global toxic contamination problem."[200] "Even as DuPont and Chemours had information about the toxic impacts of PFAS on

---

[197] https://pfas.3m.com/pfas_uses (last visited July 16, 2024).

[198]    https://www.dupont.com/pfas.html#:~:text=DuPont%20de%20Nemours%20has%20never,and%20safety%20rules%20and%20standards (last visited July 16, 2024).

[199] In 2015, after Old DuPont spun off Chemours, Old DuPont and The Dow Chemical Company ("Old Dow") merged as subsidiaries of a newly created entity, DowDuPont, Inc. Subsequently, DowDuPont, Inc. spun off Corteva, Inc. and Dow, Inc. ("New Dow") and transferred Old DuPont's historical assets and liabilities, retaining the specialty products business. In connection with these transfers, the surviving entity of the spin-offs, now known as DuPont de Nemours, Inc. ("New DuPont"), assumed certain Old DuPont assets and liabilities.

[200] https://www.ohchr.org/en/press-releases/2024/02/us-companies-dupont-and-chemours-generated-extensive-contamination-toxic (last visited July 16, 2024).

human health and drinking water, the companies continued to produce and discharge PFAS," the experts said.[201]

221.    In the same Statement, New DuPont stated that "it does use select PFAS compounds within industrial processes pursuant to relevant environmental, health and safety rules and standards. Such uses are necessary to impart specific product performance criteria and only in products that are essential to safety and the critical functioning of society."[202] Further, it stated that "[s]afety, health and protecting the planet are core values at DuPont. We are committed to continuous improvement of our chemical stewardship process and to upholding the highest standards for the safe operation of facilities and the protection of our environment, our employees, our customers, and the people of the communities in which we do business."[203] Those statements are belied by the history of DuPont companies in despoiling the waters and air with PFAS products, including in the carpeting at issue in this litigation.

## H.    New DuPont and Corteva agreed with Chemours to share costs for PFAS liabilities arising out of conduct before July 1, 2015.

222.    On January 22, 2021, New DuPont, Corteva, and Chemours "announced they have entered into a binding memorandum of understanding

---

[201] *Id.*

[202]    https://www.dupont.com/pfas.html#:~:text=DuPont%20de%20Nemours%20has%20never,and%20safety%20rules%20and%20standards (last visited July 16, 2024).

[203] *Id.*

containing a settlement to resolve legal disputes originating from the 2015 spin-off of Chemours from E. I. du Pont de Nemours and Company (EID), and to establish a cost sharing arrangement and an escrow account to be used to support and manage potential future legacy PFAS liabilities arising out of pre-July 1, 2015 conduct."[204]

223.    The settlement agreement "replaces the February 2017 PFOA Settlement and subsequent amendment to the Chemours Separation Agreement."[205] "According to the terms of the cost sharing arrangement, DuPont and Corteva together, on one hand, and Chemours, on the other hand, agree to a 50-50 split of certain qualified expenses incurred over a term not to exceed twenty years or $4 billion of qualified spend and escrow contributions in the aggregate. DuPont and Corteva's 50 percent will be limited to $2 billion including qualified expenses and escrow contributions. Under the existing Letter Agreement from June 1, 2019, DuPont and Corteva will each bear 50 percent of the first $300 million (up to $150 million each) and thereafter, DuPont bears 71 percent and Corteva bears the remaining 29 percent. DuPont's share of the potential $2 billion would be approximately $1.36 billion and Corteva's approximately $640 million."[206]

---

[204]    https://www.chemours.com/en/news-media-center/all-news/press-releases/2021/dupont-corteva-and-chemours-announce-resolution-of-legacy-pfas-claims (last visited August 13, 2024).

[205]    *Id.*

[206]    *Id.*

224.   In connection with that cost-sharing agreement, the three companies agreed "to establish a $1 billion maximum escrow account to address potential future PFAS liabilities. Subject to the terms of the arrangement, contributions to the escrow will be made by Chemours, on one hand, and DuPont and Corteva, on the other hand, annually over an eight-year period. Over such period, Chemours will deposit a total of $500 million into the account and DuPont and Corteva will deposit an additional $500 million pursuant to the terms of their existing Letter Agreement. The escrow provides for a one-time replenishment mechanism if the escrow account balance has less than $700 million at December 31, 2028."[207]

225.   Plaintiffs reserve the right to name New DuPont and Corteva as defendants if needed to collect any judgment against Old DuPont and Chemours.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery Rule Tolling

226.   All Plaintiffs and all Class members did not know (and could not reasonably have discovered): (1) that their carpeting contained PFAS-infused products (or both); or (2) Defendants' deception with respect to the harms caused by those products.

227.   Within the period of any applicable statutes of limitation, Plaintiffs and Class members could not have discovered through the exercise of reasonable

---

[207] *Id.*

diligence that their carpets contained PFAS that would continue to be emitted into the environment throughout the life of the carpeting.

228.   Plaintiffs and Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants did not report information within their knowledge to federal and state authorities or to consumers; nor would a reasonable and diligent investigation have disclosed that Defendant had concealed information about PFAS, which was discovered by the named Plaintiffs only shortly before this action was filed.

229.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to all claims alleged herein.

**B.    Estoppel**

230.   Defendants are and were under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of carpeting treated with PFAS-infused products.

231.   Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the PFAS infused into the Plaintiffs' and Class members' carpeting.

232.   Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.  CLASS ALLEGATIONS

233.  Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class"):

> All persons who purchased carpeting and had it installed before January 1, 2020, in the United States, limited to persons who still own the building in which the carpeting was installed and have not removed the carpeting.

234.  Excluded from the Class are individuals who have personal injury claims resulting from PFAS in carpeting. Also excluded from the Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

235.  Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

236.  This action has been brought and may be properly maintained under Federal Rule of Civil Procedure 23 on behalf of the Classes proposed herein.

237. **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be at least tens of thousands of Class members. The precise number of Class members is unknown to Plaintiffs but may be found in sales records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

238. **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a) Whether Defendants engaged in the conduct alleged herein;

b) Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed PFAS products into the stream of commerce in the United States;

c) Whether Defendants knew about the dangers of PFAS and, if so, how long they have known;

d) Whether Defendants are liable under RICO and consumer protection statutes, and under claims for products liability and nuisance;

- 92 -

e)       Whether there is an enterprise within the meaning of RICO;

f)       Whether Defendants participated in the enterprise; and

g)       Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

239.   **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above.

240.   **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

241.   **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims

against Defendants, so it would be impracticable for the members of the Classes to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, which they cannot, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.  CLAIMS

**A.      Claim on behalf of each Plaintiff and all Class members.**

### COUNT 1 (against all Defendants)

### Violations of Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), (d)

242.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

243.   Plaintiffs bring this Count individually and on behalf of the Class against all Defendants.

244.   All Defendants are "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

245.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate

or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate."

246. For many years, Old DuPont, Chemours, 3M, and Daikin (along with other entities and individuals) created and/or participated in the affairs of an illegal enterprise ("PFAS Concealment Enterprise") whose purpose was to conceal the dangers of their PFAS products, including PFAS-infused products sold to carpet manufacturers. As explained in detail below, the acts of Old DuPont, Chemours, 3M, and Daikin in furtherance of the PFAS Concealment Enterprise violate Section 1962(c) and (d).

### 1. The members of the PFAS Concealment Enterprise.

247. The PFAS Concealment Enterprise members are 3M, Old DuPont, Chemours, and Daikin.

248. 3M had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise by:

a. Manufacturing, distributing, and selling Scotchgard to carpet manufacturers and others;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about PFAS products to carpet manufacturers, Plaintiffs, members of the Class, and the public generally;

c. Introducing Scotchgard into the stream of U.S. commerce;

- 95 -

d. Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused Scotchgard;

e. Persisting in the manufacturing, distribution of PFAS products despite knowing about their dangers; and

f. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS-infused Scotchgard.

249. Old DuPont and Chemours had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise by:

a. Manufacturing, distributing, and selling PFAS products to carpet manufacturers and others;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about PFAS products to carpet manufacturers, Plaintiffs, members of the Class, and the public generally;

c. Old DuPont's introduction of Stainmaster into the stream of U.S. commerce;

d. Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused products;

e. Persisting in the manufacturing, distribution of PFAS products despite knowing about their dangers ; and

f. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS.

250. Daikin had substantial control over (and participated) in the affairs of the PFAS Concealment Enterprise by:

a. Manufacturing, distributing, and selling PFAS products to carpet manufacturers;

b.    Misrepresenting    and    omitting    (or    causing    such misrepresentations and omissions to be made) the truth about PFAS to carpet manufacturers, Plaintiffs, members of the Class, and the public generally;

c.    Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused products;

d.    Persisting in the manufacturing, distribution of PFAS products despite knowing about their dangers; and

e.    Designing    and    distributing    marketing    materials    that misrepresented and concealed the truth about the dangers of PFAS.

251. All members of the PFAS Concealment Enterprise directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present because such information lies in the Defendants' and others' hands.

252. All members of the PFAS Concealment Enterprise served the common purpose of concealing the emissions dangers of PFAS-infused products from carpet manufacturers, Plaintiffs, members of the Class, and the public generally. Each member of the PFAS Concealment Enterprise shared the bounty generated by the PFAS Concealment Enterprise—*i.e.*, by continuing to sell PFAS-infused products for decades even though they knew that PFAS in those products posed grave dangers.

## 2.    The Predicate Acts

253.    To carry out or attempt to carry out the scheme to defraud, the members of the PFAS Concealment Enterprise conducted or participated in the conduct of the affairs of that enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

254.    Specifically, the members of the PFAS Concealment Enterprise participated in the scheme to defraud by using mail, telephone, and the Internet to transmit writings travelling in interstate or foreign commerce.

255.    The PFAS Concealment Enterprise members' use of the mails and wires include but are not limited to the transmission, delivery, or shipment of the following by the members or third parties that were foreseeably caused to be sent as a result of the PFAS Concealment Enterprise members' illegal scheme:

    a.    PFAS products to carpet manufacturers and others;

    b.    Documents and communications accompanying the shipments of PFAS products to carpet manufacturers and others;

    c.    False or misleading Material Safety Data Sheets. Safety Data Sheets, Technical Data Sheets, and product labels;

    d.    Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of PFAS products;

    e.    Documents intended to facilitate the manufacture and sale of PFAS products, including invoices, shipping records, reports and correspondence;

f.    Documents to process and receive payment for PFAS products, including invoices and receipts;

g.    Payments to the PFAS Concealment Enterprise members for PFAS products;

h.    Deposits of proceeds from sales of PFAS products by PFAS Concealment Enterprise members; and

i.    Other documents and things, including electronic communications.

256.  The PFAS Concealment Enterprise members utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described therein.

257.  The PFAS Concealment Enterprise members also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

258.  The mail and wire transmissions described herein were made in furtherance of the PFAS Concealment Enterprise members' scheme and common course of conduct to deceive regulators and consumers and lure carpet manufacturers into purchasing products that the PFAS Concealment Enterprise members knew emit PFAS.

259.  Many of the precise dates of the fraudulent uses of U.S. Mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the PFAS Concealment Enterprise members' books and records. But

Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

260.   The PFAS Concealment Enterprise members have not undertaken the practices described herein in isolation but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the PFAS Concealment Enterprise members conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the PFAS Concealment Enterprise members in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the PFAS Concealment Enterprise members and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

261.   The PFAS Concealment Enterprise members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

262.   To achieve their common goals, the PFAS Concealment Enterprise members hid from the general public, carpet manufacturers, and others the emission dangers of PFAS.

263.   The PFAS Concealment Enterprise members, with knowledge and intent, have agreed to the overall objectives of the PFAS Concealment Enterprise and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling PFAS-infused products to carpet manufacturers.

264.   The PFAS Concealment Enterprise members' conduct in furtherance of this scheme was intentional. Plaintiffs and the Class members were harmed as a result of the PFAS Concealment Enterprise members' intentional conduct. Plaintiffs, the Class members, regulators, and consumers, among others, relied on the PFAS Concealment Enterprise members material misrepresentations and omissions.

265.   As described herein, the PFAS Concealment Enterprise members engaged in a pattern of related and continuous predicate acts for many years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and other Class members and obtaining significant monies and revenues from them and through them while providing PFAS-infused products to carpet manufacturers and others. The predicate acts also

had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

266.    The predicate acts all had the purpose of generating significant revenue and profits for the PFAS Concealment Enterprise members at the expense of Plaintiffs, the Class members, and consumers. The predicate acts were committed or caused to be committed by the PFAS Concealment Enterprise members through their participation in the PFAS Concealment Enterprise and in furtherance of its fraudulent scheme.

267.    he PFAS Concealment Enterprise members had a duty to disclose the truth about the emissions dangers of PFAS-infused products to carpet manufacturers, consumers, and others but never do so. The Hazard Communication Standard requires that the chemical manufacturer, distributor, or importer provide Safety Data Sheets (SDSs) (formerly MSDSs or Material Safety Data Sheets) for each hazardous chemical to downstream users to communicate information on these hazards.[208] The information contained in the SDS is largely the same as the MSDS, except now the SDSs are required to be presented in a consistent user-friendly, 16-section format.[209]

---

[208] The Standard was first adopted in 1983 in the United States with limited scope (48 FR 53280; November 25, 1983). In 1987, it was expanded to cover all industries where employees are potentially exposed to hazardous chemicals (52 FR 31852; August 24, 1987).

[209] https://www.osha.gov/sites/default/files/publications/OSHA3514.pdf.

268.   On information and belief, Plaintiffs allege that the PFAS Concealment Enterprise members never disclosed the emissions dangers of PFAS in PFAS-infused products in SDSs and MSDSs for PFAS-infused products that they sold to carpet manufacturers and others.

269.   The PFAS Concealment Enterprise members' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and Class members, all of whom are entitled to bring this action for three times their actual damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c). Each member of the PFAS Concealment Enterprise knew, understood, and intended for carpet manufacturers to purchase PFAS-infused products for treating carpets that the carpet manufacturers sold to Plaintiffs and Class members, knowing that the PFAS emitted by those carpets would injure Plaintiffs and the Class members.

