# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Vicki Peterson and Paul Sadeghi, *individually and on behalf of all others similarly situated*,

        Plaintiffs,

v.

3M Company, EIDP, Inc., and the Chemours Company,

        Defendants.

File No. 24-CV-03497 (JMB/DLM)

**ORDER**

---

Rebecca A. Peterson, George Feldman McDonald, PLLC, Bloomington MN; Brian D. Clark, Lockridge Grindal Nauen PLLP, Minneapolis, MN; Steve W. Berman (*pro hac vice*) and Craig R. Spiegel (*pro hac vice*), Hagens Berman Sobol Shapiro LLP, Seattle, WA; Jeannie Evans (*pro hac vice*), Hagens Berman Sobol Shapiro LLP, Chicago, IL; and Abigail Pershing (*pro hac vice*), Hagens Berman Sobol Shapiro LLP, Pasadena, CA, for Plaintiffs.

Benjamin W. Hulse, Norton Rose Fulbright US LLP, Minneapolis, MN; Lauren R. Goldman (*pro hac vice*), Gibson, Dunn & Crutcher LLP, New York, NY; Timothy C. Loose (*pro hac vice*), Gibson, Dunn & Crutcher LLP, Los Angeles, CA; Ashley E. Johnson (*pro hac vice*), Gibson, Dunn & Crutcher LLP, Dallas, TX; and Gregg Costa (*pro hac vice*), Gibson, Dunn & Crutcher LLP, Houston, TX, for Defendant 3M Company.

Arthur G. Boylan and Ryan Matthew Lawrence, Anthony Ostlund Louwagie Dressen & Boylan P.A., Minneapolis, MN; Benjamin W. Hulse, Norton Rose Fulbright US LLP, Minneapolis, MN; Andrew D. Carpenter (*pro hac vice*), Amy M. Crouch (*pro hac vice*), and Brent Dwerlkotte (*pro hac vice*), Shook, Hardy & Bacon, LLP, Kansas City, MO, for Defendants EIDP, Inc. and The Chemours Company.

---

This matter is before the Court on Defendants 3M Company's (3M), EIDP, Inc.'s (Old DuPont), and the Chemours Company's (Chemours) (together, Defendants) motion to dismiss Plaintiffs Vicki Peterson's and Paul Sadeghi's Class Action Complaint. (Doc.

1

No. 25.)  For the reasons explained below, the Court grants the motion to dismiss and dismisses this action.

## BACKGROUND

### A.      PFAS-Treated Carpets

Per- and polyfluoroalkyl substances (PFAS), commonly referred to as "forever chemicals," are a group of thousands of human-made chemicals that have a unique chemical structure that make them resistant to degradation in the environment and difficult for the body to metabolize and excrete.  (Doc. No. 1 [hereinafter, "Compl."] ¶¶ 2, 33, 35, 36.)

The Complaint includes allegations that beginning in the early 1980's, PFAS have been used to make carpets and rugs resistant to stains, soil, and grease.  (*Id.* ¶ 44.)  In addition, the Complaint quotes from a report prepared by the California Department of Toxic Substances Control designating PFAS as "a priority product."  (Compl. ¶¶ 42-53.) [1] The Complaint includes portions of the DTSC Report that refer to a 2017 presentation by

---

[1] The Complaint includes more than fifty citations and sections pasted verbatim from this report.  (Compl. ¶¶ 42-53 (citing Chemical Profile for Carpets and Rugs Containing PFAS, available    at    https://dtsc.ca.gov/wp-content/uploads/sites/31/2023/01/Final_Product-Chemical_Profile_Carpets_Rugs_PFASs_a.pdf [hereinafter DTSC Report]).)  Indeed, the only paragraphs in the Complaint on which Plaintiffs rely to establish the injury-in-fact requirement of Article III standing are copied verbatim from the DTSC Report.  The report itself cautions readers, however, that the California agency "is not asserting that [PFAS] cannot be used safely."  (DTSC Report at 5.)  Rather, the report "indicates only that there is a potential for people or the environment to be exposed to [PFAS]; that such exposure has the potential to cause or contribute to significant or widespread adverse impacts; and that safer alternatives should be explored."  (*Id.*)  Given these caveats, the Court is concerned that the DTSC Report cannot confer standing to bring the claims at issue without additional, specific allegations.