**B.    State Law Claims**

**1.    Claim brought on behalf of all Class members relating to their State-law claims.**

## COUNT 2

## Conspiracy

270.   Under the common law of each State for which claims are alleged below, Plaintiffs allege on information and belief that Defendants knowingly and

intentionally conspired to engage in the wrongful conduct alleged in each Count under State law set forth below.

**2.    Claims brought on behalf of Class members who installed their carpeting in Alabama (the "Alabama Class members").**

### COUNT 3 (against all Defendants)

### Alabama Extended Manufacturer's Liability Doctrine
### (design defect)

271.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

272.    At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

273.    As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Alabama Class members, who might be foreseeably harmed by PFAS-infused products.

274.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.    Defendants failed to disclose these threats to carpet manufacturers, Alabama Class members, and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

275.    At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Alabama Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

276.    At all relevant times, Alabama Class members used their carpets with PFAS-infused products as intended.

277.    Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

278.    At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products

outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

279.   Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

280.   As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Alabama Class members have been injured by widespread and toxic PFAS contamination.

281.   These and other acts by Defendants were a direct and proximate cause of damages to Alabama Class members.

## COUNT 4 (against all Defendants)

### Alabama Extended Manufacturer's Liability Doctrine
### (failure to warn)

282.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

283.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Alabama Class members, as well as to all

carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Alabama Class members.

284.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Alabama Class members of those risks.

285.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

286.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

287.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

288.   Defendants' failure to warn proximately caused reasonably foreseeable injuries to Alabama Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Alabama Class members used their carpets with PFAS-infused products as intended.

289.   Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the

carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Alabama Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Alabama Class members would not have installed the carpets at issue.

290.    These and other acts by Defendants were a direct and proximate cause of damages to Alabama Class members.

**3.    Claims brought on behalf of Class members who installed their carpeting in Alaska (the "Alaska Class members").**

**COUNT 5 (against all Defendants)**

**Strict Products Liability
(design defect)**

291.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

292.    At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

293.    As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Alaska Class members, who might be foreseeably harmed by PFAS-infused products.

294. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

    a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

    b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

    c.    Defendants failed to disclose these threats to carpet manufacturers, Alaska Class members, and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

295. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to Alaska Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

296. At all relevant times, Alaska Class members used their carpets with PFAS-infused products as intended.

297. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced

or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

298.   At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

299.   Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

300.   As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Alaska Class members have been injured by widespread and toxic PFAS contamination.

301.   These and other acts by Defendants were a direct and proximate cause of damages to Alaska Class members.

## COUNT 6 (against all Defendants)

### Strict Products Liability
### (failure to warn)

302.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

303.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Alaska Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Alaska Class members.

304.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Alaska Class members of those risks.

305.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

306.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

307.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

308.   Defendants' failure to warn proximately caused reasonably foreseeable injuries to Alaska Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Alaska Class members used their carpets with PFAS-infused products as intended.

309.   Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Alaska Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Alaska Class members would not have installed the carpets at issue.

310.   These and other acts by Defendants were a direct and proximate cause of damages to Alaska Class members.

## COUNT 7 (against all Defendants)

### Nuisance
### ALASKA STAT. ANN. § 09.45.230 *et seq.*

311.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

312.   Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Alaska Class members' use of their land by selling PFAS-

infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Alaska Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

313.  Defendants knew that the Alaska Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Alaska Class members.

314.  Defendants' intentional and unreasonable conduct proximately caused the Alaska Class members to suffer damages, for which the Alaska Class members seek compensation in this action. ALASKA STAT. ANN. § 09.45.230(a).

315.  The Alaska Class members are entitled to abatement of the nuisance caused by Defendants. *Id.*

### COUNT 8 (against all Defendants)

### Violation of the Alaska Unfair Trade Practices and Consumer Protection Act
(ALASKA STAT. ANN. § 45.50.471 *et seq.)*

316.  Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

317.  The Alaska Unfair Trade Practices and Consumer Protection Act (Alaska CPA) declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including "using or

employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged." ALASKA STAT. ANN. § 45.50.471(b)(12).

318.  The Alaska Class members are "consumers" within the meaning of ALASKA STAT. ANN. § 45.50.561(4).

319.  Defendants were engaged "in the conduct of trade or commerce" within the meaning of ALASKA STAT. ANN. § 45.50.471(a) when they sold their PFAS-infused products to carpet manufacturers.

320.  In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that carpets purchased by the Alaska Class members were treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

321.  In purchasing their carpets, the Alaska Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

322.  The Alaska Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

323.   Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

324.   Defendants knew or should have known that their conduct violated the Alaska CPA.

325.   Defendants owed the Alaska Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.   Possessed superior knowledge that their products were infused with PFAS and were applied to carpeting purchased by the Alaska Class members; and

b.   Intentionally concealed the foregoing from the Alaska Class members.

326.   Defendants' conduct proximately caused injuries to the Alaska Class members.

327.   The Alaska Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

328.   Defendants' violations present a continuing risk to the Alaska Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

329.    Pursuant to ALASKA STAT. ANN. § 45.50.531(a), Alaska Class members seek "to recover for each unlawful act or practice three times the actual damages or $500, whichever is greater."

330.    The Alaska Class members also seek attorneys' fees and any other just and proper relief available under the Alaska CPA.

331.    On August 29, 2024, Plaintiffs sent a letter to Defendants complying with ALASKA STAT. ANN. § 45.50.535(b)(1).

**4.    Claims brought on behalf of Class members who installed their carpeting in Arizona (the "Arizona Class members").**

### COUNT 9 (against all Defendants)

### Strict Products Liability
### (design defect)

332.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

333.    At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

334.    As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Arizona Class members, who might be foreseeably harmed by PFAS-infused products.

335.   PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.    Defendants failed to disclose these threats to carpet manufacturers, Arizona Class members, and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

336.   At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Arizona Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

337.   At all relevant times, the Arizona Class members used their carpets with PFAS-infused products as intended.

338.   Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced

or eliminated the health and environmental dangers posed by PFAS. Defendants'
failure to adopt those reasonable, feasible, safer, alternative designs rendered their
products defective, not reasonably safe, and unreasonably dangerous to persons and
to property.

339.  At all relevant times, the foreseeable risk of harm to public health,
property, and the environment posed by Defendants' PFAS-infused products
outweighed the utility of using PFAS in those products and outweighed the cost to
Defendants of reducing or eliminating such risk.

340.  Defendants' PFAS-infused products were defectively designed at the
time they left Defendants' control, and those products reached their end users
without substantial change in their condition.

341.  As a direct and proximate result of Defendants' unreasonably
dangerous design of PFAS-infused products, Arizona Class members have been
injured by widespread and toxic PFAS contamination.

342.  These and other acts by Defendants were a direct and proximate cause
of damages to Arizona Class members.

## COUNT 10 (against all Defendants)

## Strict Products Liability
## (failure to warn)

343.  Plaintiffs incorporate by reference the allegations contained in the
preceding paragraphs of this complaint.

- 118 -

344.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Arizona Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Arizona Class members.

345.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Arizona Class members of those risks.

346.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

347.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

348.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

349. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Arizona Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Arizona Class members used their carpets with PFAS-infused products as intended.

350. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Arizona Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Arizona Class members would not have installed the carpets at issue.

351. These and other acts by Defendants were a direct and proximate cause of damages to Arizona Class members.

## COUNT 11 (against all Defendants)

### Nuisance

352. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

353. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Arizona Class members' use of their land by selling PFAS-

infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Arizona Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

354.  Defendants knew that the Arizona Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Arizona Class members.

355.  Defendants' intentional and unreasonable conduct proximately caused the Arizona Class members to suffer damages, for which the Arizona Class members seek compensation in this action.

356.  The Arizona Class members are entitled to abatement of the nuisance caused by Defendants.

## COUNT 12 (against all Defendants)

### Violation of the Arizona Consumer Fraud Act
### (ARIZ. REV. STAT. § 44-1521 *et seq.*)

357.  Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

358.  The Arizona Consumer Fraud Act (Arizona CFA) provides that the "act, use or employment by any person of any deception, deceptive act or practice, fraud . . . , misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or

omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A).

359.  Each Defendant and each Arizona Class member is a "person" within the meaning of the Arizona CFA, ARIZ. REV. STAT. § 44-1521(6).

360.  PFAS-infused products are "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

361.  Defendants' conduct, as set forth above, occurred in the conduct of trade or commerce.

362.  In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that carpets purchased by the Arizona Class members were treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

363.  In purchasing their carpets, the Arizona Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

364.  The Arizona Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

365.  Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

366.  Defendants knew or should have known that their conduct violated the Arizona CFA.

367.  Defendants owed the Arizona Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.  Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the Arizona Class members; and

b.  Intentionally concealed the foregoing from the Arizona Class members.

368.  Defendants' conduct proximately caused injuries to the Arizona Class members.

369.  The Arizona Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

370.  Defendants' violations present a continuing risk to the Arizona Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

371.   Pursuant to the Arizona CFA, Plaintiffs seek monetary relief against each Defendant in an amount to be determined at trial. Plaintiffs also seek punitive damages because each Defendant engaged in aggravated and outrageous conduct with an evil mind.

**5.    Claims brought on behalf of Class members who installed their carpeting in Arkansas ("Arkansas Class members").**

**COUNT 13 (against all Defendants)**

**Strict Products Liability
(design defect)**

372.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

373.   At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

374.   As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Arkansas Class members, who might be foreseeably harmed by PFAS-infused products.

375.   PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

   a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.   PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.   Defendants failed to disclose these threats to carpet manufacturers, Arkansas Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

376.   At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Arkansas Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

377.   Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

378.   At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products

outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

379.    At all relevant times, Arkansas Class members used their carpets with PFAS-infused products as intended.

380.    Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

381.    As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Arkansas Class members have been injured by widespread and toxic PFAS contamination.

382.    These and other acts by Defendants were a direct and proximate cause of damages to the Arkansas Class members.

## COUNT 14 (against all Defendants)

### Strict Products Liability
### (failure to warn)

383.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

384.    As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use

and misuse of their products, including Arkansas Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Arkansas Class members.

385.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Arkansas Class members of those risks.

386.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

387.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

388.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

389.   Defendants' failure to warn proximately caused reasonably foreseeable injuries to Arkansas Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Arkansas Class members used their carpets with PFAS-infused products as intended.

390.   Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Arkansas Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Arkansas Class members would not have installed the carpets at issue.

391.   These and other acts by Defendants were a direct and proximate cause of damages to the Arkansas Class members.

**6.    Claims brought on behalf of Class members who installed their carpeting in California ("California Class members").**

**COUNT 15 (against all Defendants)**

**Strict Products Liability**
**(design defect)**

392.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

393.   At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

394.   As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and

they owed that duty to all persons, including the California Class members, who might be foreseeably harmed by PFAS-infused products.

395. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.   PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.   PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.   Defendants failed to disclose these threats to carpet manufacturers, California Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

396. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the California Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

397. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced

or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

398.    At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

399.    At all relevant times, California Class members used their carpets with PFAS-infused products as intended.

400.    Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

401.    As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, California Class members have been injured by widespread and toxic PFAS contamination.

402.    These and other acts by Defendants were a direct and proximate cause of damages to the California Class members.

## COUNT 16 (against all Defendants)

### Strict Products Liability
### (failure to warn)

403.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

404.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including California Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to California Class members.

405.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and California Class members of those risks.

406.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

407.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

408. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

409. Defendants' failure to warn proximately caused reasonably foreseeable injuries to California Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, California Class members used their carpets with PFAS-infused products as intended.

410. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to California Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the California Class members would not have installed the carpets at issue.

411. These and other acts by Defendants were a direct and proximate cause of damages to the California Class members.

## COUNT 17 (against all defendants)

### Nuisance
### CAL. CIV. CODE § 3479 *et seq.*

412.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

413.   Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and California Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the California Class members without disclosing the emissions dangers of PFAS in PFAS-infused products. Defendants' conduct constitutes a nuisance under CAL. CIV. CODE § 3479.

414.   Defendants knew that the California Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the California Class members.

415.   Defendants' intentional and unreasonable conduct proximately caused the California Class members to suffer damages, for which the California Class members seek compensation in this action.

416.   The California Class members are entitled to abatement of the nuisance caused by Defendants.

## COUNT 18 (against all defendants)

### Violation of the California Unfair Competition Law
### (CAL. BUS. & PROF. CODE § 17200 *et seq.*)

417.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

418.   California's Unfair Competition Law (UCL), CAL. BUS. & PROF. CODE § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

419.   The California Class members and Defendants are "persons" within the meaning of CAL. BUS. & PROF. CODE § 17201.

420.   In purchasing their carpets, the California Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

421.   The California Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

422.   Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

423.   Defendants knew or should have known that their conduct violated the UCL.

424. Defendants owed the California Class a duty to disclose the truth about PFAS-infused products because Defendants:

a.   Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the California Class members; and

b.   Intentionally concealed the foregoing from the California Class members.

425. Defendants' conduct proximately caused injuries to the California Class members.

426. The California Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

427. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

428. Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to the California Class members any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as

provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3345; and for such other relief as may be appropriate.

**7.    Claims brought on behalf of Class members who installed their carpeting in Colorado ("Colorado Class members").**

**COUNT 19 (against all Defendants)**

**Strict Products Liability
(design defect)**

429.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

430.   At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

431.   As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Colorado Class members, who might be foreseeably harmed by PFAS-infused products.

432.   PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.   Defendants failed to disclose these threats to carpet manufacturers, Colorado Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

433.   At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Colorado Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

434.   At all relevant times, the Colorado Class members used their carpets with PFAS-infused products as intended.

435.   Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

436.   At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products

outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

437.   Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

438.   As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Colorado Class members have been injured by widespread and toxic PFAS contamination.

439.   These and other acts by Defendants were a direct and proximate cause of damages to the Colorado Class members.

## COUNT 20 (against all Defendants)

### Strict Products Liability
### (failure to warn)

440.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

441.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Colorado Class members, as well as to all

carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Colorado Class members.