Joe Yarbrough on behalf of the Carpet and Rug Institute, an industry trade association representing carpet manufacturers in the United States. During the presentation, Yarbrough stated that "most residential and commercial carpets are treated" with PFAS-based stain- and soil-repellants. (*Id.* ¶¶ 44, 67 (quoting DTSC Report at 14).)[2] No further information is provided in the Complaint about Yarbrough's presentation or the basis for his statements. The Complaint also copies verbatim from the DTSC Report an explanation that "PFAS-containing treatments can be applied to carpets at four different stages" including "during the manufacturing of the carpet fibers," "during the carpet and rug manufacturing process," "after the carpet and rug manufacturing process, at a separate finishing facility or in stores at the time of sale," and "postsale of the carpet or rug by consumers or professional cleaners." (*Id.* ¶ 44.) The Complaint also includes portions of the DTSC Report regarding the possible adverse health effects of exposure to PFAS-treated carpets. (*Id.* ¶¶ 4–6, 54, 59–60, 62, 69, 79–80.)

The Complaint also explains that by 2008, the carpet industry eliminated treatments based on long-chain PFASs from production in the United States (*id.* ¶ 81), and that companies replaced these long-chain PFASs with shorter-chain compounds, which the Complaint alleges are also unsafe (*id.* ¶¶ 180–93). In 2018, the Green Science Policy Institute held a workshop "for the carpet industry to educate them about the PFAS problem

---

[2] The Complaint also includes another verbatim quote from the DTSC Report regarding the prevalence of PFAS products in carpets, although the DTSC did not cite or directly attribute this statement to the Yarbrough or the Carpet and Rug Institute: "most commercial and residential carpets and rugs sold in the U.S. are treated with PFAS to provide resistance to soil and to oil- or water-based stains." (DTSC Report at 15, *quoted in* Compl. ¶ 45.)

and brainstorm solutions." (*Id.* ¶ 16.) Those in attendance included representatives of carpet companies that produced about ninety percent of carpets and rugs sold in the United States. (*Id.*) Following the workshop, the carpet companies all agreed to phase out all products treated with PFAS (*id.* ¶ 17), although the Complaint alleges that PFAS exposure continues because carpets have a lifespan of up to twenty years. (*Id.* ¶ 78.)

### B.    The Parties

Peterson and Sadeghi are Minnesota residents who purchased carpet from Home Depot in 2012 and 2017. (Compl. ¶¶ 28, 29.) They purchased the carpet for use in their homes, and the carpet remains in their homes. (*Id.*) 3M is a Delaware corporation, with its principal place of business in Minnesota, that manufactured, distributed, and sold PFAS products. (*Id.* ¶ 30.) Old DuPont is a Delaware corporation, with its principal place of business in Delaware, that has produced and sold PFAS products since the 1950s. (*Id.* ¶ 31.) Chemours is a Delaware corporation, with its principal place of business in Delaware, that spun off from Old DuPont in 2015 to operate Old DuPont's performance chemicals business and take on vast environmental liabilities, including those related to PFAS. (*Id.* ¶ 32.)

According to Plaintiffs' Complaint, Defendants and non-party Daikin America, Inc. (Daikin), manufactured, distributed, marketed, and/or sold stain and soil repellants that contained PFAS products and that these products "were applied by carpet manufacturers and others to all or virtually all carpets manufactured in the United States before carpet manufacturers stopped incorporating PFAS into their carpet products in 2020." (*Id.* ¶ 7.) Defendants and Daikin knew that their PFAS products contained PFAS and that PFAS is

"extremely dangerous to health, property, and the environment," but they intentionally did not disclose these dangers to carpet manufacturers, retailers, consumers, or anyone else. (*Id.* ¶¶ 7–9.)  Rather, the Complaint alleges that they collaborated to conceal the truth so that they all could continue profiting.  (*Id.* ¶¶ 9, 266.)