442.    Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Colorado Class members of those risks.

443.    Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

444.    Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

445.    Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

446.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to Colorado Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Colorado Class members used their carpets with PFAS-infused products as intended.

447.    Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the

carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Colorado Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Colorado Class members would not have installed the carpets at issue.

448.   These and other acts by Defendants were a direct and proximate cause of damages to the Colorado Class members.

## COUNT 21 (against all Defendants)

## Nuisance

449.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

450.   Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Colorado Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Colorado Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

451.    Defendants knew that the Colorado Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Colorado Class members.

452.    Defendants' intentional and unreasonable conduct proximately caused the Colorado Class members to suffer damages, for which the Colorado Class members seek compensation in this action.

453.    The Colorado Class members are entitled to abatement of the nuisance caused by Defendants.

## COUNT 22 (against all Defendants)

### Violation of the Colorado Consumer Protection Act
### (COLO. REV. STAT. § 6-1-101 *et seq.*)

454.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

455.    The Colorado Consumer Protection Act (Colorado CPA) prohibits deceptive practices in the course of a person's business, including but not limited to "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." COLO. REV. STAT. § 6-1-105.

456.    Plaintiffs, Colorado Class members, and Defendants are "persons" within the meaning of under COLO. REV. STAT. § 6-1-102(6).

457.   The Colorado Class members are "consumers" for purposes of COL. REV. STAT § 6-1-113(1)(a).

458.   Each Defendant's conduct, as set forth above, occurred in the conduct of trade or commerce.

459.   In purchasing their carpets, the Colorado Class members were deceived by Defendants' failure to disclose the material information that their carpets were treated with PFAS-infused products.

460.   The Colorado Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

461.   Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

462.   Defendants knew or should have known that their conduct violated the Colorado CPA.

463.   Defendants owed the Colorado Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.   Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the Colorado Class members; and

b.    Intentionally concealed the foregoing from the Colorado Class members.

464.    Defendants' conduct proximately caused injuries to the Colorado Class members.

465.    Pursuant to COLO. REV. STAT. § 6-1-113, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each plaintiff or class member.

466.    Plaintiffs also seek attorneys' fees and any other just and proper remedy under the Colorado CPA.

**8.    Claims brought on behalf of Class members who installed their carpeting in Connecticut (collectively, "Connecticut Class members").**

**COUNT 23 (against all Defendants)**

**Strict Products Liability**
**(design defect)**

467.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

468.    At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

469.    As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and

they owed that duty to all persons, including the Connecticut Class members, who might be foreseeably harmed by PFAS-infused products.

470.  PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.  PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.  PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.  Defendants failed to disclose these threats to carpet manufacturers, Connecticut Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

471.  At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Connecticut Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

472.  At all relevant times, Connecticut Class members used their carpets with PFAS-infused products as intended.

473.  Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have

made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

474.  At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

475.  Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

476.  As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Connecticut Class members have been injured by widespread and toxic PFAS contamination.

477.  These and other acts by Defendants were a direct and proximate cause of damages to the Connecticut Class members.

## COUNT 24 (against all Defendants)

## Strict Products Liability
## (failure to warn)

478.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

479.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Connecticut Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Connecticut Class members.

480.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Connecticut Class members of those risks.

481.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

482.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

483.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

484.   Defendants' failure to warn proximately caused reasonably foreseeable injuries to Connecticut Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Connecticut Class members used their carpets with PFAS-infused products as intended.

485.   Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Connecticut Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Connecticut Class members would not have installed the carpets at issue.

486.   These and other acts by Defendants were a direct and proximate cause of damages to the Connecticut Class members.

## COUNT 25 (against all Defendants)

## Nuisance

487.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

488.   Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Connecticut Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Connecticut Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

489.   Defendants knew that the Connecticut Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Connecticut Class members.

490.   Defendants' intentional and unreasonable conduct proximately caused the Connecticut Class members to suffer damages, for which the Connecticut Class members seek compensation in this action.

491.   The Connecticut Class members are entitled to abatement of the nuisance caused by Defendants.

**9.      Claims brought on behalf of Class members who installed their carpeting in Delaware ("Delaware Class members").**

### COUNT 26 (against all Defendants)

### Negligence
### (design defect)

492.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

493.   At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

494.   As manufacturers of PFAS-infused products, Defendants had a duty not to negligently place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Delaware Class members, who might be foreseeably harmed by PFAS-infused products.

495.   PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.      PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.      PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.      Defendants failed to disclose these threats to carpet manufacturers, Delaware Class members and the public generally but instead

downplayed and misrepresented the dangers posed by their PFAS products.

496. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Delaware Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

497. At all relevant times, Delaware Class members used their carpets with PFAS-infused products as intended.

498. Defendants knew of these risks and nevertheless negligently failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

499. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

500.   Defendants' PFAS-infused products were defectively and negligently designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

501.   As a direct and proximate result of Defendants' negligent design of unreasonably dangerous PFAS-infused products, Delaware Class members have been injured by widespread and toxic PFAS contamination.

502.   These and other acts by Defendants were a direct and proximate cause of damages to the Delaware Class members.

## COUNT 27 (against all Defendants)

## Negligence
## (failure to warn)

503.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

504.   As manufacturers of PFAS-infused products, Defendants had a duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew or should have known about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Delaware Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Delaware Class members.

505.    Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants negligently failed to warn carpet manufacturers, consumers, the public, and Delaware Class members of those risks.

506.    Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

507.    Defendants' inadequate and negligent warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

508.    Defendants' PFAS-infused products were defective by virtue of their negligently inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

509.    Defendants' negligent failure to warn proximately caused reasonably foreseeable injuries to Delaware Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Delaware Class members used their carpets with PFAS-infused products as intended.

510.    Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products.

Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Delaware Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Delaware Class members would not have installed the carpets at issue.

511.   These and other acts by Defendants were a direct and proximate cause of damages to The Delaware Class members.

## COUNT 28 (against all Defendants)

## Nuisance

512.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

513.   Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Delaware Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Delaware Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

514.   Defendants knew that the Delaware Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Delaware Class members.

515.   Defendants' intentional and unreasonable conduct proximately caused the Delaware Class members to suffer damages, for which the Delaware Class members seek compensation in this action.

516.   The Delaware Class members are entitled to abatement of the nuisance caused by Defendants.

**COUNT 29 (against all Defendants)**

**Violation of the Delaware Consumer Fraud Act**
**(DEL. CODE TIT. 6, § 2513 *et seq.*)**

517.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

518.   The Delaware Consumer Fraud Act (Delaware CFA) prohibits the "act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of any merchandise, whether or nor any person has in fact been misled, deceived, or damaged thereby." DEL. CODE TIT. 6, § 2513(a).

519.   Plaintiffs, Delaware Class members, and Defendants are "persons" within the meaning of DEL. CODE TIT. 6, § 2511(7).

520.   Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

521.    In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that carpets purchased by the Delaware Class members were treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

522.    In purchasing their carpets, the Delaware Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

523.    The Delaware Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

524.    Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

525.    Defendants knew or should have known that their conduct violated the Delaware CFA.

526.    Defendants owed the Delaware Class a duty to disclose the truth about PFAS-infused products because Defendants:

a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the Delaware Class members; and

b.      Intentionally concealed the foregoing from the Delaware Class members.

527.    Defendants' conduct proximately caused injuries to the Delaware Class members.

528.    The Delaware Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

529.    Defendants' violations present a continuing risk to the Delaware Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

530.    Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of each Defendant's unlawful conduct. *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980). Plaintiffs also seek attorneys' fees and any other just and proper relief available under the Delaware CFA.

531.    Defendants engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

10.    **Claims brought on behalf of Class members who installed their carpeting in Florida ("Florida Class members").**

## COUNT 30 (against all Defendants)

### Strict Products Liability
### (design defect)

532.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

533.    At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

534.    As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Florida Class members, who might be foreseeably harmed by PFAS-infused products.

535.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.    Defendants failed to disclose these threats to carpet manufacturers, Florida Class members and the public generally but instead

downplayed and misrepresented the dangers posed by their PFAS products.

536.   At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Florida Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

537.   At all relevant times, Florida Class members used their carpets with PFAS-infused products as intended.

538.   Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

539.   At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

540.  Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

541.  As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Florida Class members have been injured by widespread and toxic PFAS contamination.

542.  These and other acts by Defendants were a direct and proximate cause of damages to the Florida Class members.

## COUNT 31 (against all Defendants)

## Strict Products Liability
## (failure to warn)

543.  Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

544.  As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Florida Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Florida Class members.

545. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Florida Class members of those risks.

546. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

547. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

548. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

549. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Florida Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Florida Class members used their carpets with PFAS-infused products as intended.

550. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of

PFAS to Florida Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Florida Class members would not have installed the carpets at issue.

551. These and other acts by Defendants were a direct and proximate cause of damages to the Florida Class members.

**11.  Claims brought on behalf of Class members who installed their carpeting in Georgia ("Georgia Class members").**

### COUNT 32 (against all Defendants)

### Violation of the Georgia Fair Business Practices Act
### (GA. CODE ANN. § 10-1-390 *et seq.*)

552. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

553. The Georgia Fair Business Practices Act (Georgia FBPA) declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE. ANN. § 101-393(b).

554. The Georgia Class members are "consumers" within the meaning of GA. CODE. ANN. § 10-1-392(a)(6).

555. Each Defendant engaged in "trade or commerce" within the meaning of GA. CODE. ANN. § 10-1-393(a)(28).

556. In purchasing their carpets, the Georgia Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

557. The Georgia Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

558. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

559. Defendants knew or should have known that their conduct violated the Georgia FBPA.

560. Defendants owed the Georgia Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the Georgia Class members; and

b.    Intentionally concealed the foregoing from the Georgia Class members.

561. Defendants' conduct proximately caused injuries to the Georgia Class members.

562. The Georgia Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants'

conduct. These injuries are the direct and natural consequence of Defendants' omissions.

563.   Defendants' violations present a continuing risk to the Georgia Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

564.   Plaintiffs and the Georgia Class members are entitled to recover damages and exemplary damages (for intentional violations) pursuant to GA. CODE ANN. § 10-1-399(a). Plaintiffs also seek attorneys' fees and any other just and proper relief available under the Georgia FBPA pursuant to GA. CODE ANN. § 10-1-399.

565.   On August 29, 2024, Plaintiffs sent a letter to Defendants complying with GA. CODE ANN. § 10-1-399(b).

## COUNT 33 (against all Defendants)

### Violation of the Georgia Uniform Deceptive Trade Practices Act
### (GA. CODE ANN. § 10-1-370 *et seq.*)

566.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

567.   Georgia's Uniform Deceptive Trade Practices Act (Georgia UDTPA) prohibits "deceptive trade practices." GA. CODE ANN. § 10-1-372(a).

568.   Defendant, Plaintiffs, and Georgia Class members are "persons" within the meaning of GA. CODE ANN. § 10-1-371(5).

569.   Defendants engaged in deceptive conduct, as alleged above for their violations of the Georgia FBPA.

570.   The Georgia Class members seek attorneys' fees and any other just and proper relief available under GA. CODE ANN. § 10-1-373.

**12.   Claims brought on behalf of Class members who installed their carpeting in Hawaii ("Hawaii Class members").**

**COUNT 34 (against all Defendants)**

**Strict Products Liability
(design defect)**

571.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

572.   At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

573.   As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Hawaii Class members, who might be foreseeably harmed by PFAS-infused products.

574.   PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.   PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.  PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.  Defendants failed to disclose these threats to carpet manufacturers, Hawaii Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

575.  At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Hawaii Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

576.  At all relevant times, Hawaii Class members used their carpets with PFAS-infused products as intended.

577.  Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

- 165 -

578.   At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

579.   Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

580.   As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Hawaii Class members have been injured by widespread and toxic PFAS contamination.

581.   These and other acts by Defendants were a direct and proximate cause of damages to Hawaii Class members.

## COUNT 35 (against all Defendants)

### Strict Products Liability
### (failure to warn)

582.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

583.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use

and misuse of their products, including Hawaii Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Hawaii Class members.

584.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Hawaii Class members of those risks.

585.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

586.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

587.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

588.   Defendants' failure to warn proximately caused reasonably foreseeable injuries to Hawaii Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Hawaii Class members used their carpets with PFAS-infused products as intended.

589.   Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Hawaii Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Hawaii Class members would not have installed the carpets at issue.

590.   These and other acts by Defendants were a direct and proximate cause of damages to the Hawaii Class members.

## COUNT 36 (against all Defendants)

### Nuisance

591.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

592.   Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Hawaii Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets the Hawaii Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

593. Defendants knew that the Hawaii Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Hawaii Class members.

594. Defendants' intentional and unreasonable conduct proximately caused the Hawaii Class members to suffer damages, for which the Hawaii Class members seek compensation in this action.

595. The Hawaii Class members are entitled to abatement of the nuisance caused by Defendants.

**13.   Claims brought on behalf of Class members who installed their carpeting in Illinois ("Illinois Class members").**

### COUNT 37 (against all Defendants)

### Strict Products Liability
### (design defect)

596. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

597. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

598. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Illinois Class members, who might be foreseeably harmed by PFAS-infused products.

599. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

    a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

    b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

    c.    Defendants failed to disclose these threats to carpet manufacturers, Illinois Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

600. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Illinois Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

601. At all relevant times, the Illinois Class members used their carpets with PFAS-infused products as intended.

602. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants'

failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

603.   At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

604.   Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

605.   As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Illinois Class members have been injured by widespread and toxic PFAS contamination.

606.   These and other acts by Defendants were a direct and proximate cause of damages to the Illinois Class members.

**COUNT 38 (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

607.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

608.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Illinois Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Illinois Class members.

609.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Illinois Class members of those risks.

610.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

611.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

612.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

613.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to Illinois Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Illinois Class members used their carpets with PFAS-infused products as intended.

614.    Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Illinois Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Illinois Class members would not have installed the carpets at issue.