### C.    This Action

In August 2024, Plaintiffs filed this lawsuit, raising 127 claims on behalf of themselves and the class, which includes "[a]ll persons who purchased carpeting and had it installed before January 1, 2020, in the United States . . . who still own the building in which the carpeting was installed and have not removed the carpeting."  (Compl. ¶¶ 233–241.)  Specifically, they allege civil violations of the Racketeering Influenced and Corrupt Organizations Act (RICO) (Count 1); conspiracy to commit various state-law torts (Count 2), and 125 state-law claims under the laws of Minnesota and thirty-five other states.  The state-law claims largely fall into four categories: (1) design defect, (2) failure to warn, (3) nuisance, and (4) violations of consumer protection statutes (Counts 3–127).  Plaintiffs allege that they have been "injured due to the property damage caused by the carpet emitting PFAS in [their] household[s] and by buying a product [they] never would have if [they] had known about the PFAS." (Compl. ¶¶ 28–29.)

### DISCUSSION

Defendants now move to dismiss the Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(1) for lack of standing and Rule 12(b)(6) for failure to state a claim.  (Doc. No. 25.)  Because the Complaint does not include adequate factual allegations

concerning Plaintiffs' injury and the connection between any injury and Defendants' conduct, the Court grants the motion to dismiss pursuant to Rule 12(b)(1).

## I.    ARTICLE III STANDING

Article III of the United States Constitution limits federal jurisdiction to actual cases or controversies.  U.S. Const. art. III, § 2, cl. 1; *Spokeo v. Robins*, 578 U.S. 330, 337–38 (2016).  When assessing Article III standing at the pleading stage, courts consider whether a plaintiff has "clearly allege[d] facts" that demonstrate the following three elements: (1) the plaintiff has suffered an injury in fact; (2) the claimed injury is "fairly traceable" to the defendant's alleged conduct; and (3) the relief sought will redress the claimed injury. *Alleruzzo v. SuperValu, Inc. (In re SuperValu, Inc. Customer Data Sec. Breach Litig.)*, 870 F.3d 763, 768 (8th Cir. 2017) (citing *Spokeo*, 578 U.S. at 338).  In a putative class action, "federal courts lack jurisdiction if no named plaintiff has standing."  *Frank v. Gaos*, 586 U.S. 485, 492 (2019); *see also, e.g.*, *In re Milk Products Antitrust Litig.*, 195 F.3d 430, 436 (8th Cir. 1999) (explaining that because the plaintiff's individual claim was properly dismissed for lack of standing, it was not a member of the class and could not represent the class.).

### A.    Injury in Fact

To establish injury in fact, a plaintiff must show that he suffered an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339.  Concrete injuries include "traditional tangible harms, such as physical harms and monetary harms."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424–25 (2021).  Such injuries must be real and not abstract.  *Spokeo*, 578 U.S. at 339.

"Particularized" injuries must "affect the plaintiff in a personal and individual way." *Id.* (quotation omitted). Speculative claims about potential risks do not satisfy the requirement for a concrete injury. *See Forrest v. Polaris Indus. (In re Polaris Mktg., Sales Practices, & Prods. Liab. Litig.)*, 9 F.4th 793, 797 (8th Cir. 2021) (concluding that the plaintiffs failed to allege an injury in fact because they asserted "nothing more than the existence of a defect in a product line or ownership of a product that is at risk for manifesting a defect"). Where there is no "particularized reason to think the consumers' [product] actually exhibited the alleged . . . defect, the consumers lack Article III standing." *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014).