615.    These and other acts by Defendants were a direct and proximate cause of damages to Illinois Class members.

## COUNT 39 (against all Defendants)

## Nuisance

616.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

617.    Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Illinois Class members' use of their land by selling PFAS-

infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Illinois Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

618.    Defendants knew that the Illinois Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Illinois Class members.

619.    Defendants' intentional and unreasonable conduct proximately caused the Illinois Class members to suffer damages, for which the Illinois Class members seek compensation in this action.

620.    The Illinois Class members are entitled to abatement of the nuisance caused by Defendants.

## COUNT 40 (against all Defendants)

### Violation of Illinois Consumer Fraud and
### Deceptive Business Practices Act
### (815 ILL. COMP. STAT. ANN. 505/1 *et seq.*)

621.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

622.    The Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) declares several specific actions to be unlawful, including "any deception, fraud, false pretense, false promise, misrepresentation or the concealment,

suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

623.   The Illinois Class members are "consumers" within the meaning of 815 ILCS 505/1(e).

624.   Defendants were engaged in "trade" and "commerce" within the meaning of 815 ILCS 505/1(f) when they sold their PFAS-infused products to carpet manufacturers.

625.   In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that carpets purchased by the Illinois Class members were treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

626.   In purchasing their carpets, the Illinois Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

627.   The Illinois Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

628.   Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

629.    Defendants knew or should have known that their conduct violated the ICFA.

630.    Defendants owed the Illinois Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the Illinois Class members; and

b.    Intentionally concealed the foregoing from the Illinois Class members.

631.    Defendants' conduct proximately caused injuries to the Illinois Class members.

632.    The Illinois Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

633.    Defendants' violations present a continuing risk to the Illinois Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

634.    Pursuant to 815 ILCS 505/10a(a), the Illinois Class members seek monetary relief against Defendants measured as the greater of (a) actual damages in

an amount to be determined at trial and (b) statutory damages in the amount of $100 for each plaintiff.

635.    The Illinois Class members seek attorneys' fees and any other just and proper relief available under 815 ILCS 505/10a(c).

**14.    Claims brought on behalf of Class members who installed their carpeting in Indiana ("Indiana Class members").**

### COUNT 41 (against all Defendants)

### Violation of Indiana Products Liability Act
### IND. CODE ANN. § 34-20-1-1 et seq.
### (design defect)

636.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

637.    At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

638.    At all times relevant to this action, Defendants had a duty to ensure that the design of PFAS-infused products made them reasonably fit and safe for the purpose for which they were intended.

639.    Defendants' PFAS-infused products were not reasonably safe as designed and have been unreasonably dangerous for their intended, foreseeable, and ordinary use and disposal.

640.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

    a.      PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

    b.      PFAS contamination poses significant threats to public health, economic welfare, and the environment.

    c.      Defendants failed to disclose these threats to carpet manufacturers, Indiana Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

641.   At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Indiana Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

642.   At all relevant times, Indiana Class members used their carpets with PFAS-infused products as intended.

643.   Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their

products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

644. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

645. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control. Defendants expected that their PFAS-infused products would reach consumers without a substantial change in their condition, and those products reached their end users without substantial change in their condition.

646. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Indiana Class members have been injured by widespread and toxic PFAS contamination.

647. These and other acts by Defendants were a direct and proximate cause of damages to Indiana Class members.

### COUNT 42 (against all Defendants)

### Violation of Indiana Products Liability Act
### IND. CODE ANN. § 34-20-1-1 et seq.
### (failure to warn)

648. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint

649.  Defendants had a duty to reasonably warn Indiana Class members of the dangers posed by their PFAS-infused products.

650.  Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including the Indiana Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to the Indiana Class members. Defendants, by exercising reasonable diligence, could have made such warnings available to those third parties. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants unreasonably failed to warn carpet manufacturers, consumers, the public, and Indiana Class members in particular of those risks.

651.  Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

652.  Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

653.  Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

654.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to Indiana Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Indiana Class members used their carpets with PFAS-infused products as intended.

655.    Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Indiana Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Indiana Class members would not have installed the carpets at issue.

656.    These and other acts by Defendants were a direct and proximate cause of damages to Indiana Class members.

### COUNT 43 (against all Defendants)

#### Nuisance
#### IND. CODE ANN. § 32-30-6-1 *et seq.*

657.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

658.    Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Indiana Class members' use of their land by selling PFAS-

infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Indiana Class members without disclosing the emissions dangers of PFAS in PFAS-infused products. Defendants' conduct constitutes a nuisance within the meaning of IND. CODE ANN. § 32-30-6-6.

659.    Defendants knew that the Indiana Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Indiana Class members.

660.    Defendants' intentional and unreasonable conduct proximately caused the Indiana Class members to suffer damages, for which the Indiana Class members seek compensation in this action under IND. CODE ANN. § 32-30-6-8.

661.    The Indiana Class members are entitled to abatement of the nuisance caused by Defendants. *See id.*

**15.    Claims brought on behalf of Class members who installed their carpeting in Iowa ("Iowa Class members").**

### COUNT 44 (against all Defendants)

### Design Defect Claim

662.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

663.    At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

664.   As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Iowa Class members, who might be foreseeably harmed by PFAS-infused products.

665.   PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

    a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

    b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

    c.    Defendants failed to disclose these threats to carpet manufacturers, Iowa Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

666.   At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Iowa Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

667.   At all relevant times, Iowa Class members used their carpets with PFAS-infused products as intended.

668. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

669. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

670. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

671. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Iowa Class members have been injured by widespread and toxic PFAS contamination.

672. These and other acts by Defendants were a direct and proximate cause of damages to Iowa Class members.

## COUNT 45 (against all Defendants)

## Failure to Warn Claim

673.  Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

674.  As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Iowa Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Iowa Class members.

675.  Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Iowa Class members of those risks.

676.  Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

677.  Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

678.    Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

679.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to Iowa Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Iowa Class members used their carpets with PFAS-infused products as intended.

680.    Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Iowa Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Iowa Class members would not have installed the carpets at issue.

681.    These and other acts by Defendants were a direct and proximate cause of damages to Iowa Class members.

## COUNT 46 (against all Defendants)

### Nuisance
### IOWA CODE ANN. § 657.1

682.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

683.   Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Iowa Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Iowa Class members without disclosing the emissions dangers of PFAS in PFAS-infused products. Defendants' conduct constitutes a nuisance within the meaning of IOWA CODE ANN. § 657.1(1).

684.   Defendants knew that the Iowa Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Iowa Class members.

685.   Defendants' intentional and unreasonable conduct proximately caused the Iowa Class members to suffer damages, for which the Iowa Class members seek compensation in this action. *See id*.

686.   The Iowa Class members are entitled to abatement of the nuisance caused by Defendants. *See id*

## COUNT 47 (against all Defendants)

### Violation of Iowa Private Right Of Action For Consumer Frauds Act
### (IOWA CODE § 714H.1 *et seq.*)

687.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

688.   The Iowa Private Right of Action for Consumer Frauds Act (Iowa CFA) prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission in connection with the advertisement, sale, or lease of consumer merchandise." IOWA CODE § 714H.3.

689.   Each Defendant and each Iowa Class member is a "person" under IOWA CODE § 714H.2(7).

690.   The Iowa Class members are "consumers" as defined by IOWA CODE § 714H.2(3).

691.   In purchasing their carpets, the Iowa Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

692.   The Iowa Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

693.   Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

694.   Defendants knew or should have known that their conduct violated the Iowa CFA.

695.   Defendants owed the Iowa Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.      Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the Iowa Class members; and

b.      Intentionally concealed the foregoing from the Iowa Class members.

696.   Defendants' conduct proximately caused injuries to the Iowa Class members.

697.   The Iowa Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

698.   Defendants' violations present a continuing risk to the Iowa Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

699.   Pursuant to IOWA CODE § 714H.5, Plaintiffs seek actual damages, statutory damages up to three times the amount of actual damages awarded as a result of each Defendant's willful and wanton disregard for the rights of others, and attorneys' fees.

**16.    Claims brought on behalf of Class members who installed their carpeting in Maryland ("Maryland Class members").**

### COUNT 48 (against all Defendants)

### Strict Products Liability
### (design defect)

700.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

701.   At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

702.   As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Maryland Class members, who might be foreseeably harmed by PFAS-infused products.

703.   PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.   PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.   Defendants failed to disclose these threats to carpet manufacturers, Maryland Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

704.  At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Maryland Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

705.  At all relevant times, Maryland Class members used their carpets with PFAS-infused products as intended.

706.  Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

- 191 -

707.   At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

708.   Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

709.   As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Maryland Class members have been injured by widespread and toxic PFAS contamination.

710.   These and other acts by Defendants were a direct and proximate cause of damages to Maryland Class members.

## COUNT 49 (against all Defendants)

### Strict Products Liability
### (failure to warn)

711.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

712.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use

and misuse of their products, including Maryland Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Maryland Class members.

713.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Maryland Class members of those risks.

714.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

715.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

716.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

717.   Defendants' failure to warn proximately caused reasonably foreseeable injuries to Maryland Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Maryland Class members used their carpets with PFAS-infused products as intended.

718.   Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Maryland Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Maryland Class members would not have installed the carpets at issue.

719.   These and other acts by Defendants were a direct and proximate cause of damages to Maryland Class members.

## COUNT 50 (against all Defendants)

### Nuisance

720.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

721.   Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Maryland Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Maryland Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

722.  Defendants knew that the Maryland Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Maryland Class members.

723.  Defendants' intentional and unreasonable conduct proximately caused the Maryland Class members to suffer damages, for which the Maryland Class members seek compensation in this action.

724.  The Maryland Class members are entitled to abatement of the nuisance caused by Defendants.

## COUNT 51 (against all Defendants)

### Violation of Maryland Consumer Protection Act
### (MD. CODE ANN., COM. LAW § 13-101 *et seq.*)

725.  Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

726.  The Maryland Consumer Protection Act (Maryland CPA) provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive" and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," MD. CODE ANN., COM. LAW § 13-301, regardless of whether the consumer is actually deceived or damaged, MD. CODE ANN., COM. LAW § 13-302.

727.   Defendants, Plaintiffs, and Maryland Class members are "persons" within the meaning of MD. CODE ANN., COM. LAW § 13-101(h).

728.   In purchasing their carpets, the Maryland Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

729.   The Maryland Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

730.   Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

731.   Defendants knew or should have known that their conduct violated the Maryland CPA.

732.   Defendants owed the Maryland Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.   Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the Maryland Class members; and

b.   Intentionally concealed the foregoing from the Maryland Class members.

733.    Defendants' conduct proximately caused injuries to the Maryland Class members.

734.    The Maryland Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

735.    Defendants' violations present a continuing risk to the Maryland Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

736.    Pursuant to MD. CODE ANN., COM. LAW § 13-408, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

**17.    Claims brought on behalf of Class members who installed their carpeting in Massachusetts ("Massachusetts Class members").**

**COUNT 52 (against all Defendants)**

**Breach of the implied warranty of merchantability
(design defect)**

737.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

738.    At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

739.   As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Massachusetts Class members, who might be foreseeably harmed by PFAS-infused products.

740.   PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.     PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.     PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.     Defendants failed to disclose these threats to carpet manufacturers, Massachusetts Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

741.   At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Massachusetts Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

742.   At all relevant times, Massachusetts Class members used their carpets with PFAS-infused products as intended.

743. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

744. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

745. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

746. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Massachusetts Class members have been injured by widespread and toxic PFAS contamination.

747. These and other acts by Defendants were a direct and proximate cause of damages to Massachusetts Class members.

## COUNT 53 (against all Defendants)

### Breach of the implied warranty of merchantability
### (failure to warn)

748.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

749.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Massachusetts Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Massachusetts Class members.

750.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Massachusetts Class members of those risks.

751.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

752.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

753.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

754.   Defendants' failure to warn proximately caused reasonably foreseeable injuries to Massachusetts Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Massachusetts Class members used their carpets with PFAS-infused products as intended.

755.   Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Massachusetts Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Massachusetts Class members would not have installed the carpets at issue.

756.   These and other acts by Defendants were a direct and proximate cause of damages to Massachusetts Class members.

## COUNT 54 (against all Defendants)

### Nuisance
### MASS. GEN. LAWS ANN. CH. 243, § 1 *et seq.*

757.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

758.   Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Massachusetts Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Massachusetts Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

759.   Defendants knew that the Massachusetts Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Massachusetts Class members.

760.   Defendants' intentional and unreasonable conduct proximately caused the Massachusetts Class members to suffer damages, for which the Massachusetts Class members seek compensation in this action under MASS. GEN. LAWS ANN. CH. 243, § 1.

761.   The Massachusetts Class members are entitled to abatement of the nuisance caused by Defendants. *See id.*

## COUNT 55 (against all Defendants)

## Violation of the Massachusetts General Law Chapter 93A
### (MASS. GEN. LAWS CH. 93A, § 1 *et seq.*)

762. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

763. The Massachusetts Consumer Protection Act ("MCPA") makes it unlawful to engage in any "[u]nfair methods of competition or deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS CH. 93A, § 2(1).

764. Defendants, Plaintiffs, and the Massachusetts Class are "persons" within the meaning of MASS. GEN. LAWS CH. 93A, § 1(a).

765. Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of MASS. GEN. LAWS CH. 93A, § 1(b).

766. In purchasing their carpets, the Massachusetts Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

767. The Massachusetts Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

768. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

769.    Defendants knew or should have known that their conduct violated the MCPA.

770.    Defendants owed the Massachusetts Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the Massachusetts Class members; and

b.    Intentionally concealed the foregoing from the Massachusetts Class members.

771.    Defendants' conduct proximately caused injuries to the Massachusetts Class members.

772.    The Massachusetts Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

773.    Defendants' violations present a continuing risk to the Massachusetts Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

774.    The Massachusetts Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the

Defendants' conduct. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

775.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, the Massachusetts Class members seek attorneys' fees, costs, and any other just and proper relief available under the MCPA.

776.    On August 29, 2024, Plaintiffs sent a letter to Defendants complying with MASS. GEN. LAWS CH. 93A, § 9(3).

**18.    Claims brought on behalf of Class members who installed their carpeting in Minnesota ("Minnesota Class members").**

**COUNT 56 (against all Defendants)**

**Strict Products Liability
(design defect)**

777.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

778.    At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

779.    As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Minnesota Class members, who might be foreseeably harmed by PFAS-infused products.