In this case, the Complaint contains inadequate factual allegations to support a reasonable and plausible inference that Plaintiffs have experienced an injury in fact. In particular, Plaintiffs never allege that the carpet they purchased actually has been treated with PFAS products. Instead, the Complaint repeats a sentence taken from the DTSC Report quoting the statement that Yarbrough, on behalf of the Carpet and Rug Institute, made during the 2017 presentation: that "'most residential and commercial carpets are treated' with PFAS-based stain and soil repellents." (Compl. ¶¶44, 67.) The quote from Yarbrough's presentation, however, does not show that either of the Plaintiffs purchased carpets that have been treated with PFAS products, and there are no allegations in the Complaint concerning the inventory of carpets at Home Depot at the time that Plaintiffs purchased the carpets at issue. More importantly, the word "most" cannot support a reasonable inference that Plaintiffs' carpets were treated with PFAS products because most

could mean, at its most limited, a mere majority (50% plus one).[3]  Absent an allegation that

the Plaintiffs' carpets were treated with PFAS products, Plaintiffs lack standing.[4]

## B.    Traceability

Under the traceability element, "[t]here must be a causal connection between the

injury and the conduct complained of"—that is, "the injury has to be fairly traceable to the

challenged action of the defendant, and not the result of the independent action of some

third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see*

*also Agreed Found. v. U.S. Army Corps of Eng'rs*, 3 F.4th 1069, 1073 (8th Cir. 2021)

(requiring a "direct causal connection").  Traceability must be shown for each defendant.

*Murthy v. Missouri*, 603 U.S. 43, 61 (2024).

In this case, Plaintiffs have not plausibly alleged traceability.  While some of

Plaintiffs' allegations suggest that Defendants played a prominent role as producers of

---

[3] Another paragraph alleges something similar: that "most commercial and residential carpets and rugs sold in the U.S. are treated with PFASs." (Compl. ¶ 45.)  This is not attributed to Yarbrough or any other source, but is a statement copied verbatim from the DTSC Report.  (DTSC Report at 15.)  This statement falls short of what is required for Article III standing for the same reason that the statements in paragraphs 44 and 67 are insufficient: the use of the word "most," without any additional allegations concerning whether Plaintiffs' carpets were treated with PFAS products, is not sufficient to establish an injury in fact.

[4] One additional paragraph makes a more sweeping allegation, but only about carpets manufactured in the United States: "PFAS products sold by Defendants and Daikin were applied by carpet manufacturers and others to all or virtually all carpets manufactured in the United States."  (Compl. ¶ 7.)  This statement cannot salvage standing, however, because in addition to being inconsistent with the references to "most residential and commercial carpets" used elsewhere in the Complaint, it only applies to carpets manufactured in the United States.  Absent any allegations concerning the location of the manufacturers of the carpet inventory at Home Depot at the time of purchase, this statement does not plausibly allege that Plaintiffs' carpets were treated with PFAS products.

PFAS that were used in the carpet industry before 2020 (Compl. ¶¶ 30–32), other allegations acknowledge that Defendants were not the only entities responsible for developing, selling, or using PFAS products.  In fact, Daikin is listed as a "non-defendant" producer of PFAS products and referenced more than sixty times in the Complaint.  Even assuming that the Complaint contained allegations that Plaintiffs' carpets were treated with PFAS products, none of the allegations in the Complaint trace any potential injury to Defendants' products, as opposed to the products developed by Daikin or other nonparties. For instance, the quote attributed to Yarbrough at the 2017 presentation does not specify what company or companies developed or sold the PFAS products to which he is referring when he said that "'most residential and commercial carpets are treated' with PFAS-based stain and soil repellents.  (*Id.* ¶¶ 44, 67.)  Likewise, the Complaint does not distinguish between Defendants' products and Daikin's or any other entity that also developed or sold PFAS products when it alleges that "most commercial and residential carpets and rugs sold in the U.S. are treated with PFASs to provide resistance to soil and to oil- or water-based stains." (*Id.* ¶ 45.)  This is also explicitly clear in paragraph 7, which includes an allegation that groups Defendants together with Daikin: "PFAS products sold by Defendants and Daikin were applied by carpet manufacturers and others to all or virtually all carpets manufactured in the United States."  (*Id.* at 7.)[5]  Finally, the Complaint contains several