780.  PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

    a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

    b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

    c.    Defendants failed to disclose these threats to carpet manufacturers, Minnesota Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

781.  At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Minnesota Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

782.  At all relevant times, Minnesota Class members used their carpets with PFAS-infused products as intended.

783.  Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced

or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

784.   At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

785.   Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

786.   As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Minnesota Class members have been injured by widespread and toxic PFAS contamination.

787.   These and other acts by Defendants were a direct and proximate cause of damages to Minnesota Class members.

## COUNT 57 (against all Defendants)

### Strict Products Liability
### (failure to warn)

788.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

789.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Minnesota Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Minnesota Class members.

790.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Minnesota Class members of those risks.

791.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

792.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

793.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

794.   Defendants' failure to warn proximately caused reasonably foreseeable injuries to Minnesota Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Minnesota Class members used their carpets with PFAS-infused products as intended.

795.   Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Minnesota Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Minnesota Class members would not have installed the carpets at issue.

796.   These and other acts by Defendants were a direct and proximate cause of damages to Minnesota Class members.

### COUNT 58 (against all Defendants)

### Nuisance
### MINN. STAT. ANN. § 561.01 *et seq.*

797.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

798.   Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Minnesota Class members' use of their land by selling PFAS-

infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Minnesota Class members without disclosing the emissions dangers of PFAS in PFAS-infused products. Defendants' conduct constitutes a nuisance under MINN. STAT. ANN. § 561.01.

799.   Defendants knew that the Minnesota Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Minnesota Class members.

800.   Defendants' intentional and unreasonable conduct proximately caused the Minnesota Class members to suffer damages, for which the Minnesota Class members seek compensation in this action under MINN. STAT. ANN. § 561.013.

801.   The Minnesota Class members are entitled to abatement of the nuisance caused by Defendants. *See id.*

**19.   Claims brought on behalf of Class members who installed their carpeting in Missouri ("Missouri Class members").**

### COUNT 59 (against all Defendants)

### Strict Products Liability
### (design defect)

802.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

803.   At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

804.   As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Missouri Class members, who might be foreseeably harmed by PFAS-infused products.

805.   PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.    Defendants failed to disclose these threats to carpet manufacturers, Missouri Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

806.   At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Missouri Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

807.  At all relevant times, Missouri Class members used their carpets with PFAS-infused products as intended.

808.  Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

809.  At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

810.  Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

811.  As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Missouri Class members have been injured by widespread and toxic PFAS contamination.

812.   These and other acts by Defendants were a direct and proximate cause of damages to Missouri Class members.

## COUNT 60 (against all Defendants)

### Strict Products Liability
### (failure to warn)

813.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

814.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Missouri Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Missouri Class members.

815.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Missouri Class members of those risks.

816.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

817.  Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

818.  Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

819.  Defendants' failure to warn proximately caused reasonably foreseeable injuries to Missouri Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Missouri Class members used their carpets with PFAS-infused products as intended.

820.  Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Missouri Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Missouri Class members would not have installed the carpets at issue.

821.  These and other acts by Defendants were a direct and proximate cause of damages to Missouri Class members.

## COUNT 61 (against all Defendants)

## Nuisance

822.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

823.   Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Missouri Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Missouri Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

824.   Defendants knew that the Missouri Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Missouri Class members.

825.   Defendants' intentional and unreasonable conduct proximately caused the Missouri Class members to suffer damages, for which the Missouri Class members seek compensation in this action.

826.   The Missouri Class members are entitled to abatement of the nuisance caused by Defendants.

## COUNT 62 (against all Defendants)

### Violation of the Missouri Merchandising Practices Act
### (MO. REV. STAT. § 407.005 *et seq.*)

827.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

828.   The Missouri Merchandising Practices Act (Missouri MPA) makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020(1).

829. Defendants, Plaintiffs, and Missouri Class members are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

830. Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of MO. REV. STAT. § 407.010(7).

831.   In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that carpets purchased by the Missouri Class members were treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

832.   In purchasing their carpets, the Missouri Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

833.   The Missouri Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

834.   Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

835.   Defendants knew or should have known that their conduct violated the Missouri MPA.

836.   Defendants owed the Missouri Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.   Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the Missouri Class members; and

b.   Intentionally concealed the foregoing from the Missouri Class members.

837.   Defendants' conduct proximately caused injuries to the Missouri Class members.

838.   The Missouri Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

839.   Defendants' violations present a continuing risk to the Missouri Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

667.  The Missouri Class members seek damages in amounts to be proven at trial, along with attorneys' fees, costs, and punitive damages, and any other just and proper relief under MO. REV. STAT. § 407.025.

**20.    Claims brought on behalf of Class members who installed their carpeting in Nevada ("Nevada Class members").**

**COUNT 63 (against all Defendants)**

**Strict Products Liability
(design defect)**

840.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

841.   At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

842.   As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Nevada Class members, who might be foreseeably harmed by PFAS-infused products.

843.  PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.   PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.   PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.   Defendants failed to disclose these threats to carpet manufacturers, Nevada Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

844.   At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Nevada Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

845.   At all relevant times, Nevada Class members used their carpets with PFAS-infused products as intended.

846.   Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their

products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

847.   At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

848.   Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

849.   As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Nevada Class members have been injured by widespread and toxic PFAS contamination.

850.   These and other acts by Defendants were a direct and proximate cause of damages to Nevada Class members.

## COUNT 64 (against all Defendants)

### Strict Products Liability
### (failure to warn)

851.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

852.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and

misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Nevada Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Nevada Class members.

853.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Nevada Class members of those risks.

854.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

855.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

856.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

857.   Defendants' failure to warn proximately caused reasonably foreseeable injuries to Nevada Class members, who would have heeded legally adequate

warnings about the dangers of PFAS products. At all relevant times, Nevada Class members used their carpets with PFAS-infused products as intended.

858.    Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Nevada Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Nevada Class members would not have installed the carpets at issue.

859.    These and other acts by Defendants were a direct and proximate cause of damages to Nevada Class members.

## COUNT 65 (against all Defendants)

### Nuisance
### NEV. REV. STAT. 40.140

860.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

861.    Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Nevada Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would

sell PFAS-infused carpets to the Nevada Class members without disclosing the emissions dangers of PFAS in PFAS-infused products. Defendants' conduct constitutes a nuisance within the meaning of NEV. REV. STAT. 40.140(1).

862. Defendants knew that the Nevada Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Nevada Class members.

863. Defendants' intentional and unreasonable conduct proximately caused the Nevada Class members to suffer damages, for which the Nevada Class members seek compensation in this action. *See id.*

864. The Nevada Class members are entitled to abatement of the nuisance caused by Defendants. *See id.*

## COUNT 66 (against all Defendants)

### Violation of the Nevada Deceptive Trade Practices Act
### (NEV. REV. STAT. § 598.0903 *et seq.*)

865. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

866. The Nevada Deceptive Trade Practices Act (Nevada DTPA) prohibits deceptive trade practices. NEV. REV. STAT. § 598.0923(1)(b) provides that a "person engages in a 'deceptive trade practice" when in the course of his or her business or occupation he or she knowingly … [f]ails to disclose a material fact in connection with the sale or lease of goods or services."

867. In purchasing their carpets, the Nevada Class members were deceived by Defendants' failure to disclose the material fact that their carpets were treated with PFAS-infused products.

868. The Nevada Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

869. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

870. Defendants knew or should have known that their conduct violated the Nevada DTPA.

871. Defendants owed the Nevada Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the Nevada Class members; and

b.    Intentionally concealed the foregoing from the Nevada Class members.

872. Defendants' conduct proximately caused injuries to the Nevada Class members.

873. The Nevada Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants'

conduct. These injuries are the direct and natural consequence of Defendants' omissions.

874. Defendants' violations present a continuing risk to the Nevada Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

875. The Nevada Class members seek their actual damages, punitive damages, costs, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA. NEV. REV. STAT. § 41.600.

**21.    Claims brought on behalf of Class members who installed their carpeting in New Hampshire ("New Hampshire Class members").**

### COUNT 67 (against all Defendants)

### Strict Products Liability
### (design defect)

876. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

877. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

878. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the New Hampshire Class members, who might be foreseeably harmed by PFAS-infused products.

879. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.     PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.     PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.     Defendants failed to disclose these threats to carpet manufacturers, New Hampshire Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

880. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the New Hampshire Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

881. At all relevant times, New Hampshire Class members used their carpets with PFAS-infused products as intended.

882. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced

or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

883.  At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

884.  Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

885.  As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, New Hampshire Class members have been injured by widespread and toxic PFAS contamination.

886.  These and other acts by Defendants were a direct and proximate cause of damages to New Hampshire Class members.

## COUNT 68 (against all Defendants)

### Strict Products Liability
### (failure to warn)

887.  Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

888.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including New Hampshire Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to New Hampshire Class members.

889.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and New Hampshire Class members of those risks.

890.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

891.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

892.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

893.   Defendants' failure to warn proximately caused reasonably foreseeable injuries to New Hampshire Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, New Hampshire Class members used their carpets with PFAS-infused products as intended.

894.   Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to New Hampshire Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the New Hampshire Class members would not have installed the carpets at issue.

895.   These and other acts by Defendants were a direct and proximate cause of damages to New Hampshire Class members.

## COUNT 69 (against all Defendants)

### Nuisance

896.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

897.   Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and New Hampshire Class members' use of their land by selling

PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the New Hampshire Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

898.    Defendants knew that the New Hampshire Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the New Hampshire Class members.

899.    Defendants' intentional and unreasonable conduct proximately caused the New Hampshire Class members to suffer damages, for which the New Hampshire Class members seek compensation in this action.

900.    The New Hampshire Class members are entitled to abatement of the nuisance caused by Defendants.

## COUNT 70 (against all Defendants)

### Violation of the New Hampshire Consumer Protection Act
### (N.H. REV. STAT. ANN. § 358-A:1 *et seq.*)

901.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

902.    The New Hampshire Consumer Protection Act (New Hampshire CPA) makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. REV. STAT. § 358-A:2.

903.   Defendant, Plaintiffs, and New Hampshire Class members are "persons" within the meaning of N.H. REV. STAT. ANN. § 358-A:1.

904.   Defendants' actions as set forth herein occurred in the conduct of trade and commerce within the meaning of N.H. REV. STAT. ANN. § 358-A:1.

905.   In purchasing their carpets, the New Hampshire Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

906.   The New Hampshire Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

907.   Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

908.   Defendants knew or should have known that their conduct violated the New Hampshire CPA.

909.   Defendants owed New Hampshire Class members a duty to disclose the truth about PFAS-infused products because Defendants:

   a.   Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the New Hampshire Class members; and

- 231 -

b.     Intentionally concealed the foregoing from the New Hampshire Class members.

910.  Defendants' conduct proximately caused injuries to the New Hampshire Class members.

911.  The New Hampshire Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct, as a direct and natural consequence of Defendants' omissions.

912.  Defendants' violations present a continuing risk to the New Hampshire Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

913.  Because Defendants' willful conduct caused injury to Plaintiffs' property through violations of the New Hampshire CPA, Plaintiffs seek recovery of actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; and any other just and proper relief under N.H. REV. STAT. ANN. § 358-A:10.

22. **Claims brought on behalf of Class members who installed their carpeting in New Jersey ("New Jersey Class members").**

### COUNT 71 (against all Defendants)

### Strict Products Liability
### (design defect)

914. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

915. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

916. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the New Jersey Class members, who might be foreseeably harmed by PFAS-infused products.

917. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to carpet manufacturers, New Jersey Class members and the public generally but instead

downplayed and misrepresented the dangers posed by their PFAS products.

918. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the New Jersey Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

919. At all relevant times, New Jersey Class members used their carpets with PFAS-infused products as intended.

920. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

921. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

922.    Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

923.    As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, New Jersey Class members have been injured by widespread and toxic PFAS contamination.

924.    These and other acts by Defendants were a direct and proximate cause of damages to New Jersey Class members.

## COUNT 72 (against all Defendants)

## Strict Products Liability
## (failure to warn)

925.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

926.    As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including New Jersey Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to New Jersey Class members.

927.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and New Jersey Class members of those risks.

928.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

929.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

930.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

931.   Defendants' failure to warn proximately caused reasonably foreseeable injuries to New Jersey Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, New Jersey Class members used their carpets with PFAS-infused products as intended.

932.   Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of

PFAS to New Jersey Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the New Jersey Class members would not have installed the carpets at issue.

933.   These and other acts by Defendants were a direct and proximate cause of damages to New Jersey Class members.

## COUNT 73 (against all Defendants)

## Nuisance

934.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

935.   Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and New Jersey Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the New Jersey Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

936.   Defendants knew that the New Jersey Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the New Jersey Class members.

937. Defendants' intentional and unreasonable conduct proximately caused the New Jersey Class members to suffer damages, for which the New Jersey Class members seek compensation in this action.

938. The New Jersey Class members are entitled to abatement of the nuisance caused by Defendants.

### COUNT 74 (against all Defendants)

### Violation of the New Jersey Consumer Fraud Act
### (N.J. STAT. ANN. § 56:8-1 *et seq.*)

939. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

940. The New Jersey Consumer Fraud Act (New Jersey CFA) makes unlawful the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. STAT. ANN. § 56:8-2.

941. Defendants, Plaintiffs, and the New Jersey Class members are "persons" within the meaning of N.J. STAT. ANN. § 56:8-1(d).

942.    Defendants engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (d).

943.    In purchasing their carpets, the New Jersey Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

944.    The New Jersey Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

945.    Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

946.    Defendants knew or should have known that their conduct violated the New Jersey CFA.

947.    Defendants owed the New Jersey Class members a duty to disclose the truth about PFAS-infused products because Defendants:

    a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the New Jersey Class members; and

    b.    Intentionally concealed the foregoing from the New Jersey Class members.