---

[5] The Court also observes that the Complaint contains allegations (again, copied verbatim from the DTSC Report) that there are four different points at which PFAS products can be applied to carpets, including by retail stores at the time of sale and "post-sale of the carpet or rug by consumers or professional cleaners."  (Compl. ¶ 44 (quoting without reference DTSC Report at 14).)  Allegations that include the possibility that consumers, like Plaintiffs, might have applied PFAS product—including those made by nonparties or

allegations regarding the "ubiquitous" nature of PFAS. (*E.g.*, Compl. ¶¶ 3, 58.) These allegations, especially absent any statements plausibly pleading that Plaintiffs' carpets were treated with PFAS products, undermine traceability because Plaintiffs' PFAS exposure could be related to the conduct of parties other than the named Defendants.

In sum, Plaintiffs have failed to allege Article III standing because they have not plausibly alleged an injury in fact or traceability.

## II.    REMAINING ARGUMENTS

The Court need not analyze the remaining arguments Defendants raise in support of their motion to dismiss. Nevertheless, the Court notes its concern that the Complaint contains inadequate factual allegations to establish standing to bring a RICO claim and to establish the elements of the federal RICO claim as well as the elements of the Minnesota common law claims of nuisance, design defect; and failure to warn listed in the Complaint.

First, many courts have held that persons who did not purchase the product at issue directly from the alleged antitrust violator lack standing to assert RICO claims. *E.g.*, *Apple Inc. v. Pepper*, 587 U.S. 273, 281–82 (2019) (acknowledging the "bright-line rule" established in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) that bars those "who are two or more steps removed from the [antitrust] violator in a distribution chain" from suing for antitrust damages); *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 612–14 (6th Cir. 2004) ("While indirect purchasers lack standing under RICO and the antitrust laws to sue for overcharges passed on to them by middlemen, direct purchasers do have standing."

---

companies located outside of the United States—defeat standing because such conduct is not traceable to Defendants.

(citation omitted)); *see also McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 844 (3d Cir. 1996) (holding the plaintiffs lacked standing to bring a RICO treble-damages claim because they were not "direct purchasers," as required by *Illinois Brick*); *Carter v. Berger*, 777 F.2d 1173, 1176 (7th Cir. 1985) ("We conclude that [under RICO] the directly injured party should receive a complete recovery, no matter what; an indirectly injured party should look to the recovery of the directly injured party, not to the wrongdoer, for relief."); *Int'l Bhd. Of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris*, 196 F.3d 818, 823–26 (7th Cir. 1999); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1169 (9th Cir. 2002) (observing in a non-indirect purchaser case that "potential plaintiffs who have suffered 'passed-on' injury—that is, injury derived from a third party's direct injury—lack statutory [RICO] standing"); *cf. Newton v. Tyson Foods, Inc.*, 207 F.3d 444, 447 (8th Cir. 2000) (declining to expressly rule on the indirect purchaser standing issue, but "observ[ing] that all the reasons that antitrust standing is limited to those directly injured apply with especially great force . . . where there are many intermediaries and many potential causes . . . in the chain of causation between the remotely positioned [Plaintiffs] and [Defendant]'s alleged acts"). Here, Plaintiffs explain that they purchased their carpets from Home Depot, not directly from Defendants. (Compl. ¶¶ 28, 29.) These allegations suggest "many intermediaries and many potential causes" of the claimed harm, *see Newton*, 207 F.3d at 447, and absent additional factual allegations concerning the chain of commerce leading up to Plaintiffs' purchases, the indirect-purchaser rule likely bars Plaintiffs' RICO claim.