948.   Defendants' conduct proximately caused injuries to the New Jersey Class members.

949.   The New Jersey Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

950.   Defendants' violations present a continuing risk to the New Jersey Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

951.   Plaintiffs are entitled to recover treble damages, costs, and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19, and any other just and appropriate relief.

**23.   Claims brought on behalf of Class members who installed their carpeting in New Mexico ("New Mexico Class members").**

### COUNT 75 (against all Defendants)

### Strict Products Liability
### (design defect)

952.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

953.   At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

954.    As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the New Mexico Class members, who might be foreseeably harmed by PFAS-infused products.

955.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.      PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.      PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.      Defendants failed to disclose these threats to carpet manufacturers, New Mexico Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

956.    At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to New Mexico Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

957.    At all relevant times, New Mexico Class members used their carpets with PFAS-infused products as intended.

958. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

959. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

960. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

961. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, New Mexico Class members have been injured by widespread and toxic PFAS contamination.

962. These and other acts by Defendants were a direct and proximate cause of damages to New Mexico Class members.

## COUNT 76 (against all Defendants)

### Strict Products Liability
### (failure to warn)

963.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

964.   As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including New Mexico Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to New Mexico Class members.

965.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and New Mexico Class members of those risks.

966.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

967.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

968.    Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

969.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to New Mexico Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, New Mexico Class members used their carpets with PFAS-infused products as intended.

970.    Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to New Mexico Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the New Mexico Class members would not have installed the carpets at issue.

971.    These and other acts by Defendants were a direct and proximate cause of damages to New Mexico Class members.

## COUNT 77 (against all Defendants)

## Nuisance

972.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

973.   Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and New Mexico Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the New Mexico Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

974.   Defendants knew that the New Mexico Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the New Mexico Class members.

975.   Defendants' intentional and unreasonable conduct proximately caused the New Mexico Class members to suffer damages, for which the New Mexico Class members seek compensation in this action.

976.   The New Mexico Class members are entitled to abatement of the nuisance caused by Defendants.

**COUNT 78 (against all Defendants)**

**Violation of the New Mexico Unfair Trade Practices Act**
**(N.M. STAT. ANN. § 57-12-1 *et seq.*)**

977.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

978.   The New Mexico Unfair Trade Practices Act (New Mexico UTPA) makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. STAT. ANN. § 57-12-2(D).

979.   Defendants, Plaintiffs, and the New Mexico Class members are "person[s]" within the meaning of N.M. STAT. ANN. § 57-12-2.

980.   Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined by N.M. STAT. ANN. § 57-12-2.

981.   In purchasing their carpets, the New Mexico Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

982.   The New Mexico Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

983.   Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

984.   Defendants knew or should have known that their conduct violated the New Mexico UTPA.

985.   Defendants owed the New Mexico Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.   Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the New Mexico Class members; and

b.   Intentionally concealed the foregoing from the New Mexico Class members.

986.   Defendants' conduct proximately caused injuries to the New Mexico Class members.

987.   The New Mexico Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

988. Defendants' violations present a continuing risk to the New Mexico Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

989. Because Defendants' unconscionable, willful conduct caused actual harm to Plaintiffs, the New Mexico Class members seek recovery of actual damages or $100, whichever is greater; discretionary treble damages; reasonable attorneys' fees and costs; and all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

**24.    Claims brought on behalf of Class members who installed their carpeting in New York ("New York Class members").**

### COUNT 79 (against all Defendants)

### Strict Products Liability
### (design defect)

990. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

991. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

992. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the New York Class members, who might be foreseeably harmed by PFAS-infused products.

993.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.    Defendants failed to disclose these threats to carpet manufacturers, New York Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

994.    At all times relevant to this Complaint, PFAS-infused products were in a defective condition unreasonably dangerous to New York Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

995.    At all relevant times, New York Class members used their carpets with PFAS-infused products as intended.

996.    Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced

or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

997.   At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

998.   Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

999.   As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, New York Class members have been injured by widespread and toxic PFAS contamination.

1000. These and other acts by Defendants were a direct and proximate cause of damages to New York Class members.

### COUNT 80 (against all Defendants)

### Strict Products Liability
### (failure to warn)

1001. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1002. As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including New York Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to New York Class members.

1003. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and New York Class members of those risks.

1004. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1005. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1006. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1007. Defendants' failure to warn proximately caused reasonably foreseeable injuries to New York Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, New York Class members used their carpets with PFAS-infused products as intended.

1008. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to New York Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the New York Class members would not have installed the carpets at issue.

1009. These and other acts by Defendants were a direct and proximate cause of damages to New York Class members.

## COUNT 81 (against all Defendants)

## Nuisance

1010. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1011. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and New York Class members' use of their land by selling PFAS-

infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the New York Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

1012. Defendants knew that the New York Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the New York Class members.

1013. Defendants' intentional and unreasonable conduct proximately caused the New York Class members to suffer damages, for which the New York Class members seek compensation in this action.

1014. The New York Class members are entitled to abatement of the nuisance caused by Defendants.

**25.    Claims brought on behalf of Class members who installed their carpeting in North Carolina ("North Carolina Class members").**

**COUNT 82 (against all Defendants)**

**Products Liability**
**(design defect)**

1015. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1016. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1017. As manufacturers of PFAS-infused products, Defendants had a duty not to act negligently in placing into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the North Carolina Class members, who might be foreseeably harmed by PFAS-infused products.

1018. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.    Defendants failed to disclose these threats to carpet manufacturers, North Carolina Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1019. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the North Carolina Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1020. At all relevant times, North Carolina Class members used their carpets with PFAS-infused products as intended.

1021. Defendants knew of these risks and nevertheless failed to use reasonable care and acted negligently in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1022. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1023. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1024. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, North Carolina Class members have been injured by widespread and toxic PFAS contamination.

1025. These and other acts by Defendants were a direct and proximate cause of damages to North Carolina Class members.

## COUNT 83 (against all Defendants)

### Products Liability
### (failure to warn)

1026. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1027. As manufacturers of PFAS-infused products, Defendants had a duty not to act unreasonably in failing to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew or should have known about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including North Carolina Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to North Carolina Class members.

1028. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, they unreasonably failed to warn carpet manufacturers, consumers, the public, and North Carolina Class members in particular of those risks.

1029. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of

PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1030. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1031. Defendants' PFAS-infused products acted unreasonably by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1032. Defendants' failure to reasonably warn proximately caused reasonably foreseeable injuries to North Carolina Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, North Carolina Class members used their carpets with PFAS-infused products as intended.

1033. Had Defendants reasonably provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to North Carolina Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the North Carolina Class members would not have installed the carpets at issue.

1034. These and other acts by Defendants were a direct and proximate cause of damages to North Carolina Class members.

## COUNT 84 (against all Defendants)

### Nuisance

1035. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1036. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and North Carolina Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the North Carolina Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

1037. Defendants knew that the North Carolina Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the North Carolina Class members.

1038. Defendants' intentional and unreasonable conduct proximately caused the North Carolina Class members to suffer damages, for which the North Carolina Class members seek compensation in this action.

1039. The North Carolina Class members are entitled to abatement of the nuisance caused by Defendants.

## COUNT 85 (against all Defendants)

## Violation of North Carolina Unfair And Deceptive Trade Practices Act
### (N.C. GEN. STAT. § 75-1.1 *et seq.*)

1040. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1041. North Carolina's Unfair and Deceptive Acts and Practices Act (the North Carolina Act) broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1(a).

1042. Defendants engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

1043. In purchasing their carpets, the North Carolina Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

1044. The North Carolina Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1045. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1046. Defendants knew or should have known that their conduct violated the North Carolina Act.

1047. Defendants owed the North Carolina Class members a duty to disclose the truth about PFAS-infused products because Defendants:

    a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the North Carolina Class members; and

    b.    Intentionally concealed the foregoing from the North Carolina Class members.

1048. Defendants' conduct proximately caused injuries to the North Carolina Class members.

1049. The North Carolina Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1050. Defendants' violations present a continuing risk to the North Carolina Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1051. Plaintiffs seek an order for treble their actual damages, costs, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

26.    **Claims brought on behalf of Class members who installed their carpeting in Ohio ("Ohio Class members").**

## COUNT 86 (against all Defendants)

### Products Liability
### Ohio Rev. Code Ann. § 2307.71 et seq.
### (design defect)

1052. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1053. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1054. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Ohio Class members, who might be foreseeably harmed by PFAS-infused products.

1055. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.     Defendants failed to disclose these threats to carpet manufacturers, Ohio Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1056. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Ohio Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1057. At all relevant times, Ohio Class members used their carpets with PFAS-infused products as intended.

1058. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1059. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products

outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1060. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1061. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Ohio Class members have been injured by widespread and toxic PFAS contamination.

1062. These and other acts by Defendants were a direct and proximate cause of damages to Ohio Class members.

## COUNT 87 (against all Defendants)

### Products Liability
### Ohio Rev. Code Ann. § 2307.71 et seq.
### (failure to warn)

1063. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1064. As manufacturers of PFAS-infused products, Defendants had a duty under the laws of both strict liability and negligence to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew or should have known about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse

of their products, including Ohio Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Ohio Class members.

1065. Notwithstanding Defendants' superior knowledge of the safety risks posed by PFAS-infused products, Defendants failed to warn consumers, the public, and Ohio Class members in particular of those risks.

1066. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1067. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1068. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1069. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Ohio Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Ohio Class members used their carpets with PFAS-infused products as intended.

1070. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Ohio Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Ohio Class members would not have installed the carpets at issue.

1071. These and other acts by Defendants were a direct and proximate cause of damages to Ohio Class members.

### COUNT 88 (against all Defendants)

### Nuisance

1072. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1073. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Ohio Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Ohio Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

1074. Defendants knew that the Ohio Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Ohio Class members.

1075. Defendants' intentional and unreasonable conduct proximately caused the Ohio Class members to suffer damages, for which the Ohio Class members seek compensation in this action.

1076. The Ohio Class members are entitled to abatement of the nuisance caused by Defendants.

**27. Claims brought on behalf of Class members who installed their carpeting in Oklahoma (collectively, "Oklahoma Class members").**

### COUNT 89 (against all Defendants)

### Strict Products Liability
### (design defect)

1077. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1078. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1079. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Oklahoma Class members, who might be foreseeably harmed by PFAS-infused products.

1080. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.  PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.  PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.  Defendants failed to disclose these threats to carpet manufacturers, Oklahoma Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1081. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Oklahoma Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1082. At all relevant times, Oklahoma Class members used their carpets with PFAS-infused products as intended.

1083. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced

or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1084. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1085. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1086. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Oklahoma Class members have been injured by widespread and toxic PFAS contamination.

1087. These and other acts by Defendants were a direct and proximate cause of damages to Oklahoma Class members.

## COUNT 90 (against all Defendants)

### Strict Products Liability
### (failure to warn)

1088. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

- 268 -

1089. As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Oklahoma Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Oklahoma Class members.

1090. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Oklahoma Class members of those risks.

1091. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1092. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1093. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1094. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Oklahoma Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Oklahoma Class members used their carpets with PFAS-infused products as intended.

1095. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Oklahoma Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Oklahoma Class members would not have installed the carpets at issue.

1096. These and other acts by Defendants were a direct and proximate cause of damages to Oklahoma Class members.

### COUNT 91 (against all Defendants)

### Nuisance
### OKLA. STAT. ANN. TIT. 50, § 1 *et seq.*

1097. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1098. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Oklahoma Class members' use of their land by selling PFAS-

infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Oklahoma Class members without disclosing the emissions dangers of PFAS in PFAS-infused products. Defendants' conduct constitutes a nuisance within the meaning of OKLA. STAT. ANN. TIT. 50, § 1.

1099. Defendants knew that the Oklahoma Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Oklahoma Class members.

1100. Defendants' intentional and unreasonable conduct proximately caused the Oklahoma Class members to suffer damages, for which the Oklahoma Class members seek compensation in this action.

1101. The Oklahoma Class members are entitled to abatement of the nuisance caused by Defendants.

## COUNT 92 (against all Defendants)

### Violation of the Oklahoma Consumer Protection Act
### (OKLA. STAT. TIT. 15, § 751 *et seq.*)

1102. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1103. The Oklahoma Consumer Protection Act (Oklahoma CPA) provides that a "person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act when, in the course of the person's business,

the person … [c]ommits an unfair or deceptive trade practice as defined in Section 752 of this title." OKLA. STAT. TIT. 15, § 753(21). Section 752(13) provides that a "deceptive trade practice" means "a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person."

1104. Defendants, Plaintiffs, and Oklahoma Class members are "persons" within the meaning of OKLA. STAT. TIT. 15, § 752.

1105. Each Defendant is a "person," "corporation," or "association" within the meaning of OKLA. STAT. TIT. 15, § 15-751(1).

1106. In purchasing their carpets, the Oklahoma Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

1107. The Oklahoma Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1108. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1109. Defendants knew or should have known that their conduct violated the Oklahoma CPA.

1110. Defendants owed the Oklahoma Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.     Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the Oklahoma Class members; and

b.     Intentionally concealed the foregoing from the Oklahoma Class members.

1111. Defendants' conduct proximately caused injuries to the Oklahoma Class members.

1112. The Oklahoma Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1113. Defendants' violations present a continuing risk to the Oklahoma Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1114. Because Defendants' unconscionable conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15,

§ 761.1. Plaintiffs further seek any other just and proper relief available under the Oklahoma CPA.

**28.    Claims brought on behalf of Class members who installed their carpeting in Oregon (collectively, "Oregon Class members").**

**COUNT 93 (against all Defendants)**

**Strict Products Liability**
**(design defect)**

1115. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1116. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1117. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Oregon Class members, who might be foreseeably harmed by PFAS-infused products.

1118. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.      Defendants failed to disclose these threats to carpet manufacturers, Oregon Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1119. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Oregon Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1120. At all relevant times, Oregon Class members used their carpets with PFAS-infused products as intended.

1121. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1122. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products

outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1123. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1124. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Oregon Class members have been injured by widespread and toxic PFAS contamination.

1125. These and other acts by Defendants were a direct and proximate cause of damages to Oregon Class members.

## COUNT 94 (against all Defendants)

### Strict Products Liability
### (failure to warn)

1126. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1127. As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Oregon Class members, as well as to all

carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Oregon Class members.