In addition, the Court is concerned that the Complaint does not contain sufficient allegations to state a RICO claim. To plead a viable RICO claim, a plaintiff must allege

that the defendant "engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *H & Q Props., Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (quotation omitted). These elements must be plead with particularity when the alleged racketeering activity involves fraud, *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011), and must be plead with respect to each defendant individually, *Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008). A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). This broad definition encompasses "association-in-fact" enterprises— "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S 938, 947 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). An association-in-fact enterprise must have "at least three structural features: [1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. Under this framework, a plaintiff must plead that the alleged RICO enterprise had "an ascertainable structure distinct from the conduct of a pattern of racketeering." *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 354 (8th Cir. 2011) (quoting *United States v. Lee*, 374 F.3d 637, 647 (8th Cir. 2004)). "Whether the enterprise has a structure that is distinct from the pattern of racketeering activity turns on whether the enterprise would still exist if the racketeering activity were absent." *Ill. Farmers Ins. Co. v. Mobile Diagnostic Imaging, Inc.*, No. 13-CV-2820 (PJS/TNL), 2014 WL 4104789, at *14 (D. Minn. Aug. 19, 2014); *see also McDonough v. Nat'l Home Ins. Co.*, 108 F.3d 174,

177 (8th Cir. 1997) (explaining that "the common activities of the enterprise [must] extend beyond the minimal association necessary to sustain the pattern of racketeering"). A plaintiff must also plead that the alleged enterprise "functioned together as a coherent unit." *Nelson v. Nelson*, 833 F.3d 965, 968 (8th Cir. 2016). The Complaint contains few detailed and nonconclusory allegations sufficient to satisfy the requirement of particularity concerning the enterprise and pattern-of-racketeering elements of a RICO claim.

Likewise, the Complaint contains few specific allegations to establish the element of causation, which is required for the Minnesota common law claims of nuisance, design defect, and failure to warn. *See Johnson v. Consumers Coop. Ass'n of Litchfield*, No. A18-0517, 2019 WL 1233263, at *2 (Minn. Ct. App. Mar 18, 2019) (citing *Highview N. Apartments v. Ramsey Cnty.*, 323 N.W.2d 65, 70 (Minn. 1982) ("[T]here must be some kind of conduct causing the nuisance harm."); *see also Adams v. Toyota Motor Corp.*, 867 F.3d 903, 971 (8th Cir. 2017) (explaining that a design defect claim brought under Minnesota law requires, among other things, proof that "the defect was the proximate cause of plaintiffs' injuries"); *Michel v. Minn-Dak Co.*, No. C8002-1082, 2002 WL 31689352, at *2 (Minn. App. Dec. 3, 2002) (setting forth that "[t]o prevail on a claim of failure to warn, a plaintiff must establish," among other things, that "the lack of an adequate warning caused the plaintiff's injuries" (citing *Erickson v. Amer Honda Motor Co., Inc.*, 455 N.W.2d 74, 77–78 (Minn. App. 1990), *review denied*, (Minn. July 13, 1990)). A plaintiff fails to establish proximate cause where "the connection between the defendant's conduct and the plaintiff's injury [i]s too attenuated." *Montemayor v. Sebright Prods.*, 898 N.W.2d 623, 629–30 (Minn. 2017). The Complaint does not include any allegations that Plaintiffs'

carpet was treated with PFAS products, undermining the conclusory allegations of causation.[6]

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    Defendants' Motion to Dismiss (Doc. No. 25) is GRANTED;

2.    This action is DISMISSED WITHOUT PREJUDICE.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  September 30, 2025                              /s/ *Jeffrey M. Bryan*
                                                       Judge Jeffrey M. Bryan
                                                       United States District Court

---

[6] A complaint that fails to plausibly plead causation also fails to plead civil conspiracy.  *See Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 986–87 (8th Cir. 2008) (explaining that, under Minnesota law, a conspiracy claim must be supported by an underlying tort).