1128. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Oregon Class members of those risks.

1129. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1130. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1131. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1132. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Oregon Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Oregon Class members used their carpets with PFAS-infused products as intended.

1133. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the

carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Oregon Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Oregon Class members would not have installed the carpets at issue.

1134. These and other acts by Defendants were a direct and proximate cause of damages to Oregon Class members.

## COUNT 95 (against all Defendants)

### Nuisance

1135. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1136. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Oregon Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Oregon Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

1137. Defendants knew that the Oregon Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Oregon Class members.

1138. Defendants' intentional and unreasonable conduct proximately caused the Oregon Class members to suffer damages, for which the Oregon Class members seek compensation in this action.

1139. The Oregon Class members are entitled to abatement of the nuisance caused by Defendants.

## COUNT 96 (against all Defendants)

### Violation of the Oregon Unlawful Trade Practices Act
### (OR. REV. STAT. § 646.605 *et seq.*)

1140. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1141. The Oregon Unfair Trade Practices Act (Oregon UTPA) provides that a "person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following: … (u) Engages in any other unfair or deceptive conduct in trade or commerce." OR. REV. STAT. § 646.608(1)(u).

1142. Each Defendant and each Oregon Class member is a "person" within the meaning of OR. REV. STAT. § 646.605(4).

1143. Their PFAS-infused products are "goods" within the meaning of OR. REV. STAT. § 646.605(6).

1144. In purchasing their carpets, the Oregon Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

1145. The Oregon Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1146. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1147. Defendants knew or should have known that their conduct violated the Oregon UTPA.

1148. Defendants owed the Oregon Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the Oregon Class members; and

b. Intentionally concealed the foregoing from the Oregon Class members.

1149. Defendants' conduct proximately caused injuries to the Oregon Class members.

1150. The Oregon Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1151. Defendants' violations present a continuing risk to the Oregon Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1152. The Oregon Class members are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1), (8). Plaintiffs are also entitled to punitive damages because Defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

1153. The Oregon Class members seek attorneys' fees and any other just and proper relief available under OR. REV. STAT. § 646.638(1), (8).

**29.    Claims brought on behalf of Class members who installed their carpeting in Pennsylvania ("Pennsylvania Class members").**

### COUNT 97 (against all Defendants)

### Strict Products Liability
### (design defect)

1154. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1155. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1156. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Pennsylvania Class members, who might be foreseeably harmed by PFAS-infused products.

1157. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

    a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

    b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

    c.    Defendants failed to disclose these threats to carpet manufacturers, Pennsylvania Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1158. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Pennsylvania Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1159. At all relevant times, Pennsylvania Class members used their carpets with PFAS-infused products as intended.

1160. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1161. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1162. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1163. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Pennsylvania Class members have been injured by widespread and toxic PFAS contamination.

1164. These and other acts by Defendants were a direct and proximate cause of damages to Pennsylvania Class members.

**COUNT 98 (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

1165. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1166. As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Pennsylvania Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Pennsylvania Class members.

1167. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Pennsylvania Class members of those risks.

1168. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

- 284 -

1169. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1170. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1171. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Pennsylvania Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Pennsylvania Class members used their carpets with PFAS-infused products as intended.

1172. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Pennsylvania Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Pennsylvania Class members would not have installed the carpets at issue.

1173. These and other acts by Defendants were a direct and proximate cause of damages to Pennsylvania Class members.

**COUNT 99 (against all Defendants)**

**Nuisance**

1174. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1175. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Pennsylvania Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Pennsylvania Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

1176. Defendants knew that the Pennsylvania Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Pennsylvania Class members.

1177. Defendants' intentional and unreasonable conduct proximately caused the Pennsylvania Class members to suffer damages, for which the Pennsylvania Class members seek compensation in this action.

1178. The Pennsylvania Class members are entitled to abatement of the nuisance caused by Defendants.

## COUNT 100 (against all Defendants)

## Violation of the Pennsylvania Unfair Trade Practices
## And Consumer Protection Law
## (73 PA. CONS. STAT. § 201-1 *et seq.*)

1179. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1180. This claim is brought by Plaintiffs on behalf of Pennsylvania purchasers who are members of the Class.

1181. The Pennsylvania Unfair Trade Practices and Consumer Protection Law (Pennsylvania CPL) prohibits unfair or deceptive acts or practices, including representing that goods or services have characteristics, benefits or qualities that they do not have; representing that goods or services are of a particular standard, quality or grade if they are of another; advertising goods or services with intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding. 73 P.S. § 201-2(4).

1182. Defendant, Plaintiffs, and Pennsylvania Class members are "persons" within the meaning of 73 PA. CONS. STAT. § 201-2(2).

1183. Plaintiffs purchased or leased Polluting Vehicles primarily for personal, family, or household purposes within the meaning of 73 PA. CONS. STAT. § 201-9.2.

1184. All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 PA. CONS. STAT. § 201-2(3).

1185. Defendants are liable to Plaintiffs for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 PA. CONS. STAT. § 201-9.2(a).

**30.    Claims brought on behalf of Class members who installed their carpeting in South Carolina (collectively, "South Carolina Class members").**

### COUNT 101 (against all Defendants)

### Strict Products Liability
### (design defect)

1186. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1187. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1188. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the South Carolina Class members, who might be foreseeably harmed by PFAS-infused products.

1189. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.    Defendants failed to disclose these threats to carpet manufacturers, South Carolina Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1190. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the South Carolina Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1191. At all relevant times, South Carolina Class members used their carpets with PFAS-infused products as intended.

1192. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their

products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1193. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1194. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1195. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, South Carolina Class members have been injured by widespread and toxic PFAS contamination.

1196. These and other acts by Defendants were a direct and proximate cause of damages to South Carolina Class members.

**COUNT 102 (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

1197. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1198. As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and

misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including South Carolina Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to South Carolina Class members.

1199. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and South Carolina Class members of those risks.

1200. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1201. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1202. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1203. Defendants' failure to warn proximately caused reasonably foreseeable injuries to South Carolina Class members, who would have heeded legally adequate

warnings about the dangers of PFAS products. At all relevant times, South Carolina Class members used their carpets with PFAS-infused products as intended.

1204. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to South Carolina Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the South Carolina Class members would not have installed the carpets at issue.

1205. These and other acts by Defendants were a direct and proximate cause of damages to South Carolina Class members.

## COUNT 103 (against all Defendants)

### Nuisance

1206. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1207. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and South Carolina Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers

would sell PFAS-infused carpets to the South Carolina Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

1208. Defendants knew that the South Carolina Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the South Carolina Class members.

1209. Defendants' intentional and unreasonable conduct proximately caused the South Carolina Class members to suffer damages, for which the South Carolina Class members seek compensation in this action.

1210. The South Carolina Class members are entitled to abatement of the nuisance caused by Defendants.

## COUNT 104 (against all Defendants)

### Violation Of The South Carolina Unfair Trade Practices Act
### (S.C. CODE ANN. § 39-5-10 *et seq.*)

1211. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

1212. This claim is brought by Plaintiffs on behalf of South Carolina purchasers who are members of the Class.

1213. The South Carolina Unfair Trade Practices Act (South Carolina UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. CODE ANN. § 39-5-20(a).

1214. Each Defendant is a "person" under S.C. CODE ANN. § 39-5-10.

- 293 -

1215. Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiffs seek monetary relief to recover their economic losses. Because Defendants' actions were willful and knowing, Plaintiffs' damages should be trebled.

1216. Plaintiffs further allege that Defendants' malicious and deliberate conduct warrants an assessment of punitive damages because Defendants carried out despicable conduct with willful and conscious disregard of the rights of others. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

### 31. Claims brought on behalf of Class members who installed their carpeting in South Dakota ("South Dakota Class members").

### COUNT 105 (against all Defendants)

### Strict Products Liability
### (design defect)

1217. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1218. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1219. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the South Dakota Class members, who might be foreseeably harmed by PFAS-infused products.

1220. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.   PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.   PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.   Defendants failed to disclose these threats to carpet manufacturers, South Dakota Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1221. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the South Dakota Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1222. At all relevant times, South Dakota Class members used their carpets with PFAS-infused products as intended.

1223. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced

or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1224. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1225. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1226. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, South Dakota Class members have been injured by widespread and toxic PFAS contamination.

1227. These and other acts by Defendants were a direct and proximate cause of damages to South Dakota Class members.

## COUNT 106 (against all Defendants)

### Strict Products Liability
### (failure to warn)

1228. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1229. As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including South Dakota Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to South Dakota Class members.

1230. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and South Dakota Class members of those risks.

1231. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1232. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1233. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1234. Defendants' failure to warn proximately caused reasonably foreseeable injuries to South Dakota Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, South Dakota Class members used their carpets with PFAS-infused products as intended.

1235. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to South Dakota Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the South Dakota Class members would not have installed the carpets at issue.

1236. These and other acts by Defendants were a direct and proximate cause of damages to South Dakota Class members.

### COUNT 107 (against all Defendants)

### Nuisance
### S.D. CODIFIED LAWS § 21-10-1 *et seq.*

1237. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1238. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and South Dakota Class members' use of their land by selling PFAS-

infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the South Dakota Class members without disclosing the emissions dangers of PFAS in PFAS-infused products. Defendants' conduct constitutes a nuisance within the meaning of S.D. CODIFIED LAWS § 21-10-1.

1239. Defendants knew that the South Dakota Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the South Dakota Class members.

1240. Defendants' intentional and unreasonable conduct proximately caused the South Dakota Class members to suffer damages, for which the South Dakota Class members seek compensation in this action.

1241. The South Dakota Class members are entitled to abatement of the nuisance caused by Defendants.

**COUNT 108 (against all Defendants)**

**Violation of the South Dakota Deceptive Trade Practices
And Consumer Protection Law
(S.D. CODIFIED LAWS § 37-24-6 *et seq.*)**

1242. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1243. The South Dakota Deceptive Trade Practices and Consumer Protection Law (South Dakota CPL) provides that it is a "deceptive act or practice for any

person to … (1) Knowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise or the solicitation of contributions for charitable purposes, regardless of whether any person has in fact been misled, deceived, or damaged thereby…." S.D. CODIFIED LAWS §§ 37-24-6.

1244. In purchasing their carpets, the South Dakota Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

1245. The South Dakota Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1246. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1247. Defendants knew or should have known that their conduct violated the South Dakota CPL.

1248. Defendants owed the South Dakota Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the South Dakota Class members; and

b.    Intentionally concealed the foregoing from the South Dakota Class members.

1249. Defendants' conduct proximately caused injuries to the South Dakota Class members.

1250. The South Dakota Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1251. Defendants' violations present a continuing risk to the South Dakota Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1252. Under S.D. CODIFIED LAWS § 37-24-31, the South Dakota Class members are entitled to a recovery of their actual damages suffered as a result of Defendants' acts and practices.

32.    **Claims brought on behalf of Class members who installed their carpeting in Tennessee ("Tennessee Class members").**

## COUNT 109 (against all Defendants)

### Strict Products Liability
### (design defect)

1253. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1254. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1255. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Tennessee Class members, who might be foreseeably harmed by PFAS-infused products.

1256. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.    Defendants failed to disclose these threats to carpet manufacturers, Tennessee Class members and the public generally but instead

- 302 -

downplayed and misrepresented the dangers posed by their PFAS products.

1257. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Tennessee Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1258. At all relevant times, Tennessee Class members used their carpets with PFAS-infused products as intended.

1259. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1260. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1261. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1262. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Tennessee Class members have been injured by widespread and toxic PFAS contamination.

1263. These and other acts by Defendants were a direct and proximate cause of damages to Tennessee Class members.

## COUNT 110 (against all Defendants)

### Strict Products Liability
### (failure to warn)

1264. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1265. As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Tennessee Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Tennessee Class members.

1266. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Tennessee Class members of those risks.

1267. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1268. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1269. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1270. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Tennessee Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Tennessee Class members used their carpets with PFAS-infused products as intended.

1271. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of

PFAS to Tennessee Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Tennessee Class members would not have installed the carpets at issue.

1272. These and other acts by Defendants were a direct and proximate cause of damages to Tennessee Class members.

## COUNT 111 (against all Defendants)

### Nuisance

1273. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1274. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Tennessee Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Tennessee Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

1275. Defendants knew that the Tennessee Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Tennessee Class members.

1276. Defendants' intentional and unreasonable conduct proximately caused the Tennessee Class members to suffer damages, for which the Tennessee Class members seek compensation in this action.

1277. The Tennessee Class members are entitled to abatement of the nuisance caused by Defendants.

**33.    Claims brought on behalf of Class members who installed their carpeting in Texas ("Texas Class members").**

**COUNT 112 (against all Defendants)**

**Strict Products Liability**
**(design defect)**

1278. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1279. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1280. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Texas Class members, who might be foreseeably harmed by PFAS-infused products.

1281. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.     PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.     PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.     Defendants failed to disclose these threats to carpet manufacturers, Texas Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1282. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Texas Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1283. At all relevant times, Texas Class members used their carpets with PFAS-infused products as intended.

1284. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their

products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1285. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1286. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1287. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Texas Class members have been injured by widespread and toxic PFAS contamination.

1288. These and other acts by Defendants were a direct and proximate cause of damages to Texas Class members.

## COUNT 113 (against all Defendants)

### Strict Products Liability
### (failure to warn)

1289. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1290. As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and

misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Texas Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Texas Class members.

1291. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Texas Class members of those risks.

1292. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1293. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1294. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1295. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Texas Class members, who would have heeded legally adequate warnings

about the dangers of PFAS products. At all relevant times, Texas Class members used their carpets with PFAS-infused products as intended.

1296. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Texas Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Texas Class members would not have installed the carpets at issue.

1297. These and other acts by Defendants were a direct and proximate cause of damages to Texas Class members.

## COUNT 114 (against all Defendants)

## Nuisance

1298. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1299. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Texas Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-

infused carpets to the Texas Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

1300. Defendants knew that the Texas Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Texas Class members.

1301. Defendants' intentional and unreasonable conduct proximately caused the Texas Class members to suffer damages, for which the Texas Class members seek compensation in this action.

1302. The Texas Class members are entitled to abatement of the nuisance caused by Defendants.

**COUNT 115 (against all Defendants)**

**Violation of the Texas Deceptive Trade
Practices And Consumer Protection Act
(TEX. BUS. & COM. CODE § 17.4 *et seq.*)**

1303. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1304. The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides that "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful…." TEX. BUS. & COM. CODE § 17.46(a). The Texas DTPA further declares that "the term 'false, misleading, or deceptive acts or practices' includes, but is not limited to, the

following acts: several specific actions to be unlawful, including: … (24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed…."

1305. Their PFAS-infused products are "goods" within the meaning of TEX. BUS. & COM. CODE § 17.45(1).

1306. Defendants, Plaintiffs, and the Texas Class members are "persons" within the meaning of TEX. BUS. & COM. CODE § 17.45(3).

1307. Each Plaintiff and each Texas Class member is a "consumer" within the meaning of TEX. BUS. & COM. CODE § 17.41(4).

1308. Defendants committed the acts complained of herein in the course of "trade" and "commerce" within the meaning of TEX. BUS. & COM. CODE § 17.41(6).

1309. In purchasing their carpets, the Texas Class members were deceived by Defendants' knowing failure to disclose that their carpets were treated with PFAS-infused products.

1310. The Texas Class members reasonably relied on Defendants' knowing omissions, and they did not and could not unravel Defendants' deception on their own.

1311. Defendants' knowing concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1312. Defendants knew that their conduct violated the Texas DTPA.

1313. Defendants owed the Texas Class members a duty to disclose the truth about PFAS-infused products because Defendants:

    a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the Texas Class members; and

    b.    Intentionally concealed the foregoing from the Texas Class members.

1314. Defendants' conduct proximately caused injuries to the Texas Class members.

1315. The Texas Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1316. Defendants' violations present a continuing risk to the Texas Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1317. As a direct and proximate result of Defendants' violations of the Texas DTPA, the Texas Class members have suffered injury-in-fact and/or actual damages.

1318. Plaintiffs seek monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages for Defendants' knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

1319. Alternatively, or additionally, pursuant to TEX. BUS. & COM. CODE § 17.50(b)(3) & (4), the Texas Class members are also entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA or which the Court deems proper.

1320. On August 29, 2024, Plaintiffs sent a letter to Defendants complying with TEX. BUS. & COM. CODE ANN. § 17.505.

**34.    Claims brought on behalf of Class members who installed their carpeting in Utah ("Utah Class members").**

**COUNT 116 (against all Defendants)**

**Strict Products Liability
(design defect)**

1321. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1322. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1323. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Utah Class members, who might be foreseeably harmed by PFAS-infused products.

1324. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.    Defendants failed to disclose these threats to carpet manufacturers, Utah Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1325. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to the Utah Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1326. At all relevant times, Utah Class members used their carpets with PFAS-infused products as intended.

1327. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1328. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1329. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1330. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Utah Class members have been injured by widespread and toxic PFAS contamination.

1331. These and other acts by Defendants were a direct and proximate cause of damages to Utah Class members.

**COUNT 117 (against all Defendants)**

**Strict Products Liability
(failure to warn)**

1332. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1333. As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Utah Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Utah Class members.

1334. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Utah Class members of those risks.

1335. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1336. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1337. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1338. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Utah Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Utah Class members used their carpets with PFAS-infused products as intended.

1339. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Utah Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Utah Class members would not have installed the carpets at issue.

1340. These and other acts by Defendants were a direct and proximate cause of damages to Utah Class members.

## COUNT 118 (against all Defendants)

### Nuisance
### UTAH CODE ANN. § 78B-6-1101 *et seq.*

1341. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1342. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Utah Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Utah Class members without disclosing the emissions dangers of PFAS in PFAS-infused products. Defendants' conduct constitutes a nuisance within the meaning of UTAH CODE ANN. § 78B-6-1101(1).

1343. Defendants knew that the Utah Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Utah Class members.

1344. Defendants' intentional and unreasonable conduct proximately caused the Utah Class members to suffer damages, for which the Utah Class members seek compensation in this action under UTAH CODE ANN. § 78B-6-1102.

1345. The Utah Class members are entitled to abatement of the nuisance caused by Defendants. *See id.*

## COUNT 119 (against all Defendants)

### Nuisance
### WASH. REV. CODE ANN. § 7.48.120 *et seq.*

1346. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1347. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Washington Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Washington Class members without disclosing the emissions dangers of PFAS in PFAS-infused products. Defendants' conduct constitutes a nuisance within the meaning of WASH. REV. CODE ANN. § 7.48.120.

1348. Defendants knew that the Washington Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Washington Class members.

1349. Defendants' intentional and unreasonable conduct proximately caused the Washington Class members to suffer damages, for which the Washington Class members seek compensation in this action under WASH. REV. CODE ANN. § 7.48.020.

1350. The Washington Class members are entitled to abatement of the nuisance caused by Defendants. *See id.*

**COUNT 120 (against all Defendants)**

**Violation of Washington Consumer Protection Act**
**(WASH. REV. CODE ANN. § 19.86.010 *et seq.*)**

1351. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1352. The Washington Consumer Protection Act (Washington CPA) broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE. ANN. § 19.96.010.

1353. Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE. ANN. § 19.96.010.

1354. In purchasing their carpets, the Washington Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

1355. The Washington Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1356. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1357. Defendants knew or should have known that their conduct violated the Washington CPA.

1358. Defendants owed the Washington Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the Washington Class members; and

b.    Intentionally concealed the foregoing from the Washington Class members.

1359. Defendants' conduct proximately caused injuries to the Washington Class members.

1360. The Washington Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1361. Defendants' violations present a continuing risk to the Washington Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1362. Defendants are liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under WASH. REV. CODE. ANN. § 19.86.090.

35.    Claims brought on behalf of Class members who installed their carpeting in West Virginia ("West Virginia Class members").

### COUNT 121 (against all Defendants)

### Strict Products Liability
### (design defect)

1363. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1364. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1365. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is not reasonably safe, and they owed that duty to all persons, including the West Virginia Class members, who might be foreseeably harmed by PFAS-infused products.

1366. PFAS-infused products are not reasonably safe for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.    Defendants failed to disclose these threats to carpet manufacturers, West Virginia Class members and the public generally but instead

downplayed and misrepresented the dangers posed by their PFAS products.

1367. At all relevant times, PFAS-infused products were in a defective condition not reasonably safe for the West Virginia Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1368. At all relevant times, West Virginia Class members used their carpets with PFAS-infused products as intended.

1369. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and not reasonably safe for persons and to property.

1370. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1371. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1372. As a direct and proximate result of Defendants' not reasonably safe design of PFAS-infused products, West Virginia Class members have been injured by widespread and toxic PFAS contamination.

1373. These and other acts by Defendants were a direct and proximate cause of damages to West Virginia Class members.

## COUNT 122 (against all Defendants)

### Strict Products Liability
### (failure to warn)

1374. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1375. As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including West Virginia Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to West Virginia Class members.

1376. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and West Virginia Class members of those risks.

1377. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1378. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1379. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1380. Defendants' failure to warn proximately caused reasonably foreseeable injuries to West Virginia Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, West Virginia Class members used their carpets with PFAS-infused products as intended.

1381. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of

PFAS to West Virginia Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the West Virginia Class members would not have installed the carpets at issue.

1382. These and other acts by Defendants were a direct and proximate cause of damages to West Virginia Class members.

## COUNT 123 (against all Defendants)

### Nuisance

1383. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1384. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and West Virginia Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the West Virginia Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

1385. Defendants knew that the West Virginia Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the West Virginia Class members.

1386. Defendants' intentional and unreasonable conduct proximately caused the West Virginia Class members to suffer damages, for which the West Virginia Class members seek compensation in this action.

1387. The West Virginia Class members are entitled to abatement of the nuisance caused by Defendants.

## COUNT 124 (against all Defendants)

### Violation of the West Virginia Consumer Credit And Protection Act
### (W. VA. CODE § 46A-1-101 *et seq.*)

1388. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1389. The West Virginia Consumer Credit and Protection Act (West Virginia CCPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." W. VA. CODE § 46A-6-104. Without limitation, "unfair or deceptive" acts or practices include: "The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby…." W. VA. CODE § 46A-6-102(7)(M).

1390. Each Defendant and each West Virginia Class member is a "person" under W. VA. CODE § 46A-1-102(31).

1391. The West Virginia Class members are "consumers" as defined by W. VA. CODE §§ 46A-1-102(12) and 46A-6-102(2), who purchased carpeting treated with PFAS-infused products.

1392. Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of W. VA. CODE § 46A-6-102(6).

1393. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that carpets purchased by the West Virginia Class members were treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

1394. In purchasing their carpets, the West Virginia Class members were deceived by Defendants' failure to disclose that their carpets were treated with PFAS-infused products.

1395. The West Virginia Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1396. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1397. Defendants knew or should have known that their conduct violated the West Virginia CCPA.

1398. Defendants owed the West Virginia Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to carpeting purchased by the West Virginia Class members; and

b.    Intentionally concealed the foregoing from the West Virginia Class members.

1399. Defendants' conduct proximately caused injuries to the West Virginia Class members.

1400. The West Virginia Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1401. Defendants' violations present a continuing risk to the West Virginia Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1402. Pursuant to W. VA. CODE § 46A-6-106, Plaintiffs seek monetary relief against the Defendants measured as the greater of (a) actual damages in an amount

to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff.

1403. Plaintiffs also seek punitive damages against the Defendants because they carried out despicable conduct with willful and conscious disregard of the rights of others, subjecting Plaintiffs to cruel and unjust hardship as a result.

1404. Plaintiffs further seek restitution, punitive damages, costs of Court, attorney's fees under W. Va. Code § 46A-5-101 *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

1405. On August 29, 2024, Plaintiffs sent a letter to Defendants complying with W. Va. Code § 46A-6-106(b).

**36.    Claims brought on behalf of Class members who installed their carpeting in Wisconsin ("Wisconsin Class members").**

### COUNT 125 (against all Defendants)

### Strict Products Liability
### (design defect)

1406. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1407. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1408. As manufacturers of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous and

not reasonably safe, and they owed that duty to all persons, including the Wisconsin Class members, who might be foreseeably harmed by PFAS-infused products.

1409. PFAS-infused products are unreasonably dangerous and not reasonably safe for their foreseeable uses and misuses because, among other things:

a.     PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.     PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.     Defendants failed to disclose these threats to carpet manufacturers, Wisconsin Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1410. At all relevant times, PFAS-infused products were in a defective condition unreasonably dangerous to (and not reasonably safe for) the Wisconsin Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1411. At all relevant times, Wisconsin Class members used their carpets with PFAS-infused products as intended.

1412. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS, the omission of which renders those products not reasonably safe. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1413. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1414. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1415. As a direct and proximate result of Defendants' unreasonably dangerous and not reasonably safe design of PFAS-infused products, Wisconsin Class members have been injured by widespread and toxic PFAS contamination.

1416. These and other acts by Defendants were a direct and proximate cause of damages to Wisconsin Class members.

**COUNT 126 (against all Defendants)**

**Strict Products Liability
(failure to warn)**

1417. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1418. As manufacturers of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Wisconsin Class members, as well as to all carpets manufacturers who treated their carpets with PFAS-infused products before selling them to Wisconsin Class members.

1419. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn carpet manufacturers, consumers, the public, and Wisconsin Class members of those risks.

1420. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1421. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1422. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1423. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Wisconsin Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Wisconsin Class members used their carpets with PFAS-infused products as intended.

1424. Had Defendants provided adequate warnings regarding the dangers of PFAS to carpet manufacturers who treated carpets with PFAS-infused products, the carpet manufacturers would *not* have treated their carpets with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to Wisconsin Class members about the dangers of carpet treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the Wisconsin Class members would not have installed the carpets at issue.

1425. These and other acts by Defendants were a direct and proximate cause of damages to Wisconsin Class members.

## COUNT 127

### Nuisance
### WIS. STAT. ANN. § 844.01 *et seq.*

1426. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this complaint.

1427. Defendants substantially, intentionally, and unreasonably interfered with Plaintiffs' and Wisconsin Class members' use of their land by selling PFAS-infused products to carpet manufacturers without disclosing the emissions dangers of PFAS in PFAS-infused products, knowing that the carpet manufacturers would sell PFAS-infused carpets to the Wisconsin Class members without disclosing the emissions dangers of PFAS in PFAS-infused products.

1428. Defendants knew that the Wisconsin Class members would suffer dangerous PFAS emissions from those carpets, which emissions would endure over time but did not disclose those dangers to the Wisconsin Class members.

1429. Defendants' intentional and unreasonable conduct proximately caused the Wisconsin Class members to suffer damages, for which the Wisconsin Class members seek compensation in this action under WIS. STAT. ANN. § 844.01.

1430. The Wisconsin Class members are entitled to abatement of the nuisance caused by Defendants. *See id.*

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.      Certification of the proposed Class and appointment of Plaintiffs' counsel as Class Counsel;

B.      Damages, including punitive damages and disgorgement, in an amount to be determined at trial, but monetary relief under certain consumer protection statutes shall be limited before completion of notice requirements alleged above;

C.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

D.      An award of costs and attorneys' fees; and

E.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: August 30, 2024              Respectfully Submitted,


                                    By: /s/ Rebecca A. Peterson
                                          Rebecca A. Peterson, #392663
                                    LOCKRIDGE GRINDAL NAUEN PLLP
                                    100 Washington Avenue South, Suite 2200
                                    Minneapolis, MN 55401
                                    Telephone: (612) 596-4019
                                    rapeterson@locklaw.com

Steve W. Berman
Craig R. Spiegel
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
craigs@hbsslaw.com

Jeannie Evans
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
jeannie@hbsslaw.com

***Attorneys for Plaintiffs and the Proposed Class***